UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

| | | |
|---|---|---|
| LOCAL 295 IBT EMPLOYER GROUP WELFARE FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 2:22-cv-02432-EFM-ADM |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | **AMENDED COMPLAINT FOR** |
| vs. | ) ) | **VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| COMPASS MINERALS INTERNATIONAL, INC., FRANCIS J. MALECHA, JAMES D. STANDEN, and ANTHONY J. SEPICH | ) ) ) ) | |
| Defendants. | ) ) | <u>DEMAND FOR JURY TRIAL</u> |
| | ) ) | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   JURISDICTION AND VENUE .............................................................................6

III.  PARTIES ................................................................................................................6

IV.   DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF BUSINESS................8

    A.   Compass Minerals Plans to Reduce Costs by Upgrading Its Technology..............8

    B.   CMCH Fails to Meet Compass Minerals' Expectations...........................................9

    C.   In April 2017, Compass Minerals Revises Its Internal Estimates for
          CMCH Cost-Savings ...........................................................................................11

    D.   In May 2017, Defendants Knowingly Misrepresent the Expected Cost-
          Savings from the CMCH Upgrade at Goderich ......................................................13

    E.   Defendants Continue to Misrepresent the Expected Cost-Savings from the
          CMCH Upgrade at Goderich Throughout the Second Half of 2017 ....................14

    F.   Defendants Misrepresent Compass Minerals' Realized Cost Savings from
          CMCH .....................................................................................................................16

    G.   Defendants Misrepresent Goderich's Annual Production Capacity .....................18

    H.   Defendants Misrepresent the Reasons for Compass Minerals' Increased
          Costs and Production Constraints .........................................................................19

    I.    Defendants Misrepresent Current Salt Production Levels....................................20

    J.    Defendants Fail to Disclose Material Trends Relating to Compass
          Minerals' Salt Production, in Violation of Item 303 of Regulation S-K .............22

V.    MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING
      THE CLASS PERIOD...........................................................................................25

VI.   THE TRUTH EMERGES.....................................................................................47

VII.  ADDITIONAL SCIENTER ALLEGATIONS.....................................................50

VIII. LOSS CAUSATION AND ECONOMIC LOSS ..................................................54

IX.   NO SAFE HARBOR ............................................................................................55

X.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE ...........................56

**Page**

XI.  CLASS ACTION ALLEGATIONS ..................................................................58

XII.  COUNTS ...........................................................................................................59

COUNT I ........................................................................................................................59

For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All
  Defendants ..........................................................................................................59

COUNT II .......................................................................................................................62

For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ............62

XIII.  PRAYER FOR RELIEF ....................................................................................63

XIV.  JURY DEMAND ...............................................................................................64

Court-appointed Lead Plaintiff Retail Wholesale Department Store Union Local 338 Retirement Fund ("Lead Plaintiff") and additional plaintiff Local 295 IBT Employer Group Welfare Fund (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters based upon the investigation undertaken by their counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Compass Minerals International, Inc. ("Compass Minerals" or the "Company"), press releases, analyst and media reports, and other public reports and information about the Company, including the:

> Order Instituting Cease-and-[Desist] Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order, in *In the Matter of Compass Minerals International, Inc.*, S.E.C. Release No. 4340, Securities Act Release No. 11107, Securities Exchange Act Release No. 95889, 2022 WL 4445488 (Sept. 23, 2022) (the "SEC Order").

Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This is a federal securities class action on behalf of purchasers of Compass Minerals common stock between October 31, 2017 and November 18, 2018, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    Compass Minerals mines and produces essential minerals, including salt for winter roadway safety and other consumer, industrial, and agricultural uses, and specialty plant nutrition minerals that improve the quality and yield of crops. During the Class Period, the Company operated three business segments: the Salt segment, the Plant Nutrition North America segment, and

the Plant Nutrition South America segment.  The Salt segment represented approximately 60% of the Company's consolidated revenues during the Class Period.  The Company's Salt products are used in a wide variety of applications, including as a de-icer for roadways, consumer and professional use, as an ingredient in chemical production, for water treatment, human and animal nutrition, and for a variety of other consumer and industrial uses.

3.      Within the Salt segment, Compass Minerals operates the largest underground rock salt mine in the world in Goderich, Ontario, Canada ("Goderich" or the "Goderich mine"), which the Company hails as the "crown jewel" of its asset portfolio.  The Goderich mine accounted for approximately one-third of the Company's earnings during the Class Period.

4.      Prior to the start of the Class Period, Defendants (defined below) announced that the Company was investing in upgrades to the mining system at Goderich—moving from traditional "drilling-and-blasting," to continuous mining and continuous haulage ("CMCH"), which uses complex machinery to cut salt from the face of the rock and transport it for processing.  The upgrade to CMCH was primarily intended to reduce costs and improve profitability.  In late 2014, the Company forecasted the project would cost $70-to-$80 million and, after it was fully implemented, would reduce the unit cost at Goderich by over 23%—saving the Company approximately $30 million annually, beginning in 2018.

5.      During 2016 and 2017, however, Compass Minerals experienced a number of problems with the implementation of CMCH, which caused the project to fall far short of the assumptions on which this cost-savings model was based.  Although the $30 million cost-savings model was premised on Goderich producing 7.5 million tons of salt per year, during 2016, the CMCH equipment produced only about 1.4 million tons of salt.  These shortfalls caused Compass Minerals to incur significant expenses, including for purchasing salt from third parties, and for

shipping salt from its mine in Louisiana to northern markets typically served by Goderich. And while Compass Minerals had projected that unit costs at Goderich would begin to decline by the first quarter of 2017 ("1Q17"), they instead increased by more than 42%.

6.    During the first three operating months of 2017, the CMCH system at Goderich was still producing less than half of the salt needed to attain the $30 million in annual savings. Moreover, the installation of an additional CMCH machine that Compass Minerals was relying on to increase production was about nine months behind schedule. The CMCH equipment that had been installed was also taking significantly longer to ramp up than Compass Minerals had expected.

7.    These issues prompted Compass Minerals to reevaluate its $30 million cost-savings projection in April 2017. When it did so, the Company concluded that even if the CMCH equipment could produce 7.5 million tons of salt annually, the direct annual savings from CMCH would only be approximately $18 million. Compass Minerals' employees and executives—including the Chief Executive Officer ("CEO"), Defendant Francis J. Malecha ("Malecha")—reviewed the new forecast and determined that the Company would nonetheless continue to tell investors that it expected CMCH to generate $30 million in annual cost savings. Thereafter, Defendants reiterated the $30 million cost-savings forecast on numerous occasions, even as they received periodic internal reports showing that Goderich was continuing to fall short of the production levels underlying the cost-savings model.

8.    On February 14, 2018, Defendants told investors that the $30 million annual cost-savings from CMCH would not be attained until 2019, rather than in 2018—but still reaffirmed that CMCH would ultimately save Compass Minerals $30 million per year. At the same time, Defendants falsely attributed the delayed savings to a "ceiling fall" incident at the Goderich mine in September 2017, as well as salt "quality issues" that they blamed on the mine's geology, but which

- 3 -

were actually due in part to the CMCH equipment producing salt that was finer than the salt previously produced by drill-and-blast mining.

9.      Defendants also falsely stated that CMCH had "already achieved about $5 million of savings in 2017," although internal documents showed that CMCH had enabled the Company to reduce costs by just $1.1 million in 2017—and even those savings were more than offset by higher expenses at Goderich related to CMCH.  Also in February 2018, Defendants reported that Goderich's "annual production capacity" was eight million tons of salt—at a time when the CMCH system was not capable of mining close to that amount.

10.      On May 2, 2018, Defendants continued to blame the ceiling fall for disappointing Salt segment results—claiming that it had reduced Compass Minerals' earnings for the first quarter of 2018 ("1Q18") by $20 million.  In fact, the direct costs related to the ceiling fall incident had reduced Compass Minerals' 1Q18 earnings by just $3 million, while other $17 million was due to continuing operational issues at Goderich.

11.      On August 6, 2018, Defendants disclosed "production constraints" at Goderich, but again falsely blamed a one-time event—this time, a recent labor strike at the mine.  In truth, just **20%** of the 2017 production shortfall at Goderich was due to the ceiling fall, and just **31%** of the 2018 production shortfall was due to the strike—while the remainder of the production shortfalls in both 2017 and 2018 were due to the underperformance of the CMCH system.

12.      On September 12, 2018, Defendants falsely represented that Goderich was "about 75% of the way to" its targeted production rate of 600,000 tons per month—indicating that the mine was currently producing about 450,000 tons of salt per month—although internal production reports showed that Goderich was on pace to produce less than 225,000 tons of salt that month.

13.     From May through September 2018, Defendants also repeatedly stated that Compass Minerals had "realized" approximately $15 million in annualized cost-savings in the Salt segment, without disclosing that these savings were more than offset by higher expenses at Goderich related to CMCH.

14.     Then, on October 23, 2018, investors discovered that CMCH was not, in fact, generating *any* cost-savings for Compass Minerals.  That day, the Company disclosed that lower-than-expected production rates at Goderich had resulted in an estimated "negative impact of $15 million to third-quarter 2018 Salt segment earnings"—wiping out the $15 million in annualized savings that Compass Minerals had "realized" in the Salt segment to-date.  In response to this news, the price of Compass Minerals common stock fell more than 30% over the following two trading days.

15.     On November 19, 2018, the Company announced the abrupt termination of Defendant Malecha—which analysts attributed "to the severity of the issues at Goderich . . . ."  In response to this announcement, the price of Compass Minerals common stock fell nearly 8% over three trading days.

16.     The Goderich mine ultimately produced less than four million tons of salt in 2018, at a unit cost that was more than double what unit costs had been at the mine before Compass Minerals began the CMCH project four years earlier.

17.     On November 6, 2019, Compass Minerals revealed that the SEC was "investigating the Company's disclosures concerning the operation of the Goderich mine."  Following a multi-year investigation, on September 23, 2022, the SEC announced settled charges against Compass Minerals for, *inter alia*, misleading investors about its operations at Goderich.  The SEC announced that the Company would pay $12 million to settle the charges, and had agreed "to cease and desist from

further violations" of the federal securities laws. The same day, the SEC Order was published, which contained detailed factual findings by the SEC. The SEC Order apprised Plaintiffs and members of the Class (defined below) for the first time of Defendants' knowing or reckless misrepresentations and omissions during the Class Period.

## II. JURISDICTION AND VENUE

18. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

20. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District. Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District. In addition, the Company's principal executive offices are located in this District.

21. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## III. PARTIES

22. As set forth in its Certification previously filed with the Court and incorporated herein by reference, Lead Plaintiff Retail Wholesale Department Store Union Local 338 Retirement Fund purchased Compass Minerals common stock during the Class Period, and suffered damages as a result of the violations of the federal securities laws alleged herein. *See* ECF 6-3.

23.     As set forth in its Certification previously filed with the Court and incorporated herein by reference, additional Plaintiff Local 295 IBT Employer Group Welfare Fund purchased Compass Minerals common stock during the Class Period, and suffered damages as a result of the violations of the federal securities laws alleged herein. *See* ECF 4.

24.     Defendant Compass Minerals is a Delaware corporation headquartered in Overland Park, Kansas. Compass Minerals common stock trades on the NYSE under the symbol "CMP."

25.     Defendant Malecha served as CEO, President, and a Director of Compass Minerals from 2013 until November 19, 2018, when the Company announced that he was stepping down from those roles, effective immediately.

26.     Defendant James D. Standen ("Standen") served as Chief Financial Officer ("CFO") of Compass Minerals beginning on August 3, 2017. Prior to that date, Standen served as Interim CFO beginning on April 25, 2017, and, before holding that position, he served as Vice President, Finance and Treasurer.

27.     Defendant Anthony J. Sepich ("Sepich") served as Senior Vice President of Compass Minerals' Salt segment from November 2016 until July 17, 2019, when Compass Minerals announced his abrupt departure from the Company, as part of its "organizational changes."

28.     Defendants Malecha, Standen, and Sepich are collectively referred to herein as the "Individual Defendants" and, together with Compass Minerals, as "Defendants."

29.     During the Class Period, the Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's SEC filings, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their

issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV.    DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF BUSINESS

### A.    Compass Minerals Plans to Reduce Costs by Upgrading Its Technology

30.    In late 2014, Compass Minerals' Board of Directors (the "Board") approved a multi-year project aimed at reducing the unit cost of salt mined at Goderich by upgrading the mine's equipment. The Company planned to convert Goderich from traditional "drill-and-blast" mining to a CMCH system. CMCH uses complex machinery to cut salt and transport it for processing on flexible conveyor trains, as depicted in the following images:



31.     At that time, Compass Minerals forecasted that the project would cost $70-to-$80 million and, after it was fully implemented, would reduce the unit cost of salt mined at Goderich by over 23%.  This unit cost reduction was expected to save the Company approximately $27 million per year, beginning in 2018.

32.     Critically, the Company's projections assumed that Goderich would produce 7.5 million tons of salt per year utilizing CMCH.  Due to the economics of salt mining, unit cost increases as volume declines—other factors being equal.  Therefore, production volume was a key variable in Compass Minerals' ability to reduce its unit cost, and thereby achieve the expected cost savings.

33.     During an earnings call in April 2015, Defendant Malecha told investors that the Company would save "roughly about" $30 million annually, beginning in 2018, as a result of the $70 to $80 million upgrade to CMCH.

**B.     CMCH Fails to Meet Compass Minerals' Expectations**

34.     Unbeknownst to investors, however, in 2016 and 2017, various issues caused the CMCH project to fall far short of Compass Minerals' production assumptions.  In particular, the Company experienced problems with the implementation of the new CMCH machines.  Beginning in 2016, Compass Minerals also faced challenges stemming from the geology of the Goderich mine, when it encountered an unprecedented change in the geology of the area of the mine in which it was conducting operations.  Increasing levels of rock and other impurities in the salt deposit slowed mining operations and contributed to the underperformance of the CMCH system.  During 2016, the CMCH equipment that Compass Minerals had installed produced only about 1.4 million tons of salt—significantly underperforming what the Company had expected at that time.

35.     Compass Minerals' difficulties implementing CMCH as planned, combined with other operational challenges at the Goderich mine, required the Company to incur significant

unplanned expenses during this time period. For example, during late 2016 and early 2017, Compass Minerals purchased approximately 250,000 tons of salt from third parties at significant price premiums in order to meet its contractual commitments to customers. Compass Minerals also had to pay shipping and logistics expenses to transport salt from its Cote Blanche, Louisiana rock salt mine to the northern markets typically served by the Goderich mine.[1]

36.    The production shortfalls at the Goderich mine resulted in significant increases in unit cost. Whereas Compass Minerals had projected internally that Goderich's unit cost would remain stable through mid-2016, and then begin to decline by the end of 1Q17, the unit cost at Goderich instead ***increased by more than 42%*** during that period. Most of this increase was attributable to Compass Minerals' inability to implement CMCH at the Goderich mine as planned, and the unanticipated expenses associated with the CMCH upgrade.

37.    Significantly, the foundation of Compass Minerals' cost-savings model was that CMCH at the Goderich mine would produce 7.5 million tons of salt per year. Prior to and during the Class Period, however, the CMCH system at Goderich was not close to producing 7.5 million tons of salt annually.

38.    During the first three full operating months of 2017,[2] as Goderich was transitioning from drill-and-blast mining to solely CMCH, the CMCH system at Goderich produced an average of less than 260,000 tons of salt per month—putting the mine on track to produce approximately 3.1 million tons of salt in 2017. That amount was substantially below Compass Minerals' internal

---

[1]    Due to the high cost of transporting salt relative to its price, Compass Minerals ordinarily delivers salt from mines located within the same regions as its customers.

[2]    The Goderich Mine shuts down annually for a period of time in March, for routine maintenance.

expectations and was *less than half* of the 7.5 million tons of salt needed to generate $30 million in annual savings.

39.     And although Compass Minerals was working to complete its installation of the CMCH system at Goderich by bringing an additional CMCH machine online to increase production, the installation was significantly behind schedule.  In fact, Compass Minerals did not expect that machine to be fully installed until November 2017—about nine months late.

40.     Moreover, the Company's experience with the CMCH equipment that had already been installed at Goderich showed that the CMCH machines were likely to take significantly longer to ramp up than Compass Minerals had initially assumed.  In the meantime, Goderich's production shortfalls were continuing to cause Compass Minerals to incur significant unplanned expenses— which, in turn, were resulting in substantial increases to unit cost at Goderich.  Compass Minerals' experience at the Goderich mine showed that until the ramp-up was complete, production shortfalls would continue to result in significantly higher unit costs for the Company.

### C.    In April 2017, Compass Minerals Revises Its Internal Estimates for CMCH Cost-Savings

41.     An internal presentation sent to Defendant Malecha in April 2017 explained that management changes at Goderich were necessary because "the move to [CMCH] has not met expectations and forecasts," and that Goderich "has not been able to maintain consistent production." Two days later, Defendant Malecha informed Compass Minerals' Board of management changes at Goderich.  Defendant Malecha explained that "*[w]e have not made the progress required on* safety, *continuous mining*, and production reliability."

42.     In April 2017, Compass Minerals revisited its CMCH cost-savings projections. When it did so, the Company concluded that many of the assumptions in its original calculations had proven unreliable.

43.     Compass Minerals, working with a third-party consultant, had included certain assumptions in its original projected cost-savings calculations that turned out to be faulty.  For example, Compass Minerals and its consultant had underestimated the amount of electricity needed to run the continuous mining systems.  Compass Minerals had also underestimated maintenance and repair expenses for the continuous mining systems, which were breaking down more often than the Company and its consultant had expected.

44.     Compass Minerals' new projections for the project showed that *even if* the CMCH equipment could produce 7.5 million tons of salt annually, CMCH would *not* directly save the Company approximately $30 million per year—as Compass Minerals had told investors.  Rather, the direct annual savings from CMCH would only be approximately *$18 million*.

45.     Instead of accurately updating the cost-savings estimates issued to investors, Compass Minerals executives manufactured a new model to support the existing $30 million cost-savings forecast.  The new model included other Goderich mine cost-reduction initiatives that were *not* directly related to CMCH, as well as future initiatives that the Company had *not yet identified*.  For example, Compass Minerals added to its revised model expected savings from separate "continuous improvement projects" at the Goderich mine—including a longstanding project pre-dating CMCH to reduce the number of conveyor belt stops at Goderich.  Compass Minerals also included in its revised model an amount for "operational excellence" projects that the Company had not even identified.

46.     Compass Minerals finance and operations employees, together with Defendant Malecha, the CFO,[3] and the General Counsel, *reviewed the new forecast and determined that the*

---

[3]     Patrick D. Linehan served as Compass Minerals' CFO from April 3, 2017 to April 25, 2017, when he resigned due to "unforeseen personal circumstances."

*Company would continue to tell investors that it expected CMCH to generate $30 million in annual cost savings*.

### D. In May 2017, Defendants Knowingly Misrepresent the Expected Cost-Savings from the CMCH Upgrade at Goderich

47.     Despite knowing, as of April 2017, that their CMCH cost-savings forecast was no longer supported, Defendants continued to publicly represent that the implementation of CMCH at Goderich would save Compass Minerals approximately $30 million per year, beginning in 2018. For example, during the scripted portion of the Company's May 4, 2017 earnings call for 1Q17, Defendant Malecha told investors that "*our major investments at Goderich are progressing on plan*."

48.     Later during the call, when an analyst asked whether Compass Minerals was "sticking with" the $30 million cost-savings forecast, Defendant Standen replied, in pertinent part:

> *[Y]es, absolutely, we're sticking to the $30 million coming out in 2018*.  We are working through the development stage of the area we're working on now.  And as we finish that up this year and move into some more streamlined continuous mining that occurs in 2018, *we feel very comfortable that the costs will drop and [we will] experience that $30 million during 2018*.

49.     Another analyst then sought additional clarity:

> So if I could just clarify on the last answer you just gave.  So if you ran Goderich at volumes, demand was weak, you guys ran at suboptimal rates again, you'd still expect the $30 million savings?  That's not impacted by, I guess, operating rates?

50.     In response, Defendant Malecha doubled-down:

> *I mean it—we're talking about looking at our costs this year to next year and that $30 million reduction hitting the P&L*.  We know that production rates are going to change.  We hope they go up.  But *that should be real cost reduction*.

51.     Two weeks later, speaking at the BMO Capital Markets Farm to Market Conference on May 17, 2017, Defendant Malecha stated, in the scripted portion of his remarks:

Specifically related to increasing efficiency, ***we're in the process of implementing continuous mining throughout the Goderich mine which is expected to result in about $30 million in annualized savings in '18.*** So those continuous mining and continuous hauling operations are currently going in and being commissioned, will be complete by the end of this year. And we'll start to realize that $30 million annual run rate savings in '18.

### E. Defendants Continue to Misrepresent the Expected Cost-Savings from the CMCH Upgrade at Goderich Throughout the Second Half of 2017

52. By August 2017, the expected cost savings directly from the CMCH upgrade had declined even further—from $18 million per year, to just ***$13 million per year***.

53. Throughout the time period from August through October 2017, Compass Minerals executives provided reports to Defendant Malecha, Defendant Standen, and the Board, showing that Goderich was continuing to fall far short of the production expectations underlying the Company's CMCH cost-savings models. Although Goderich's salt production improved during this time period, it remained far short of Compass Minerals' production goals.

54. During the six-month period from April to October 2017, the CMCH system at Goderich produced an average of only 310,000 tons of salt per month—putting the mine on track to produce approximately 3.7 million tons of salt in 2017. That amount was still ***less than half*** of the 7.5 million tons of salt needed to achieve $30 million in annual savings. Compass Minerals' executives also provided reports to management showing that unit cost at Goderich continued to be significantly higher than expected.

55. Nevertheless, following each of the reports in August, September, and October 2017, Defendants continued to tell investors that the CMCH project would save the Company approximately $30 million annually beginning in 2018—without adequately disclosing that this forecast required a level of salt production that Goderich was far from achieving, or that ongoing production shortfalls would continue to result in unit cost increasing, rather than decreasing.

56.     For example, on August 8, 2017, during the scripted portion of the Company's earnings call for the second quarter of 2017, Defendant Malecha again highlighted "*the $30 million in cost reductions we expect to achieve when continuous mining is fully implemented in 2018*."

57.     Later on the call, an analyst asked how Defendants expected "the benefit of the" $30 million in cost savings from CMCH at Goderich to "play[] out across the year" in 2018.  Defendant Malecha responded, in pertinent part: "[W]e're expecting that rates will continue to improve on those [CMCH] miners as we go through this year and, *ultimately, we get to 100% by the end of the year*."  Defendant Standen then added: "Yes, I think that *the $30 million will start coming out Jan 1, [2018] on an annualized basis*."

58.     During Compass Minerals' annual Investor Day, held on September 29, 2017, each of the Individual Defendants highlighted the expected $30 million in annual cost savings from CMCH. In the scripted portion of his remarks, Defendant Malecha stated, in pertinent part:

> *We introduced in 2014 a capital investment program* intended to ensure the integrity of 2 of our key advantage assets, Ogden and Goderich, *to increase the efficiency and increase our productive capabilities*.  As we near the end of 2017, we're also nearing the completion of the majority of these projects.
>
> *            *            *
>
> *The capital projects we've invested in do include cost-saving components as well, the largest being $30 million in annual savings that will come from our Goderich investments*.

59.     Defendant Sepich similarly stated, during his prepared remarks:

> We expect that this approach to mining, once fully implemented, *will result in significant cost savings.  We've noted a $30 million savings as our target* over full year 2016 production costs.

60.     Defendant Standen likewise stated, during his prepared remarks:

> *With our Goderich mine investments [in] continuous mining and continuous haulage winding down, we remain on track to achieve our $30 million cost reduction in 2018.  This will translate into approximately $2 to $3 of per-unit salt*

*costs*. It is important to note that our implementation was not, and will not, be impacted by the partial ceiling collapse that has temporarily limited our production.

61.     Later during his prepared remarks, Defendant Standen reiterated:

***Most critically, we remain on track to achieving our $30 million in annualized savings at Goderich, which will be a step change in how efficiently we produce salt***.

62.     On October 31, 2017, during Compass Minerals' earnings call for the third quarter of 2017 ("3Q17"), Defendant Malecha stated, in his prepared remarks:

***Installation of continuous mining and haul[age] systems at the Goderich mine is also on track***, even with the partial roof collapse we experienced in September. We are currently commissioning the final continuous mining system and expect to complete this in 2017 in fourth quarter.

*    *    *

Our cost-savings plan initiated in July . . . is on track. . . . ***These savings are in addition to the $30 million in cost reductions we expect to achieve in 2018 from our investment in continuous mining at Goderich***.

63.     Thus, by the end of 2017, Defendants had made numerous statements to investors that CMCH would save the Company approximately $30 million per year, beginning in 2018. Many of these statements were scripted and vetted by multiple executives before they were made.

**F.     Defendants Misrepresent Compass Minerals' Realized Cost Savings from CMCH**

64.     During Compass Minerals' February 14, 2018 conference call to discuss its financial results for the fourth quarter and full year of 2017 ("4Q17" and "2017," respectively), Defendant Standen represented that: "***We already achieved about $5 million of savings in 2017 when we finished installing the fourth [CMCH] mining system*** and completely stopped drilling and blasting in the fourth quarter."

65.     This statement conveyed that CMCH had already begun generating a significant amount of the cost-savings that Defendants had told investors it would produce. In truth, Compass Minerals' internal documents showed that CMCH had enabled the Company to reduce costs by just

*$1.1 million* in 2017—primarily from Compass Minerals no longer having to purchase explosives to conduct drill-and-blast mining operations at Goderich.  The remaining $3.9 million in savings were generated by other projects at Goderich that were ***not*** directly related to CMCH.

66.    And even these savings were more than offset by higher expenses at Goderich related to CMCH—which Defendants did not disclose when highlighting the savings that the Company had "already achieved."

67.    First, during 2017, Compass Minerals had to pay more than $4 million in maintenance and repair expenses at the Goderich mine.

68.    Second, the Company incurred $600,000 in penalties to customers related to salt quality during 2017.  The CMCH equipment in operation at Goderich during 2017 produced salt that was finer than the salt produced by the traditional drill-and-blast method.  Because the salt was also finer than the specifications contractually-required by some customers, Compass Minerals had to pay penalties for delivering salt that was not within customers' specifications.

69.    Third, Compass Minerals incurred approximately $5 million in price premiums for salt that it purchased from third parties, in order to cover the Goderich production shortfalls.

70.    Finally, during 2017, Compass Minerals began a $9 million project to improve the quality of the salt mined at Goderich, in order to meet customers' specifications.  To address the increase in salt that did not meet customers' specifications caused by the CMCH equipment (as well as issues related to the geology of the mine), Compass Minerals installed a filtering system that, among other things, reduced impurities in the salt.  In addition to the upfront cost, in mid-2017, Compass Minerals determined that the new filtering system would reduce output at the mine by approximately 400,000 tons per year—thereby increasing unit costs going forward.

**G.    Defendants Misrepresent Goderich's Annual Production Capacity**

71.    During the Class Period, Defendants also misrepresented the Goderich mine's annual production capacity.  In the Company's Form 10-K for the fiscal year ended December 31, 2017 (the "2017 Form 10-K"), filed on February 27, 2018, Compass Minerals represented that the Goderich mine had the capacity to produce eight million tons of salt annually.  Compass Minerals defined "[a]nnual production capacity" in the 2017 Form 10-K as "our estimate of the tons that can be produced assuming a normal amount of scheduled down time and operation of [the mine] under normal working conditions, including staffing levels, based on actual historical production rates."

72.    These representations were materially misleading because they exaggerated Compass Minerals' ability to increase production using CMCH, if warranted by product demand, during the transition period to CMCH.  In truth, although the Goderich mine had been able to produce nearly eight million tons of salt annually using drill-and-blast mining, Compass Minerals had discontinued drill-and-blast mining at Goderich during 4Q17, and the CMCH system was not capable of mining close to eight million tons of salt annually during the transition period.

73.    Indeed, during 2017, the Goderich mine had produced less than 5.2 million tons of salt—an amount that was 1.5 million tons less than Compass Minerals had planned to produce. While a ceiling fall incident at the mine in September 2017 caused approximately 300,000 tons—or 20%—of the 2017 production shortfall, the *remaining 80%* of the shortfall was due to the underperformance of the CMCH system.

74.    *Through December 2018*, the CMCH system at Goderich produced a maximum of 450,000 tons of salt per month—an amount that would yield just 5.4 million tons on an annualized

basis.[4]  It was not until 2019 that Compass Minerals finally began to increase the annual production capacity at Goderich by installing additional and larger CMCH machines.

**H.      Defendants Misrepresent the Reasons for Compass Minerals' Increased Costs and Production Constraints**

75.      During Compass Minerals' May 2, 2018 conference call to discuss its financial results for 1Q18, Defendants discussed that the Company's costs had increased—but misrepresented the causes of that increase.  Reading from a script that had been vetted by other executives, including the General Counsel, Defendant Standen falsely told investors that the Company's 1Q18 earnings had been depressed by $20 million due to the ceiling fall incident at Goderich that had interrupted mining operations in September 2017.

76.      In truth, the direct costs related to the ceiling fall incident had reduced Compass Minerals' earnings by only ***$3 million*** in 1Q18.  The other $17 million in increased costs resulted from the continuing operational issues at Goderich throughout 2017—only a small portion of which stemmed from the ceiling fall.  In addition, Defendants' misstatement conveyed that costs had increased as a result of a one-off natural event, rather than because the CMCH upgrade—which was important to investors—was not performing as expected.

77.      The following quarter, Defendants similarly blamed a one-time event for Compass Minerals' inability to meet increased salt demand.  In Compass Minerals' press release announcing its financial results for the second quarter of 2018 ("2Q18"), Defendants attributed "production constraints" at Goderich to the recently-resolved 12-week labor strike at the mine.[5]  In truth, the

---

[4]      However, Goderich ultimately produced less than four million tons of salt in 2018.

[5]      On April 27, 2018, Compass Minerals announced a labor strike at the Goderich mine, but assured investors that the Company "ha[d] implemented contingency operating procedures and expect[ed] to operate the mine at or near its planned operating rates for 2018" and "expect[ed] a minimal impact on salt production costs resulting from the strike."  Throughout the strike, Compass

primary cause of the production constraints was the CMCH system underperforming Compass Minerals' expectations.  While the strike caused a production shortfall of approximately 750,000 tons—or 31% of the 2018 production shortfall, ***the remaining 69%*** of the shortfall was due to the underperformance of the CMCH system.

78.     During the 2Q18 conference call, Defendants also continued to blame increased costs in the Salt segment on the September 2017 ceiling fall at Goderich, which they told investors had resulted in costs for shipping salt from the Company's Cote Blanche, Louisiana mine to customers in northern markets.  In fact, Compass Minerals was incurring these shipping costs not because of the ceiling fall, but because of the ongoing production shortfalls at Goderich, which were primarily due to the underperformance of the CMCH system.

**I.     Defendants Misrepresent Current Salt Production Levels**

79.     On September 12, 2018, Defendants Standen and Sepich spoke at the Credit Suisse Basic Materials Conference.  Defendant Sepich gave a presentation about Goderich's salt production, during which he displayed and discussed a slide entitled "Progress on Goderich Investments Continues."  The slide represented that Compass Minerals had completed its installation of the CMCH system at Goderich "in late 2017," and that salt production was "[c]urrently ramping up" following a labor strike at the mine.  The slide also contained a graph showing Goderich's "Production Plan," which compared the mine's "current production rate" to a target rate of 600,000 tons per month:

---

Minerals utilized non-union workers to continue mining operations at Goderich.  On July 16, 2018, the Company announced that it had reached an agreement to end the 12-week strike.



80. While displaying the graph, Defendant Sepich stated: "As you can see on this chart, *we're about 75% of the way to our target rates*." Later during the conference, Defendant Standen similarly stated that achieving the "cost savings" from CMCH would "depend[] on the timing of our full ramp-up *as we move from 75% production at Goderich* up to that 100% . . . ." These statements indicated that the Goderich mine was currently producing about 450,000 tons of salt per month.

81. Defendants' representations were materially misleading because—although Goderich had produced about 438,000 tons of salt eight months earlier, in January 2018—Compass Minerals' internal production reports as of September 12, 2018 showed that Goderich was currently producing far less than 450,000 tons of salt per month.

82. During the period from April through July 2018, when mining operations were also impacted by a 12-week labor strike, the Goderich mine produced an average of approximately 314,000 tons of salt per month. In August 2018, Goderich produced only 332,000 tons of salt. And when Defendants Sepich and Standen spoke on September 12, 2018, the Goderich mine was on pace to produce less than 225,000 tons of salt in September 2018 (although it ultimately produced 346,000 tons of salt that month).

J.    **Defendants Fail to Disclose Material Trends Relating to Compass Minerals'
Salt Production, in Violation of Item 303 of Regulation S-K**

83.    Prior to and during the Class Period, the Goderich mine failed to produce the quantity

of salt that Compass Minerals' business required by increasingly large amounts.  These production

shortfalls resulted in higher unit costs that materially reduced the Company's earnings and income

from continuing operations.

84.    During 2016, Goderich produced ***800,000*** fewer tons of salt than the Company had

planned to produce.  That year, increased unit costs at Goderich reduced Compass Minerals' income

from continuing operations by ***approximately 8%***.

85.    During 2017, the shortfall was ***1.5 million*** tons.  While the September 2017 ceiling

fall caused approximately 300,000 tons—or 20%—of the 2017 production shortfall, ***the remaining***

***80%*** of the shortfall was due to the underperformance of the CMCH system.  That year, increased

unit costs at Goderich reduced Compass Minerals' income from continuing operations by

***approximately 15%***.

86.    During 2018, the Goderich production shortfall grew to ***more than 2.4 million*** tons.

And although the labor strike at the mine caused approximately 750,000 tons—or 31%—of the 2018

production shortfall, ***the remaining 69%*** of the shortfall was due to the underperformance of CMCH

system.  That year, increased unit costs at Goderich reduced Compass Minerals' income from

continuing operations by ***approximately 41%***.

87.    Ultimately, the Goderich mine produced ***less than four million tons*** of salt in 2018, at

a unit cost that was ***more than double*** what unit costs had been at the mine before Compass Minerals

began the CMCH project four years earlier.

88.    Defendants failed to disclose this material information to investors in Compass

Minerals' quarterly and annual reports filed with the SEC on Forms 10-Q and 10-K during the Class

Period, as required by controlling SEC rules and regulations. Each of the Forms 10-Q was signed by Defendant Standen, and Compass Minerals' 2017 Form 10-K was also signed by Defendant Malecha.

89.     The SEC created specific rules governing the content of disclosures by public companies in their filings with the SEC. SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

90.     Specifically, prior to and during the Class Period, Item 7 of Form 10-K and Item 2 of Form 10-Q required that a company's SEC filings furnish the information required under Item 303(a)(3) of Regulation S-K. During the Class Period, Item 303(a)(3) of Regulation S-K required that the MD&A section of a company's filings with the SEC, among other things:

(i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

91.     Similarly, Item 303(b) of Regulation S-K required a discussion of any material changes in known trends or uncertainties in quarterly reports filed on Form 10-Q.

92.     Regulation S-K also stated that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

93.     In May 1989, the SEC issued an interpretive release on Item 303 of Regulation S-K ("1989 Interpretive Release"), stating, in pertinent part:

> "Required disclosure is based on *currently known trends, events, and uncertainties that are reasonably expected to have material effects*, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract."

> *          *          *

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

94.     The 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) of Regulation S-K is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

> (1)     Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.

> (2)     If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

95.     Defendants violated the affirmative disclosure duties imposed by Item 303 of Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose, in the Company's Forms 10-Q and 10-K filed during the Class Period, the following material information that was known to management: (i) that the Goderich mine was failing to produce the quantity of salt

- 24 -

that Compass Minerals' business required by increasingly large amounts; (ii) that these production shortfalls were primarily due to the CMCH system underperforming Compass Minerals' expectations; and (iii) that these production shortfalls were resulting in higher unit costs that materially reduced the Company's earnings and income from continuing operations.

96.     The foregoing concealed facts were required to be disclosed because they were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or . . . significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations[.]"

97.     Additionally, these facts needed to be disclosed under Rule 10b-5 so as not to render the statements made in Compass Minerals' SEC filings materially misleading.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

98.     The Class Period begins on October 31, 2017.  That day, Defendants held a conference call with analysts and investors to discuss Compass Minerals' financial results for 3Q17, ended September 30, 2017.  During the call, Defendant Malecha stated, in pertinent part:

> While lower de-icing demand pressured salt segment results, ***we have made progress with our capital projects at the Goderich mine***.  I'm also glad to report that our team there has addressed all the issues related to the collapsed roof, and ***the mine is*** fully operational and ***running in line with our current production plans***.
>
> \*       \*       \*
>
> ***Installation of continuous mining and haul[age] systems at the Goderich mine is also on track***, even with the partial roof collapse we experienced in September.  We

are currently commissioning the final continuous mining system and expect to complete this in 2017 in fourth quarter.

*       *       *

Our cost-savings plan initiated in July as part of this overarching effort to improve our operational performance and increase efficiency.  This plan to eliminate $20 million in ongoing costs in 2018 is on track. . . .  ***These savings are in addition to the $30 million in cost reductions we expect to achieve in 2018 from our investment in continuous mining at Goderich***.

99.      The statement referenced above in ¶98 that Compass Minerals "expect[ed] to achieve" "$30 million in cost reductions . . . in 2018 from [its] investment in [CMCH] at Goderich" was materially misleading when made because: (i) the Company had revisited the $30 million CMCH cost-savings projection six months earlier—in April 2017—and determined that ***even if*** the CMCH equipment could produce the 7.5 million tons of salt per year upon which the cost-savings model was based, the direct annual savings from CMCH would only be approximately $18 million; (ii) by August 2017, that estimate had declined to just $13 million per year; and (iii) the cost-savings model included other Goderich mine cost-reduction initiatives that were not directly related to CMCH, as well as future initiatives that the Company had not yet identified.  In addition, the CMCH system at Goderich was not close to producing 7.5 million tons of salt annually.  Internal reports showed that during the six-month period from April to October 2017, Goderich was on track to produce approximately 3.7 million tons of salt in 2017—***less than half*** of the 7.5 million tons needed to achieve $30 million in annual savings.  Moreover, unit costs at Goderich continued to be significantly higher than expected, further undermining the $30 million cost-saving projection.

100.      In addition, the statement referenced above in ¶98 that "the mine" was "running in line with [the Company's] current production plans" was materially misleading when made because the CMCH machines were taking significantly longer to ramp up than Compass Minerals had

expected. The resulting production shortfalls were causing the Company to incur significant unplanned expenses—which, in turn, were resulting in substantial increases to unit cost at Goderich.

101. Finally, the statement referenced above in ¶98 that "[i]nstallation of [the CMCH] . . . systems at the Goderich mine [was] also on track" was materially misleading when made because although Compass Minerals was working to complete its installation of the CMCH system at Goderich by bringing an additional CMCH machine online to increase production, the installation was significantly behind schedule. In fact, Compass Minerals did not expect that machine to be fully installed until November 2017—about nine months late.

102. Also on October 31, 2017, Compass Minerals filed with the SEC its quarterly report for 3Q17 on Form 10-Q, which was signed by Defendant Standen. The 3Q17 Form 10-Q also failed to disclose the following material information that was known to management, as required by Item 303 of Regulation S-K: (i) that the Goderich mine was failing to produce the quantity of salt that Compass Minerals' business required by increasingly large amounts; (ii) that these production shortfalls were primarily due to the CMCH system underperforming Compass Minerals' expectations; and (iii) that these production shortfalls were resulting in higher unit costs that materially reduced the Company's earnings and income from continuing operations.

103. On February 14, 2018, Defendants held an earnings call with analysts and investors to discuss the Company's financial results for 4Q17 and 2017. During their prepared remarks, Defendants told investors that, as a result of the "delays" in ramping up CMCH at Goderich, the expected $30 million in annual cost-savings would not be realized until 2019, as opposed to 2018. Defendant Malecha stated that Compass Minerals now expected "***to achieve the $30 million run rate of savings by the end of 2018. This means that we expect the full $30 million of savings to***

*come through in 2019* . . . ." Defendant Standen similarly stated: "*By the end of 2018, we expect to reach our $30 million savings run rate with 2019 being the first full year of savings*."

104.     The statements referenced above in ¶103 were materially misleading when made because: (i) Compass Minerals had determined that *even if* the CMCH equipment could produce the 7.5 million tons of salt per year upon which the $30 million cost-savings model was based, CMCH would *not* directly save the Company approximately $30 million per year; (ii) as of August 2017, Compass Minerals' estimate of the direct annual savings from CMCH was approximately $13 million; and (iii) the cost-savings model included other Goderich mine cost-reduction initiatives that were not directly related to CMCH, as well as future initiatives that the Company had not yet identified.

105.     During his prepared remarks, Defendant Malecha provided the following explanation for the purportedly delayed annual cost savings from CMCH:

> *The continuous mining, continuous haulage projects has made important progress* . . . . All the systems are now installed and operating below ground. And as of November, we are no longer using any drill-and-blast to mine salt in our operations there.
>
>      . . . *There have been some delays, however, ramping up the full design rates due to a couple of factors. First, we were slowed down when the groundfall happened in September. Second, we've encountered some inconsistency in the salt quality in the area where we are mining. We expect to address these quality* issues during our normal maintenance shutdown in March.

106.     The statements referenced above in ¶105 were materially misleading when made because they conveyed that the delayed ramp-up and delayed cost-savings were the result of natural events, rather than because the CMCH upgrade was not performing as expected. In truth, the ceiling fall in September 2017 had caused a production shortfall of approximately 300,000 tons—just 20% of the 2017 production shortfall—while the remaining 80% of the shortfall was due to the underperformance of the CMCH system. In addition, the "inconsistency in . . . salt quality" was not

solely due to "the area where [Compass Minerals was] mining," but was due in part to the CMCH equipment producing salt that was finer than the salt previously produced by the drill-and-blast method.  Moreover, Defendants knew, but failed to disclose, that in order to "address these quality issues," Compass Minerals planned to install a $9 million filtering system that would reduce output at Goderich by approximately 400,000 tons per year, thereby increasing unit costs going forward.

107.    During the call, an analyst asked, in pertinent part: "[I]s there anything different that happened that now is delaying the cost savings from the continuous mining outside of . . . the impurities and also the roof collapse, but is there anything else that's really just putting that off to 2019 to get the full run rate?"  Defendants responded, in pertinent part:

Defendant Malecha:

The only thing I would say is that **with the challenge that we have with our roof collapse** and kind of maintaining the mine through that, that we probably have—**we have not reduced our labor force there as quickly as we, maybe, would have anticipated prior to that by roughly a quarter**.  So as Jamie mentioned earlier, we have initiated that process at the mine.  **And that is delaying some of the savings in the early part here of '18**. . . .

Defendant Standen:

. . . **[A]s we went through September and experienced the groundfall**, how we really focused in on ground control for a little while.  And **that really slowed down the timing of the ramp up**.  And we—because this equipment is so important to us, we just want to make sure that we've got the right focus on.  So as we got through that ground control issue, now we are taking out the labor.  **And we've just basically got a delayed ramp up.  That's why it's pushing it out about 6 months**.

108.    Defendants' statements referenced above in ¶107 were materially misleading when made because they conveyed that the delayed ramp-up and delayed cost-savings were the result of a one-off natural event, rather than because the CMCH system was underperforming.  In truth, the ceiling fall in September 2017 had caused a production shortfall of approximately 300,000 tons—just 20% of the 2017 production shortfall—while the remaining 80% of the shortfall was due to the underperformance of the CMCH system.

- 29 -

109.    In his prepared remarks during the same call, Defendant Standen stated, in pertinent part:

> Let's now move to our outlook starting with salt.  Looking forward to the first half of 2018, **we expect about $25 million in short-term product cost and logistics expense**.  About half of that $25 million is related to high-cost inventory from 2017. ***Most of this cost is due to the groundfall incident at Goderich mine, last September.  We also had lower-than-expected operating rates at that mine.  The other half of the $25 million relates to shipping and handling.  We expect to use salt from Cote Blanche to supplement the Goderich mine shortfall to fully serve the market***.  That is expected to increase our first half salt distribution cost by about $2.50 per ton.
>
> Fortunately, these costs are short-term in nature, and we expect a healthy rebound in operating margins in the second half of 2018.  Second half 2018 margins will also benefit from continuous mining savings at Goderich.

110.    The statements referenced above in ¶109 were materially misleading when made because in truth, "[m]ost of" the expected increased costs, as well as the "lower-than-expected operating rates" at Goderich, were due to the underperformance of the CMCH system—and not the ceiling fall.  Indeed, the ceiling fall in September 2017 had caused just 20% of the 2017 production shortfall—while the remaining 80% of the shortfall was due to the underperformance of the CMCH system.

111.    Defendant Standen also emphasized during the call that, although Compass Minerals was delaying its purported $30 million annual cost-savings estimate, the Company had "***already achieved about $5 million of savings in 2017 when we finished installing the fourth [CMCH] mining system*** and completely stopped drilling and blasting in the fourth quarter."  Defendant Malecha similarly stated, during his prepared remarks: "***[W]e have already achieved some 2017 cost savings from the continuous miners***."

112.    During the call, Defendants displayed and discussed an investor presentation, which likewise represented, on Slide 4, that the "Goderich mine installation of continuous mining and

haulage systems [was] complete" and that CMCH had "*[d]elivered savings of over $5 million in 2017*[.]"

113.    The statements referenced above in ¶¶111-112 were materially misleading when made because they conveyed that CMCH had already begun generating a significant amount of the cost-savings that Defendants had told investors it would produce at Goderich.  In truth, Compass Minerals' internal documents showed that CMCH had enabled the Company to reduce costs by just $1.1 million in 2017—primarily from Compass Minerals no longer having to purchase explosives to conduct drill-and-blast mining operations at Goderich.  The remaining $3.9 million in savings were generated by other projects at Goderich that were not directly related to CMCH.  And even these savings were more than offset by higher expenses at Goderich related to CMCH—which Defendants did not account for when highlighting the savings the Company had "already achieved."

114.    In response to the news that the expected $30 million in annual cost savings from CMCH at Goderich would not be realized until 2019—as opposed to 2018, as Defendants had repeatedly told investors beginning in 2015—the price of Compass Minerals common stock fell more than 9% over the following two trading days, from a closing price of $69.25 per share on February 13, 2018, to close at $63.00 per share on February 15, 2018, on heavy trading volume.  However, Defendants' misleading assurances about the progress of CMCH at Goderich—including that it had already delivered $5 million in cost savings, and would still ultimately deliver the promised $30 million in annualized cost savings—prevented a more substantial decline in Compass Minerals' share price.

115.    On February 27, 2018, Compass Minerals filed the 2017 Form 10-K, which was signed by Defendants Malecha and Standen.  In the 2017 Form 10-K, the Company represented that

the "[a]nnual production capacity" for the Goderich mine was *eight million tons of salt per year*.

The 2017 Form 10-K defined "[a]nnual production capacity" as follows:

> (a)  Annual production capacity is our estimate of the tons that can be produced assuming a normal amount of scheduled down time and operation of our facilities under normal working conditions, including staffing levels, based on actual historical production rates.  *As we introduce new production methods, such as continuous mining at our Goderich salt mine, we will update our estimates if necessary as new production data become available*.

> (b)  We continue to invest in the [Goderich] mine to achieve production capacity of approximately nine million tons annually.

116.    The statements referenced above in ¶115 were materially misleading when made because they overstated the Goderich mine's annual production capacity during the transition to CMCH.  In truth, although the Goderich mine had been able to produce nearly eight million tons of salt annually using drill-and-blast mining, Compass Minerals had discontinued drill-and-blast mining at Goderich during 4Q17, and the CMCH system was not capable of mining close to eight million tons of salt annually during the transition period.  Indeed, during 2017, the Goderich mine had produced less than 5.2 million tons of salt—an amount that was 1.5 million tons less than Compass Minerals had planned to produce.  While the ceiling fall at the mine in September 2017 caused approximately 300,000 tons—or 20%—of the 2017 production shortfall, the remaining 80% of the shortfall was due to the underperformance of the CMCH system.  Accordingly, Compass Minerals' "[a]nnual production capacity" for the Goderich mine was not eight million tons per year in 2017, and Defendants had not "updated [their] estimates . . . as new production data [became] available."

117.    The 2017 Form 10-K further stated:

> We continue to invest in our continuous mining project at our Goderich mine.  We shifted all of our Goderich mine production to continuous mining in the fourth quarter of 2017, and *we expect this project to generate annual cost savings of approximately $15 million in 2018 and $30 million in 2019* if all efficiencies are realized.

118.   The statements referenced above in ¶117 were materially misleading when made because: (i) Compass Minerals had determined that *even if* the CMCH equipment could produce the 7.5 million tons of salt per year upon which the $30 million cost-savings model was based, CMCH would *not* directly save the Company approximately $30 million per year; (ii) as of August 2017, Compass Minerals' estimate of the direct annual savings from CMCH was approximately $13 million; and (iii) the cost-savings model included other Goderich mine cost-reduction initiatives that were not directly related to CMCH, as well as future initiatives that the Company had not yet identified.

119.   The 2017 Form 10-K also failed to disclose the following material information that was known to management, as required by Item 303 of Regulation S-K: (i) that the Goderich mine was failing to produce the quantity of salt that Compass Minerals had planned to produce by increasingly large amounts—indeed, the shortfall had grown from 800,000 tons in 2016, to 1.5 million tons in 2017; (ii) that these production shortfalls were primarily due to the underperformance of the CMCH system—which caused 80% of the production shortfall in 2017; and (iii) that these production shortfalls were resulting in higher unit costs that materially reduced the Company's income from continuing operations—by approximately 15% in 2017.

120.   On May 1, 2018, after the close of the markets, Compass Minerals issued a press release announcing its financial results for 1Q18, ended March 31, 2018.  The same day, the Company filed the 1Q18 press release with the SEC as an exhibit to a Current Report on Form 8-K, which was signed by Defendant Standen.  The press release represented that:

> Salt segment operating earnings totaled $34.1 million, compared to $45.4 million in the first quarter of 2017. ***Earnings for this segment were pressured by increased logistics costs*** as well as higher-cost carryover inventory produced last year and sold in the first quarter of 2018. ***Approximately $20 million in increased logistic and production costs primarily resulted from the ceiling fall incident at the***

***Goderich mine last year***, which led the company to use rock salt from its Louisiana mine to serve customers in the Great Lakes region in the first quarter.

121.   The following day, on May 2, 2018, Compass Minerals filed with the SEC its quarterly report for 1Q18 on Form 10-Q, which was signed by Defendant Standen.  The 1Q18 Form 10-Q, likewise attributed the decrease in Salt operating earnings to the September 2017 ceiling fall:

> Salt operating earnings decreased 25%, or $11.3 million, due to higher per-unit product and logistics costs as well as higher-cost inventory produced in 2017 and sold in the first quarter of 2018.  ***The higher per-unit product and logistics costs resulted from lower production at our Goderich mine due to a ceiling fall that occurred last year, leading to deliveries of salt from our Cote Blanche, Louisiana mine to our Northern markets***.

122.   The statements referenced above in ¶¶120-121 were materially misleading when made because the direct costs related to the ceiling fall incident had reduced Compass Minerals' earnings by only $3 million in 1Q18.  The majority of the increased costs—$17 million—resulted from the continuing operational issues at Goderich throughout 2017.  And only a small portion of those costs stemmed from the ceiling fall.  In addition, the statements referenced above in ¶¶120-121 were materially false and misleading when made because they conveyed that costs had increased as a result of a one-off natural event, rather than because the CMCH system was underperforming.

123.   The 1Q18 Form 10-Q also failed to disclose the following material information that was known to management, as required by Item 303 of Regulation S-K: (i) that the Goderich mine was failing to produce the quantity of salt that Compass Minerals' business required by increasingly large amounts; (ii) that these production shortfalls were primarily due to the underperformance of the CMCH system; and (iii) that these production shortfalls were resulting in higher unit costs that materially reduced the Company's earnings and income from continuing operations.

124.   Also on May 2, 2018, Defendants held an earnings call with analysts and investors, during which Defendant Standen continued to blame the Company's earnings shortfall on the September 2017 ceiling fall, rather than additional costs associated with the CMCH upgrade:

Operating earnings for the quarter declined 25% compared to the 2017 first quarter as a result of 2 primary factors. . . . ***The second primary factor, which depressed earnings this quarter was related to the short-term costs primarily associated with the ceiling fall at Goderich mine last year. We recognized about $20 million of additional costs related to this incident***, which we previously outlined during our fourth quarter earnings call. These costs include increased unit costs as a result of lower production levels at the Goderich mine as well as the logistics cost of using salt from our Cote Blanche mine to serve customers in the Great Lakes.

125.   During the conference call, Defendants displayed and discussed an investor presentation, which reiterated, on Slide 8, that 1Q18 Salt segment "margins [were] pressured by increased logistics and production costs [i]ncluding ***short term costs primarily due to [a] ceiling fall at Goderich mine, which totaled $20 million in 1Q18***[.]"

126.   The statements referenced above in ¶¶124-125 were materially misleading when made because the direct costs related to the ceiling fall incident had reduced Compass Minerals' earnings by only $3 million in 1Q18. The majority of the increased costs—$17 million—resulted from the continuing operational issues at Goderich throughout 2017. And only a small portion of those costs stemmed from the ceiling fall. In addition, the statements referenced above in ¶¶124-125 were materially false and misleading when made because they conveyed that costs had increased as a result of a one-off natural event, rather than because the CMCH system was underperforming.

127.   Also during the 1Q18 conference call the following exchange occurred when an analyst questioned Defendant Malecha about whether issues with the quality of salt produced at Goderich were related to the CMCH equipment:

<u>Joel Jackson—BMO Capital Markets Equity Research</u>:

. . . Okay, so there's been some concern that maybe with what's going on in Goderich and the (inaudible) of the [continuous] miners, that some of the products that you're selling aren't meeting [customers'] spec[ifications]. So are there any products right now that you're currently not able to reach spec on, how are you dealing with it? Has is it been fixed with the optical sorters? What are those products? And how might it get resolved?

<u>Defendant Malecha</u>:

> . . . As we've been communicating over the past couple of quarters here, ***we've had quality issues at the mine, but not driven by—or caused by the continuous miners, but more the area of the mine that we're mining in, and the geology that we're incurring***, is just including more off-spec products than we've ever experienced in the past.  So to deal with that, we have put screening and sorting equipment into the —into operation at the mine.  And we initiated and finished that project as we did our annual shutdown, which occurred in March.

> So now we're confident going forward that we can deal with those quality issues and effectively meet our customers' specs. . . .

128.   Defendant Malecha's statements referenced above in ¶127 were materially misleading when made because in truth, the "quality issues" with the salt being produced at Goderich ***were*** "caused" in part "by the continuous miners"—and were not merely due to the "geology" of the mine.  In particular, the CMCH equipment in operation at Goderich during 2017 produced salt that was finer than the salt previously produced by the drill-and-blast method—and also finer than the specifications contractually-required by some customers—causing Compass Minerals to incur penalties for delivering salt that was not within those customers' specifications.  In addition, Defendant Malecha's statements referenced above in ¶127 were materially misleading when made because they failed to disclose that, in addition to the $9 million up-front cost of the "screening and sorting equipment" that Compass Minerals had installed at Goderich to "deal with those quality issues," Defendants had determined, in mid-2017, that the new equipment would reduce output at the mine by approximately 400,000 tons per year—thereby increasing unit costs "going forward."

129.   On May 16, 2018, speaking at the BMO Capital Markets Farm to Market Conference, Defendant Standen continued to blame the Company's higher costs in 1Q18 on the September 2017 ceiling fall at Goderich, stating in part: "We have also been challenged by a couple of operational

issues at the Goderich mine such as a ***ceiling collapse which curtailed production in the fall of 2017 and resulted in higher cost salt in the first quarter of 2018***."

130.    The statement referenced above in ¶129 was materially misleading when made because the direct costs related to the ceiling fall incident had reduced Compass Minerals' earnings by only $3 million in 1Q18.  The majority of the increased costs—$17 million—resulted from the continuing operational issues at Goderich throughout 2017.  And only a small portion of those costs stemmed from the ceiling fall.  In addition, the statement referenced above in ¶129 was materially misleading when made because it conveyed that costs had increased as a result of a one-off natural event, rather than because the CMCH system was underperforming.

131.    Reading from a script during the BMO Capital Markets Farm to Market Conference, Defendant Standen further stated, in pertinent part:

> We have installed all of the continuous mining and haulage equipment and continue to ramp up toward the design rates.  ***We have had delays in our ramp-up, which were largely driven by salt quality issues that are being addressed through our new optical sorting***.

132.    The statements referenced above in ¶131 were materially misleading when made because they conveyed that the delayed ramp-up was the result of natural circumstances, rather than because the CMCH system was underperforming.  In truth, the "delays in" the CMCH "ramp-up" were largely driven by the CMCH equipment failing to perform as expected, while the "salt quality issues" at Goderich were due in part to the CMCH equipment producing salt that was finer than the salt previously produced by the drill-and-blast method.  Moreover, Defendants knew, but failed to disclose, that the "new optical sorting" equipment that Compass Minerals had installed at Goderich to "address[]" the salt quality issue would reduce output at the mine by approximately 400,000 tons per year, thereby increasing unit costs going forward.

133.    In his scripted statements at the BMO Capital Markets Farm to Market Conference,

Defendant Standen discussed projected and realized cost-savings in the Salt segment, as follows:

> With our cost savings and efficiency projects, ***we have identified approximately $40 million in annualized cost reductions within the salt segment. These savings are expected to come from technology enhancements at our Goderich mine with the introduction of continuous mining and haulage***, as well as various other efficiency programs at this mine and throughout the other salt operations.
>
> ***We have realized about $15 million in annualized savings for this business through the first quarter of 2018.   This includes*** broad-based streamlining in addition to ***some of the initial savings from the transition to continuous mining and haulage***.  We expect that the remainder of these savings will be achieved mainly at Goderich.

134.    The statements referenced above in ¶133 concerning the expected "$40 million in

annualized cost reductions within the salt segment"—which presumably included the $30 million in

cost-savings from CMCH at Goderich—were materially misleading when made because: (i)

Compass Minerals had determined that even if the CMCH equipment could produce the 7.5 million

tons of salt per year upon which the $30 million cost-savings model was based, CMCH would not

directly save the Company approximately $30 million per year; (ii) as of August 2017, Compass

Minerals' estimate of the direct annual savings from CMCH was approximately $13 million; and

(iii) the $30 million cost-savings model included other Goderich mine cost-reduction initiatives that

were not directly related to CMCH, as well as future initiatives that the Company had not yet

identified.  In addition, the statements referenced above in ¶133 concerning the "$15 million in

annualized savings" that Compass Minerals had "realized . . . through the first quarter of 2018" were

materially misleading when made because they conveyed that CMCH had already begun generating

a significant amount of the cost-savings that Defendants had told investors it would produce at

Goderich.  In truth, any savings were more than offset by higher expenses at Goderich related to

CMCH—which Defendants did not account for when highlighting the savings the Company had

purportedly "realized."

- 38 -

135.    During the conference, Defendant Standen also displayed Slide 9 of an investor presentation, which further represented that Compass Minerals had "*[a]chieved ~$13 million in annualized salt business savings as of end of 2017*[.]"

136.    The statement referenced above in ¶135 was materially misleading when made because it conveyed that CMCH had already begun generating a significant amount of the cost-savings that Defendants had told investors it would produce at Goderich.  In truth, Compass Minerals' internal documents showed that CMCH had enabled the Company to reduce costs by just $1.1 million in 2017—primarily from Compass Minerals no longer having to purchase explosives to conduct drill-and-blast mining operations at Goderich.  The remaining savings were generated by other projects within the Salt segment that were not directly related to CMCH at Goderich.  And even these savings were more than offset by higher expenses at Goderich related to CMCH—which Defendants did not account for when highlighting the savings the Company had supposedly "[a]chieved."

137.    On June 12, 2018, Defendant Standen participated in the Stifel Cross Sector Insight Conference, during which he substantially repeated the scripted statements that he had made the previous month, in pertinent part:

> With our cost savings and efficiency projects, *we have identified approximately $40 million in annualized cost reductions specifically for the Salt segment. These savings are expected to come from technology enhancements at our Goderich mine with the introduction of continuous mining and haulage* as well as various other efficiency programs at this mine and throughout our entire salt operations.
>
> *We have realized about $15 million in annualized savings for this business through the first quarter of 2018.  This included* broad based streamlining of the business, in addition to *some initial savings from the transition to continuous mining and haulage at Goderich*.  We expect that the remainder of these savings will be achieved mainly at Goderich.  We have installed all of the continuous mining and haulage equipment and continue to ramp up toward design rates.
>
> *We have had delays in our ramp up which were largely driven by some salt quality issues that are being addressed through our new optical sorting system* . . . .

- 39 -

138.    The statements referenced above in ¶137 concerning the expected "$40 million in annualized cost reductions" in the Salt segment—which presumably included the $30 million in cost-savings from CMCH at Goderich—were materially misleading when made because: (i) Compass Minerals had determined that even if the CMCH equipment could produce the 7.5 million tons of salt per year upon which the $30 million cost-savings model was based, CMCH would not directly save the Company approximately $30 million per year; (ii) as of August 2017, Compass Minerals' estimate of the direct annual savings from CMCH was approximately $13 million; and (iii) the $30 million cost-savings model included other Goderich mine cost-reduction initiatives that were not directly related to CMCH, as well as future initiatives that the Company had not yet identified.

139.    In addition, the statements referenced above in ¶137 concerning the "$15 million in annualized savings" that Compass Minerals had "realized . . . through the first quarter of 2018" were materially misleading when made because they conveyed that CMCH had already begun generating a significant amount of the cost-savings that Defendants had told investors it would produce at Goderich.  In truth, any savings were more than offset by higher expenses at Goderich related to CMCH—which Defendants did not account for when highlighting the savings the Company had purportedly "realized."

140.    Finally, the statements referenced above in ¶137 concerning "salt quality issues" were materially misleading when made because they conveyed that the delayed ramp-up was the result of natural circumstances, rather than because the CMCH system was underperforming.  In truth, the "delays in" the CMCH "ramp up" were largely driven by the CMCH equipment failing to perform as expected, while the "salt quality issues" at Goderich were due in part to the CMCH equipment producing salt that was finer than the salt previously produced by the drill-and-blast method.

Moreover, Defendants knew, but failed to disclose, that the "new optical sorting" equipment that Compass Minerals had installed at Goderich to "address[]" the salt quality issue would reduce output at the mine by approximately 400,000 tons per year, thereby increasing unit costs going forward.

141.    On August 6, 2018, after the close of the markets, Compass Minerals issued a press release announcing its financial results for 2Q18, ended June 30, 2018.  The same day, the Company filed the 2Q18 press release with the SEC as an exhibit to a Current Report on Form 8-K, which was signed by Defendant Standen.  In the press release, Compass Minerals disclosed that although salt demand had increased, the Company would not be able to meet the increased demand "due to production constraints" at Goderich, but falsely blamed the recent 12-week strike at the mine:

> While market-wide average bid volumes have increased this season compared to the 2017-2018 season, ***the company currently does not expect to increase salt sales volume expectations for 2018 due to production constraints.  These constraints are due to the impact of the ongoing ramping up of production following the [12]-week strike at the Goderich mine, which included an unexpected 7-day full work stoppage near the end of the strike***.

142.    The statements referenced above in ¶141 were materially misleading when made because they attributed Goderich's "production constraints" to the strike, when in truth, the  primary cause was the underperformance of the CMCH system.  Indeed, while the strike caused a production shortfall of approximately 750,000 tons–or 31% of the 2018 production shortfall, the remaining 69% of the shortfall was due to the underperformance of the CMCH system.

143.    The following day, August 7, 2018, Compass Minerals filed with the SEC its quarterly report for 2Q18 on Form 10-Q, which was signed by Defendant Standen.  The 2Q18 Form 10-Q also failed to disclose the following material information that was known to management, as required by Item 303 of Regulation S-K: (i) that the Goderich mine was failing to produce the quantity of salt that Compass Minerals' business required by increasingly large amounts; (ii) that these production shortfalls were primarily due to the underperformance of the CMCH system; and

(iii) that these production shortfalls were resulting in higher unit costs that materially reduced the Company's earnings and income from continuing operations.

144.    Also on August 7, 2018, Defendants held an earnings call with analysts and investors, during which Defendant Standen further discussed the strike's impact on salt production at Goderich, in pertinent part:

> *First I'll discuss the financial implications of the Goderich strike, including the costs we incurred and its impact on our production volumes*, which has also impacted how we approached the North American highway deicing bid season. The direct costs associated with the strike were offset by the payroll savings from our striking workforce.    Therefore, *the primary cost impact relates to reduced production levels* at the beginning of the strike, during the unplanned work stoppage at the end of the strike, and now, as we make another transition back to our unionized employees.

*     *     *

> *These starts and stops have reduced full year production expectations at Goderich*, which puts pressure on producing salt in advance of the upcoming winter season and on our second half operating margins because of unfavorable fixed cost absorption.

> It's important to note that *we plan to make up some of the production shortfall with purchased salt as well as serving some northern customers with salt from our Cote Blanche mine.  We expect that most of the volume-related cost impacts from the strike will be felt throughout the second half of 2018, as we deplete this higher cost inventory*.

145.    The statements referenced above in ¶144 were materially misleading when made because they attributed Goderich's "reduced production levels," and the expected "cost impacts" to the strike.  In truth, the primary cause was the underperformance of the CMCH system.  Indeed, while the strike caused a production shortfall of approximately 750,000 tons—or 31% of the 2018 production shortfall, the remaining 69% of the shortfall was due to the CMCH system underperforming Compass Minerals' expectations.

146.    During the call, Defendant Malecha continued to highlight the "annualized cost savings" that CMCH had purportedly "already delivered," stating as follows:

The second important takeaway is that we believe we have all the pieces in place to drive more efficiency through our salt operations, and particularly, at our Goderich mine. ***Our continuous mining and continuous haulage systems at the mine are ramping up and served [us] well during the work stoppage. As we have previously reported, we estimate that this investment has already delivered approximately $5 million in ongoing annualized cost savings***.

147.    The statements referenced above in ¶146 were materially misleading when made because they conveyed that CMCH had already begun generating a significant amount of the cost-savings that Defendants had told investors it would produce at Goderich. In truth, any savings were more than offset by higher expenses at Goderich related to CMCH—which Defendants did not account for when highlighting the savings CMCH had "already delivered."

148.    During the call, Defendant Standen also continued to blame increased costs in the Salt segment on the September 2017 ceiling fall at Goderich:

Salt operating earnings for the quarter increased 17% from second quarter 2017 results and operating margin expanded slightly. This growth was primarily due to better-operating rates in the U.K., ***partially offset by the pull forward of costs associated with the Goderich ceiling fall last year. Recall that we had expected about $3 million of carryover logistics cost in the second half of 2018. This expense is related to the shipment of Cote Blanche salt to some of our northern markets***. With the increase in highway deicing demand in the second quarter, we ended up selling almost all of this higher cost salt, which pulled those ***additional costs into the second quarter***.

149.    The statements referenced above in ¶148 were materially misleading when made because Compass Minerals was incurring costs to ship salt from its Cote Blanche mine to northern markets, not because of the ceiling fall, but because of the ongoing production shortfalls at Goderich, which were primarily due to the underperformance of the CMCH system. Indeed, the ceiling fall caused just 20% of the 2017 production shortfall.

150.    Also during the call, Defendant Standen stated:

. . . ***[W]e commissioned and began full utilizing our new optical sorting and screening equipment*** during the strike. Ultimately, ***we believe these efforts will improve our operations as we've largely addressed the quality issues in our salt production***.

- 43 -

151.    The statements referenced above in ¶150 were incomplete and materially misleading because they failed to disclose that the need for the sorting equipment was due in part to the CMCH equipment producing salt that was finer than the salt previously produced by the drill-and-blast method—and also finer than the specifications contractually-required by some customers.  In addition, the statements referenced above in ¶150 were incomplete and materially misleading because they failed to disclose that—in addition to its $9 million up-front cost—the sorting equipment would reduce output at Goderich by approximately 400,000 tons per year, thereby increasing unit costs going forward—and undermining its ability to "improve . . . operations" at Goderich.

152.    In response to the news that Compass Minerals would not be able to meet increased salt demand due to production constraints at Goderich, the price of Compass Minerals common stock tumbled 4.3%, from a closing price of $68.25 per share on August 6, 2018, to close at $65.30 per share on August 7, 2018.  By falsely blaming a one-off event—the strike—and continuing to conceal that the primary cause of the production constraints was the underperformance of the CMCH system, Defendants prevented a more substantial decline in the Company's share price.

153.    On September 12, 2018, Defendants Standen and Sepich spoke at the Credit Suisse Basic Materials Conference, during which Defendant Sepich stated, in pertinent part:

> Our approach to growing our salt business is to maximize the value of our salt assets by increasing our production efficiency . . . . From an efficiency perspective, **we have taken several actions to reduce our cost. . . . Specifically, at Goderich, I'm referring to moving the entire production of the mine to a continuous mining and continuous haulage operation.  We**, in fact, ended all drilling and blasting at that mine in November of 2017 and **are now ramping up at our targeted operating rates. As of the end of the second quarter of 2018, we've achieved a run rate of $15 million in ongoing annualized savings from these efforts**.

154.    The statements referenced above in ¶153 were materially misleading when made because the implementation of CMCH at Goderich was increasing—rather than "reduc[ing]"—the

Company's "cost."  In truth, the Goderich mine was failing to produce the quantity of salt that
Compass Minerals' business required by increasingly large amounts, primarily as a result of the
underperformance of the CMCH system, resulting in higher unit costs.  Those higher unit costs
materially reduced the Company's earnings and income from continuing operations—and
substantially offset the "$15 million in ongoing annualized savings" that Compass Minerals had
purportedly achieved.

155.    At the conference, Defendant Sepich presented a slide showing Goderich's
"Production Plan," which compared the mine's "[c]urrent production rate" to a target rate of 600,000
tons per month:



156.    While displaying the slide, Defendant Sepich stated, in pertinent part:

Getting to our targeted monthly production rates will determine when we start
achieving the full savings we expect from these investments.  *As you can see on this
chart, we're about 75% of the way to our targeted rates*. . . .

157.    This statement indicated that the Goderich mine was currently producing
approximately 450,000 tons of salt per month.

158.    Later during the conference, Defendant Standen similarly stated that achieving the
"cost savings" from CMCH would "depend[] on the timing of our full ramp-up *as we move from
75% production at Goderich* up to that 100% . . . ."

159.    The statements referenced above in ¶¶155, 156 and 158 were materially misleading when made because although the Goderich mine had produced approximately 438,000 tons of salt eight months earlier, in January 2018, Compass Minerals' internal production reports as of September 12, 2018 showed that Goderich was currently producing far less than 450,000 tons of salt per month. During the period from April through July 2018, when mining operations were also impacted by the 12-week labor strike, the Goderich mine produced an average of approximately 314,000 tons of salt per month. In August 2018, Goderich had produced only 332,000 tons of salt. And when Defendants Sepich and Standen spoke on September 12, 2018, the Goderich mine was on pace to produce less than 225,000 tons of salt in September 2018.

160.    During the conference, Defendant Standen discussed the Salt segment's "depressed production levels," in pertinent part:

> . . . *[T]he depressed production levels, that includes the cost associated with the* carryover inventory from . . . 2017, where we had a *ceiling fall. That was approximately $25 million. The other part of that is the depressed production this year related to the strike impact. We haven't given a granular number on that, but you can impute something that's pretty material in that number. So those items would generally non-repeat*, except for any carryover inventory that we have into 2019.

161.    The statements referenced above in ¶160 were materially misleading when made because they attributed depressed production levels and increased costs to one-off events—*i.e.*, the September 2017 ceiling fall and the 2018 strike—when in truth, the primary cause was the underperformance of the CMCH system. Indeed, the ceiling fall caused just 20% of the 2017 production shortfall, and the strike caused just 31% of the 2018 production shortfall. The remainder of the production shortfalls were due to the CMCH system underperforming Compass Minerals' expectations—which in turn resulted in higher unit costs.

## VI.    THE TRUTH EMERGES

162.    The truth concealed by Defendants' scheme and misrepresentations was revealed through a series of partial disclosures.  As described above, the partial impact of the scheme was revealed to the market in February 2018 and August 2018, when Defendants disclosed "delays" in ramping up the CMCH system and salt "production constraints," respectively, but concealed the true cause of the shortfalls.  Then, on October 23, 2018, investors discovered that CMCH was not, in fact, generating *any* cost-savings for Compass Minerals.  On that date, Compass Minerals issued a press release, filed with the SEC as an exhibit to a Current Report on Form 8-K, preannouncing disappointing financial results for 3Q18, ended September 30, 2018, and lowering its full year 2018 earnings guidance.  The Company blamed "production rates at its Goderich, Ontario, salt mine [that] were lower-than-expected for the third quarter of 2018"—resulting in an estimated "***negative impact of $15 million*** to third-quarter 2018 Salt segment earnings . . . ."  In the press release, Defendant Malecha commented, in pertinent part:

> "We are disappointed with our salt segment earnings, which were pressured this quarter by ***lower-than-expected production at our Goderich mine***.  Our employees are making improvements each month to ramp up production ***with our new continuous mining systems***; however, ***the pace of improvement continues to be slower than expected*** since the end of the strike.  Our new guidance reflects this slower ramp-up for the remainder of the year . . . ."

163.    Thus, the "$15 million in annualized savings"—which Defendants had repeatedly stated that Compass Minerals had "realized" in the Salt segment to-date—had been completely negated by a $15 million earnings reduction in 3Q18 due to "lower-than-expected production" by the CMCH system at Goderich.

164.    In response to this news, the price of Compass Minerals common stock fell more than 19%, from a closing price of $67.89 per share on October 22, 2018, to close at $54.70 per share on October 23, 2018, on more than seven times the previous day's trading volume.  The price of

Compass Minerals common stock continued to decline the following trading day, on unusually heavy trading volume, as the market digested the adverse announcements, closing at $47.24 per share on October 24, 2018—a total decline of more than 30%.

165.     Analysts and investors expressed frustration with the Company's failure to timely disclose production issues, or to deliver the expected benefits of CMCH at Goderich.  For example, on October 23, 2018, a large shareholder told Compass Minerals to "take a serious look at your original 2018 targets, and how you communicated and clung and 'aspired' since that day, and then look at the stock performance since that day and seriously ask yourself, is this any way to run a public company?"  A BMO Capital Markets analyst report published the same day lowered its price target for the Company, noting that "[i]t appears the mine will not run more smoothly until 2019."

166.     On October 24, 2018 Stephens published an analyst report stating that: "Persistent execution and guidance issues, which caused Compass Minerals to reduce 3Q18 and FY2018 guidance, are highly disappointing."   The same day, a large bondholder complained: "[B]ondholders' reliance on the Goderich mine and steady production levels seemed assured by management up until yesterday," observing that "proper communication or maybe timely understanding of production issues is very controllable by management and that is where the issues lie with [Compass Minerals]."

167.     Then, on November 19, 2018, the Company announced the abrupt termination of Defendant Malecha.  An analyst at BMO Capital Markets reported: "We believe this change speaks to the severity of the issues at Goderich . . . ."

168.     In response to this announcement, the price of Compass Minerals common stock tumbled from a closing price of $52.50 per share on Friday, November 16, 2018, to close at $51.50 per share on Monday, November 19, 2018, and continued to decline over the next two trading days,

closing at $48.34 per share on November 21, 2018—a total decline of nearly 8% over three trading days.

169.    On November 6, 2019, Compass Minerals revealed that the SEC was "investigating the Company's disclosures concerning the operation of the Goderich mine."

170.    Following a multi-year investigation, Compass Minerals disclosed that, between November 22, 2021, and December 1, 2021, the SEC had issued "Wells Notices" to Compass Minerals and each of the Individual Defendants, among others—meaning that the SEC staff had "made a preliminary determination to recommend that the SEC take action against" the Company and those individuals.

171.    Ultimately, on September 23, 2022, the SEC issued the SEC Order, along with a press release entitled: "SEC Charges Compass Minerals for Misleading Investors about Its Operations at World's Largest Underground Salt Mine."  The press release announced that Compass Minerals would pay $12 million to settle the charges, and had agreed "to cease and desist from further violations" of the federal securities laws.

172.    According to the press release, Compass Minerals had misled investors by "repeatedly assur[ing]" them that the CMCH upgrade at the Goderich mine "was on track to materially reduce costs and boost its operating results starting in 2018," but "failed to tell investors that costs at the mine were increasing rather than decreasing, which substantially undermined the projected savings."  The Company had also "misled investors by overstating the amount of salt it was able to produce at Goderich."

173.    As the SEC's Associate Director of the Division of Enforcement, Melissa Hodgman, explained in the press release:

> "What companies say to investors must be consistent with what they know.
> Yet Compass [Minerals] repeatedly made public statements that did not jibe with the

facts on—or under—the ground at Goderich . . . . By misleading investors about mining costs in Canada . . . , Compass [Minerals] fell far short of what the federal securities laws require."

174.    Although the Company's October 23, 2018 press release had blamed the lower production rates and higher costs at Goderich that led to the earnings miss in 3Q18, in part, on the strike, unbeknownst to investors, the true cause of the miss was Defendants' concealment of and misrepresentations concerning the costs associated with the CMCH upgrade, and the CMCH system's inability to meet salt production targets.  However, the fact that Defendants knew or recklessly disregarded that their Class Period statements were false and misleading was not known until September 23, 2022, when the SEC Order revealed Defendants' Class Period misconduct.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

175.    As alleged herein, Defendants acted with scienter in that Defendants: (i) knew, or at the very least were reckless in not knowing, that the public documents and statements they issued or disseminated in the name of the Company or in their own names during the Class Period were materially false and misleading when made; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

176.    Defendants, by virtue of their receipt of information reflecting the true facts regarding Compass Minerals, their control over, and/or receipt and/or modification of Compass Minerals' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Compass Minerals, were active and culpable participants in the fraudulent scheme alleged herein.

177.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme

described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

178.    The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

179.    Compass Minerals, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Compass Minerals' true operating condition from investors.

180.    Defendants' actual knowledge of information contradicting their public statements about CMCH demonstrates their scienter. For example, Defendant Malecha received an internal presentation in April 2017, which explained that "the move to [CMCH] has not met expectations and forecasts," and that Goderich "has not been able to maintain consistent production." Malecha

acknowledged the information in the presentation, writing to the Board two days later that: "[w]e have not made the progress required on . . . continuous mining, and production reliability."

181.    That month, Compass Minerals revisited its CMCH cost-savings projections and concluded that the projections were inaccurate, as detailed above.  But instead of accurately updating the projections issued to investors, Compass Minerals executives manufactured a new model to support the existing $30 million cost-savings forecast—which included cost-reduction initiatives that were not directly related to CMCH, as well as future initiatives that the Company had not even identified.  Defendant Malecha, together with Compass Minerals finance and operations employees, the CFO, and the General Counsel, then reviewed the new forecast and determined that the Company would continue to tell investors that it expected CMCH to generate $30 million in annual cost savings.

182.    From August through October 2017, Compass Minerals executives provided reports to Defendant Malecha, Defendant Standen, and the Board, showing that Goderich was continuing to fall far short of the production expectations underlying the Company's CMCH cost-savings model— producing less than half of the 7.5 million tons on which the model was based.  Compass Minerals' executives also provided reports to management showing that unit cost at Goderich continued to be significantly higher than expected.

183.    Nevertheless, following each of these reports, Defendants continued to tell investors that the CMCH project would save the Company approximately $30 million annually beginning in 2018—without adequately disclosing that this forecast required a level of salt production that Goderich was far from achieving, or that ongoing production shortfalls would continue to result in unit cost increasing, rather than decreasing.

184.    In addition, the fraud alleged herein relates to the core business of Compass Minerals, so knowledge of the fraud may be imputed to Defendants. During the Class Period, the Goderich mine was the largest single contributor to Compass Minerals' financial results, accounting for approximately one-third of the Company's earnings. Accordingly, Defendants closely monitored all aspects of Goderich's operations, including the progress of the CMCH upgrade, realized and projected cost-savings from CMCH, salt production volume, and unit cost—and were aware that the CMCH system was underperforming Compass Minerals' expectations, resulting in production shortfalls and increased costs.

185.    Furthermore, Defendants spoke about the CMCH upgrade during every earnings call and investor conference throughout the Class Period, demonstrating that the topic was high on Defendants' radar, and a key concern for analysts and investors. Defendants' statements gave rise to a duty to familiarize themselves with current facts about the CMCH upgrade, so as to ensure that their public statements on the topic were accurate and complete. Nevertheless, Defendants repeated their false and misleading statements, detailed above, on numerous occasions, even as the facts on the ground changed, and as contradictory information became apparent.

186.    The fact that many of Defendants' false and misleading statements were scripted, and were reviewed by Company executives before they were made, shows that the statements were premeditated. Indeed, Defendants had multiple opportunities to prevent the statements from being made, or to cause them to be corrected—but did not—which underscores their scienter.

187.    Finally, Compass Minerals' longstanding and admitted violations of U.S. Generally Accepted Accounting Principles ("GAAP"), admitted material weaknesses in internal control over financial reporting, and subsequent restatement, all contribute to a strong inference of scienter.

188.    Throughout the Class Period, and continuing thereafter, Compass Minerals improperly valued its salt inventory at interim periods using forecasted cost per ton, rather than actual cost per ton, as required by GAAP.[6] *See* Accounting Standards Codification ("ASC") 330-10-30-1.[7] As a result, Compass Minerals filed materially misstated financial statements due to its use of a salt inventory accounting methodology that did not comply with GAAP.  The Company's GAAP violations had a material impact on its financial statements for certain interim periods.

189.    On August 5, 2021, Compass Minerals announced that it had identified a material weakness in its internal control over financial reporting.[8] Compass Minerals subsequently restated its quarterly Salt segment results for the first quarter of 2019 through the first quarter of 2021.

## VIII.   LOSS CAUSATION AND ECONOMIC LOSS

190.    During the Class Period, as detailed herein, Defendants made false and misleading statements and/or engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Compass Minerals common stock and operated as a fraud or deceit on Class Period purchasers of Compass Minerals stock.  As some of Defendants' misrepresentations and

---

[6]    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).

[7]    ASC 330-10-30-1 states, in pertinent part: "The primary basis of accounting for inventories is cost, which has been defined generally as the price paid or consideration given to acquire an asset. As applied to inventories, cost means in principle the sum of the applicable expenditures and charges directly or indirectly incurred in bringing an article to its existing condition and location. It is understood to mean acquisition and production cost . . . ."

[8]    As the Company later explained, the material weakness pertained to "controls and policies to analyze inventory variances at interim reporting dates that required capitalization for its salt inventory."

became apparent to the market, the price of Compass Minerals common stock fell precipitously, as the prior artificial inflation dissipated. As a result of their purchases of Compass Minerals common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

191.    By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Compass Minerals' business and prospects. Defendants' false and misleading statements and omissions had the intended effect and caused Compass Minerals' common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $76.65 per share on January 3, 2018.

192.    The precipitous decline in the price of Compass Minerals common stock was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market and/or the risks concealed by Defendants' fraud materializing and causing losses to investors. The timing and magnitude of the decline in the price of Compass Minerals common stock negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Compass Minerals common stock and the subsequent significant decline in the value of Compass Minerals common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed and/or the risks concealed by Defendants' fraud materialized.

## IX.    NO SAFE HARBOR

193.    Compass Minerals' "safe harbor" warnings accompanying its purportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. The specific statements pled herein were not FLS or identified as such, but

rather were statements of present or historical fact. To the extent any statements can properly be considered forward-looking, such statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly FLS.

194. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and/or the FLS was authorized and approved by an executive officer of the Company who knew that the FLS was false or misleading. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## X.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE

195. Plaintiffs are entitled to a presumption of reliance under the fraud-on-the market doctrine, because the market for Compass Minerals' publicly-traded stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and misleading statements and failures to disclose alleged herein, Compass Minerals stock traded at artificially inflated prices during the Class Period. Plaintiffs and other Class members purchased Compass Minerals stock in reliance on the integrity of the market price of the stock and the market information relating to Compass Minerals, and have been damaged thereby.

196. At all relevant times, the market for Compass Minerals stock was efficient for at least the following reasons:

(a)     Compass Minerals stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Compass Minerals filed periodic public reports with the SEC and the NYSE;

(c)     Compass Minerals regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Compass Minerals was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

197.    As a result of the foregoing, the market for Compass Minerals stock promptly digested current information regarding Compass Minerals from all publicly available sources and the trading price of the stock reflected such information.  Under these circumstances, all purchasers of Compass Minerals stock during the Class Period suffered similar injury through their purchase of Compass Minerals stock at artificially inflated prices and a presumption of reliance applies.

198.    A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  Because the claims alleged are predicated in part upon omissions of material fact for which there was a duty to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have

considered them important in making investment decisions.  Given the importance of Defendants'
material omissions set forth above, that requirement is satisfied here.

## XI.    CLASS ACTION ALLEGATIONS

199.    Plaintiffs bring this action as a class action under Federal Rules of Civil Procedure
23(a) and 23(b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired
Compass Minerals common stock during the Class Period and were damaged thereby (the "Class").
Excluded from the Class are: (i) Defendants and members of their immediate families; (ii) the
officers and directors of the Company, at all relevant times, and members of their immediate
families; (iii) the legal representatives, heirs, successors, or assigns of any of the foregoing; and (iv)
any entity in which any Defendant has or had a controlling interest.

200.    The members of the Class are so numerous that joinder of all members is
impracticable.  Throughout the Class Period, Compass Minerals common stock was actively traded
on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and
can only be ascertained through appropriate discovery, there are likely hundreds, if not thousands, of
members in the proposed Class.  Record owners and other Class members may be identified from
records maintained by Compass Minerals or its transfer agent and may be notified of the pendency
of this action using a form of notice customarily used in securities class actions.

201.    Plaintiffs' claims are typical of the claims of the Class, as all Class members were and
are similarly affected by Defendants' conduct.

202.    Plaintiffs will fairly and adequately protect the interests of the members of the Class
and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs
have no interests antagonistic to or in conflict with those of the Class.

203.    Common questions of law and fact exist as to all Class members and predominate
over any questions solely affecting individual Class members, including:

(a)    whether Defendants violated the Exchange Act;

(b)    whether Defendants misrepresented and/or omitted material facts;

(c)    whether Defendants knew or recklessly disregarded that their statements were false and misleading; and

(d)    whether Defendants' statements and/or omissions artificially inflated the price of Compass Minerals common stock and the extent and appropriate measure of damages.

204.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the alleged wrongs done to them.  There will be no difficulty in managing this action as a class action.

## XII.    COUNTS

### COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

205.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

206.    During the Class Period, Defendants engaged in a scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Compass Minerals stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

207.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to maintain artificially high market prices for Compass Minerals stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

208.    Defendants, individually and together, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Compass Minerals' financial well-being and prospects, as specified herein.

209.    Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Compass Minerals' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material fact and/or omitting to state material facts necessary in order to make the statements made about Compass Minerals and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's stock during the Class Period.

210.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team

or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or deliberately disregarded was materially false and misleading.

211.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with deliberate disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Compass Minerals' financial well-being and prospects from the investing public and supporting the artificially inflated price of its stock.   As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

212.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Compass Minerals stock was artificially inflated during the Class Period.   In ignorance of the fact that the market price

of the Company's stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the markets in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Compass Minerals stock during the Class Period at artificially high prices and were damaged thereby.

213.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Compass Minerals was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased their Compass Minerals stock, or, if they had purchased such stock during the Class Period, they would not have done so at the artificially inflated prices they paid.

214.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

215.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

216.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

217.    The Individual Defendants acted as controlling persons of Compass Minerals within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

218.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

219.    As set forth above, Compass Minerals and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying the Class accordingly, designating Lead Plaintiff as a class representative, and appointing Lead Counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Granting such other, further, and/or different relief as the Court deems just and proper.

## XIV.  JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  March 13, 2023            **STUEVE SIEGEL HANSON LLP**
                                  NORMAN E. SIEGEL, KSD #70354

                                  _/s/ Norman E. Siegel_

                                  Norman E. Siegel, KSD #70354
                                  460 Nichols Road, Suite 200
                                  Kansas City, MO  64112
                                  Telephone:  816/714-7100
                                  816/714-7101 (fax)
                                  siegel@stuevesiegel.com

                                  _Local Counsel_

**ROBBINS GELLER RUDMAN
   & DOWD LLP**
DARRYL J. ALVARADO
JOSEPH J. TULL
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dalvarado@rgrdlaw.com
jtull@rgrdlaw.com

**ROBBINS GELLER RUDMAN
   & DOWD LLP**
ERIN W. BOARDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
eboardman@rgrdlaw.com

**KIRBY McINERNEY LLP**
THOMAS W. ELROD
ANDREW M. McNEELA
IRA M. PRESS
250 Park Avenue, Suite 820
New York, NY  10177
Telephone:  212/317-2300
212/751-2540 (fax)
telrod@kmllp.com
amcneela@kmllp.com
ipress@kmllp.com

*Lead Counsel for Lead Plaintiff*

**FRIEDMAN & ANSPACH**
EUGENE FRIEDMAN
DANIEL TREIMAN
1500 Broadway
New York, NY  10036
Telephone:  212/354-4500
efriedman@friedmananspach.com
dtreiman@friedmananspach.com

*Additional Counsel*