UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

| | |
|---|---|
| LOCAL 295 IBT EMPLOYER GROUP WELFARE FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>    vs.<br><br>COMPASS MINERALS INTERNATIONAL, INC., et al.,<br><br>                Defendants. | Civil Action No. 2:22-cv-02432-EFM-ADM<br><br>CLASS ACTION |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO STRIKE AND MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS ......................................................................................3

III.    ARGUMENT .........................................................................................................11

      A.      The AC Properly Relies on the SEC Order .................................................12

      B.      The AC Pleads Actionable Misrepresentations ..........................................16

            1.      The AC Alleges Falsity with the Requisite Particularity............................16

            2.      Defendants' Remaining Arguments Regarding Each Category of Misstatements Are Meritless...................................................................18

                  a.      Defendants' Statements Concerning Expected Cost-Savings Are Actionable ................................................................18

                  b.      Defendants' Statements Concerning Realized Cost-Savings Are Actionable ................................................................21

                  c.      Defendants' Statements Concerning Production Capacity Are Actionable ................................................................22

                  d.      Defendants' Statements Concerning the Reasons for Increased Costs and Production Constraints Are Actionable ........23

                  e.      Defendants' Statements Concerning Current Salt Production Levels Are Actionable................................................24

             3.      Plaintiffs Have Pled Actionable Omissions Under Item 303.....................25

      C.      The AC Pleads a Strong Inference of Scienter .....................................................27

            1.      The Facts Alleged from the SEC Order Give Rise to a Strong Inference of Intent to Defraud or Recklessness .......................................28

            2.      Additional Factors Further Support Scienter ............................................33

            3.      The Inference of Scienter Is More Compelling than Any Inference of Innocence...............................................................................35

      D.      Plaintiffs Have Pled Cognizable Claims Against the Individual Defendants........36

      E.      Plaintiffs' Claims Are Timely................................................................................36

      F.      Plaintiffs Have Pled a Control-Person Claim Under §20(a)................................39

**Page**

IV.     CONCLUSION.......................................................................................................39

- ii -

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Abadilla v. Percigen, Inc.*,
2022 WL 1750033 (N.D. Cal. May 31, 2022) ...........................................................................13

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ...........................................................................................16, 17

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*,
19 F.4th 145 (2d Cir. 2021) ........................................................................................................17

*Anderson v. Spirit AeroSystems Holdings, Inc.*,
105 F. Supp. 3d 1246 (D. Kan. 2015), *aff'd*,
827 F.3d 1229 (10th Cir. 2016) .............................................................................................20, 28

*Anderson v. Spirit AeroSystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) .............................................................................................32, 34

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).....................................................................................................................11

*Ass'n of N.J. Chiropractors, Inc. v. Data iSight, Inc.*,
2022 WL 4483596 (D.N.J. Sept. 27, 2022) ...............................................................................16

*Better v. YRC Worldwide Inc.*,
2012 WL 4433500 (D. Kan. Sept. 25, 2012).............................................................................20

*Boncimino v. N.Y. State Unified Ct. Sys.*,
2018 WL 2225004
(S.D.N.Y. May 15, 2018)............................................................................................................14

*City of N. Mia. Beach Police Officers' & Firefighters' Ret. Plan v.*
*Nat'l Gen. Holdings Corp.*,
2021 WL 212337, (S.D.N.Y. Jan. 21, 2021) *aff'd sub nom.*
*Town of Davie Police Officers Ret. Sys. v.*
*City of N. Mia. Beach Police Officers' & Firefighters' Ret. Plan*,
2021 WL 5142702 (2d Cir. Nov. 5, 2021).................................................................................12

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020).......................................................................................14

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
637 F.3d 169 (2d Cir. 2011)........................................................................................................37

*Correa v. Liberty Oilfield Servs., Inc.*,
548 F. Supp. 3d 1069 (D. Colo. 2021)........................................................................................20

**Page**

*Dau v. Cephalon Inc.*,
  2000 WL 1469308 (E.D. Pa. Sept. 25, 2000) ..........................................................13

*de la Fuente v. DCI Telecomms., Inc.*,
  259 F. Supp. 2d 250 (S.D.N.Y. 2003)......................................................................16

*DeMartino v. N.Y. State Dep't of Tax'n & Fin.*,
  2023 WL 2563967 (2d Cir. Mar. 20, 2023).............................................................16

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017)................................................................................36, 37

*Franchi v. SmileDirectClub, Inc.*,
  2022 WL 4594575, (M.D. Tenn. Sept. 30, 2022)....................................................27

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
  376 F. Supp. 2d 385 (S.D.N.Y. 2005)......................................................................13

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018)......................................................................32

*Geinko v. Padda*,
  2002 WL 276236 (N.D. Ill. Feb. 27, 2002) .............................................................16

*Glazer Cap. Mgmt., L.P. v. Forescout Techs. Inc.*,
  63 F.4th 747 (9th Cir. 2023) ....................................................................................17

*GSAA Home Equity Tr. 2006-2 ex rel. LL Funds LLC v. Wells Fargo Bank, N.A.*,
  133 F. Supp. 3d 1203 (D.S.D. 2015) .......................................................................13

*Hanson v. Frazer, LLP*,
  2015 WL 4561707 (S.D.N.Y. July 17, 2015) ..........................................................16

*Haw. Ironworkers Annuity Tr. Fund v. Cole*,
  2011 WL 1257756 (N.D. Ohio Mar. 31, 2011) .......................................................13

*Hull v. Glob. Digit. Sols.*,
  2017 WL 6493148 (D.N.J. Dec. 19, 2017)...............................................................13

*In re Apollo Grp. Inc. Sec. Litig.*,
  2011 WL 5101787 (D. Ariz. Oct. 27, 2011).............................................................30

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012)................................................................12, 14

*In re Connetics Corp. Sec. Litig.*,
  542 F. Supp. 2d 996 (N.D. Cal. 2008) .....................................................................16

**Page**

*In re CRM Holdings, Ltd. Sec. Litig.*,
2012 WL 1646888 (S.D.N.Y. May 10, 2012) ..........................................................................13

*In re Fannie Mae 2008 Sec. Litig.*,
891 F. Supp. 2d 458 (S.D.N.Y. 2012), *aff'd*,
525 F. App'x 16 (2d Cir. 2013) ........................................................................................13, 14

*In re Gold Res. Corp. Sec. Litig.*,
776 F.3d 1103 (10th Cir. 2015) ........................................................................................18, 35

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) ........................................................................................20, 28

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
218 F.R.D. 76 (S.D.N.Y. 2003) ...............................................................................................13

*In re Molycorp, Inc. Sec. Litig.*,
157 F. Supp. 3d 987 (D. Colo. 2016)........................................................................................33

*In re Mylan N.V. Sec. Litig.*,
2023 WL 3539371 (W.D. Pa. May 18, 2023)...........................................................................15

*In re Mylan N.V. Sec. Litig.*,
379 F. Supp. 3d 198 (S.D.N.Y. 2019)..........................................................................12, 13, 14

*In re Myriad Genetics, Inc.*,
2021 WL 977770 (D. Utah March 16, 2021)............................................................................22

*In re NPS Pharms., Inc. Sec. Litig*,
2007 WL 1976589 (D. Utah July 3, 2007) .........................................................................19, 20

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) .................................................................................................25

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
838 F. Supp. 2d 1148 (D. Colo. 2012)......................................................................................37

*In re Platinum & Palladium Commodities Litig.*,
828 F. Supp. 2d 588 (S.D.N.Y. 2011).......................................................................................13

*In re REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010).....................................................................................32

*In re Romeo Power Inc. Sec. Litig.*,
2022 WL 1806303 (S.D.N.Y. June 2, 2022) ............................................................................34

**Page**

*In re Scottish Re Grp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007)...................................................................35

*In re Teva Sec. Litig.*,
  2023 WL 3186407 (D. Conn. May 1, 2023)...............................................13, 15, 16

*In re Under Armour Sec. Litig.*,
  540 F. Supp. 3d 513 (D. Md. 2021)...............................................................13, 29

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) .........................................................................29

*In re Wells Fargo & Co. Sec. Litig.*,
  2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)...................................................22

*In re Williams Sec. Litig.*,
  339 F. Supp. 2d 1206 (N.D. Okla. 2003).........................................................19

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
  45 F.4th 1236 (10th Cir. 2022) ................................................................ *passim*

*Integrity Advance, LLC v. Consumer Fin. Prot. Bureau*,
  48 F.4th 1161 (10th Cir. 2022) .......................................................................38

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
  14 F.4th 141 (2d Cir. 2021) ...........................................................................22

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011).....................................................................................36

*Lamartina v. VMware, Inc.*,
  2023 WL 2763541 (N.D. Cal. Mar. 31, 2023).....................................................29

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976)......................................................................13, 14

*Major Energy Elec. Servs., LLC v. Horowitz*,
  2020 WL 4432121 (S.D.N.Y. July 31, 2020) .....................................................13

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).......................................................................................12

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
  2011 WL 4389689 (C.D. Cal. May 5, 2011) .......................................................16

*Medina v. Clovis Oncology, Inc.*,
  215 F. Supp. 3d 1094 (D. Colo. 2017)..............................................................33

**Page**

*Merck & Co., Inc. v. Reynolds*,
559 U.S. 633 (2010)................................................................................................37, 38

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
2022 WL 17815767 (2d Cir. Dec. 20, 2022) ...........................................................27

*Nakkhumpun v. Taylor*,
782 F.3d 1142 (10th Cir. 2015) ....................................................................24, 27, 35

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019)........................................................................26

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) .....................................................................................32

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)............................................................................................20, 23

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000)......................................................................................25

*Owens v. Jastrow*,
789 F.3d 529 (5th Cir. 2015) ....................................................................................31

*Rubio ex rel. Z.R. v. Turner Unified Sch. Dist. No. 202*,
475 F. Supp. 2d 1092 (D. Kan. 2007).......................................................................12

*Sawo v. Drury Hotels Co., LLC*,
2011 WL 3611400 (D. Kan. Aug. 15, 2011) ............................................................12

*Scognamillo v. Credit Suisse First Bos. LLC*,
2005 WL 8162733 (N.D. Cal. Feb. 1, 2005) ............................................................13

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
119 F. Supp. 3d 1213 (C.D. Cal. 2015) ....................................................................30

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
2016 WL 7117455 (M.D. Pa. Dec. 7, 2016)..............................................................13

*SEC v. Lee*,
720 F. Supp. 2d 305 (S.D.N.Y. 2010)...........................................................13, 15, 16

*Simmons Invs., Inc. v. Conversational Computing Corp.*,
2011 WL 673759 (D. Kan. Feb. 17, 2011) ...............................................................19

*Smallen v. W. Union Co.*,
950 F.3d 1297 (10th Cir. 2020) ................................................................................29

**Page**

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015)..................................................................................................26

*Strougo v. Barclays PLC*,
105 F. Supp. 3d 330 (S.D.N.Y. 2015)..............................................................................13, 15

*Teetz as Next Friend of Lofton v. Sedgwick Cnty., Kan.*,
2023 WL 3040460 (D. Kan. Apr. 21, 2023)........................................................................39

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)............................................................................................................28

*Theodore v. Purecycle Techs., Inc.*,
2023 WL 4035880 (M.D. Fla. June 15, 2023)......................................................................34

*U.S. Postal Serv. v. Gregory*,
534 U.S. 1 (2001)................................................................................................................16

*UMB Bank, N.A. v. Monson*,
2022 WL 3910467 (D. Kan. Aug. 31, 2022) ......................................................................12

*Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC*,
2013 WL 1342529 (S.D.N.Y. Mar. 29, 2013) ....................................................................12

*United States v. Gilbert*,
668 F.2d 94 (2d Cir. 1981)..................................................................................................13

*United States v. Stewart*,
2004 WL 113506 (S.D.N.Y. Jan. 26, 2004) ........................................................................30

*Utesch v. Lannett Co., Inc.*,
385 F. Supp. 3d 408 (E.D. Penn. 2019) .........................................................................12, 13

*Vanleeuween v. Kenyuan Petrochemicals, Inc.*,
2014 WL 3891351 (S.D.N.Y. Aug. 8, 2014)........................................................................13

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019) ................................................................................16

*VNB Reality, Inc. v. Bank of Am. Corp.*,
2013 WL 5179197 (S.D.N.Y. Sept. 16, 2013)......................................................................14

*Webb v. Solarcity Corp.*,
884 F.3d 844 (9th Cir. 2018) ..............................................................................................31

*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*,
426 F. Supp. 3d 864 (D. Kan. 2019)........................................................................26, 33, 34

**Page**

*York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*,
   65 F.4th 459 (9th Cir. 2023) ........................................................................ *passim*


**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §78j(b)......................................................................................... *passim*
   §78t(a) ...............................................................................................39
   §78u-4(b)(1) ......................................................................................17
   §78u-5(c) ...........................................................................................19

28 U.S.C.
   §1658(b)(1) .......................................................................................37
   §1658(b)(2) ....................................................................................2, 32

Federal Rules of Civil Procedure
   Rule 9(b) .......................................................................................12, 27
   Rule 11 .........................................................................................15, 16
   Rule 11(b) .........................................................................................15
   Rule 11(b)(3).......................................................................................15
   Rule 12(b)(6).......................................................................................11
   Rule 12(f) ......................................................................................12, 14
   Rule 15(a)..........................................................................................39

Federal Rules of Evidence
   Rule 408 .......................................................................................13, 14
   Rule 410 ...........................................................................................13
   Rule 803(8) .......................................................................................14
   Rule 803(8)(A)(iii)..............................................................................14

17 C.F.R.
   §229.303(b)(2)(ii) ..............................................................................25


**LEGISLATIVE HISTORY**

Private Securities Litigation Reform Act of 1995
   Pub. L. No. 104-67, 109 Stat. 737 (1995).......................................... *passim*

Lead Plaintiff Retail Wholesale Department Store Union Local 338 Retirement Fund and additional plaintiff Local 295 IBT Employer Group Welfare Fund ("Plaintiffs") respectfully submit this memorandum in opposition to Defendants'[1] motion to strike and motion to dismiss the AC.

## I.    INTRODUCTION

Compass operates the largest underground rock salt mine in the world in Goderich, Ontario, Canada ("Goderich" or the "Goderich mine"). ¶3. This case concerns a multi-year project undertaken by Compass to upgrade the mining system at Goderich from traditional "drill-and-blast" mining, to a mechanized system known as continuous mining and continuous haulage ("CMCH"). ¶¶4, 30. Compass initially projected that CMCH would save it roughly $30 million annually, beginning in 2018, mainly by reducing the cost of salt mined at Goderich. ¶¶4, 31. The Company announced this forecast to investors in April 2015. ¶33.

As might happen with any complex undertaking, however, the CMCH project faced a number of unforeseen obstacles during 2016 and 2017. ¶¶5-6, 34-40. Given those problems, Compass reevaluated its $30 million cost-savings projection in April 2017, and determined that—at best—CMCH would only directly save about $18 million per year. ¶¶7, 44. Compass executives— including Defendant Malecha—*reviewed the revised forecast* and decided that the Company would *continue to tell investors* that it expected CMCH to generate $30 million in annual cost-savings. ¶¶7, 46. Defendants then proceeded to do so on numerous occasions, before and during the Class Period—despite receiving reports showing that Goderich was also falling short of the production levels underlying the cost-savings forecast—and even after Compass again lowered its internal

---

[1]    "Defendants" refers to Compass Minerals International, Inc. ("Compass" or the "Company"), Francis J. Malecha (CEO), James D. Standen (CFO), and Anthony J. Sepich (Senior VP of the Salt segment). ¶¶24-27. References to "¶" or "¶¶" are to the Amended Complaint for Violations of the Federal Securities Laws (ECF 23) (the "AC"). "MTD" refers to Defendants' Memorandum of Law in Support of Their Motion to Strike and Motion to Dismiss. Capitalized terms not defined herein are as defined in the AC. Unless otherwise noted, emphasis is added and citations are omitted.

projection in August 2017, to just $13 million.  ¶¶7, 47-62, 98, 103, 117.[2]  By making these knowingly false statements, Defendants turned a business setback into securities fraud.

Defendants also falsely stated that CMCH had saved Compass $5 million in 2017, when internal documents showed the actual savings were just $1.1 million, and those savings were dwarfed by higher expenses at Goderich during 2017 related to CMCH.  ¶¶9, 64-70.  Additionally, Defendants represented that Goderich's annual production capacity was eight million tons of salt in 2017, when the mine was not capable of producing close to that amount and had produced less than 5.2 million tons of salt in 2017.  ¶¶71-74, 115-116.  Defendants further stated that Goderich was 75% of the way to its targeted production rate—indicating it was producing 450,000 tons of salt per month—when production reports showed it was on track to produce just 225,000 tons that month.  ¶¶12, 79-82, 155-159.  When Defendants gave bad news to investors, they disproportionately blamed factors besides the CMCH upgrade.  For example, they claimed that a ceiling collapse had reduced earnings by $20 million, when the true amount was $3 million (¶¶10, 75-76, 120, 122, 124-126); attributed salt quality issues to the mine's geology, when those issues were partly caused by the CMCH equipment (¶¶8, 68, 70, 127); and blamed a labor strike for production constraints, although the strike caused less than one-third of Compass' production shortfall.  ¶¶11, 77, 141.

These allegations—which are properly drawn from a consent order Compass entered into with the SEC (the "SEC Order")—speak for themselves: Defendants made materially false and misleading statements, and did so knowingly or at least recklessly, rendering them liable under §10(b) of the Securities Exchange Act of 1934.  None of their various defenses demonstrates otherwise.

---

[2]   The Class Period runs from October 31, 2017 through November 18, 2018.  ¶1.  It begins in October 2017 (although the fraud began in April 2017) due to the five-year repose period for §10(b) claims (28 U.S.C. §1658(b)(2)), since this action was filed on October 21, 2022.  *See* ECF 1.

## II.    STATEMENT OF FACTS

Compass mines and produces salt for winter roadway safety and other consumer, industrial, and agricultural uses, as well as specialty plant nutrition minerals that improve the quality and yield of crops.  ¶2.  During the Class Period, Compass' Salt segment accounted for approximately 60% of its consolidated revenues, with plant nutrition accounting for the remainder.  *Id*.  Within the Salt segment, the Goderich mine—considered the "crown jewel" of Compass' asset portfolio—generated about one-third of the Company's earnings during the Class Period.  ¶3.

In late 2014, Compass embarked on the upgrade to CMCH, primarily to reduce costs and improve profitability.  ¶¶4, 30.  CMCH uses complex machinery to cut salt from the face of the rock, and uses flexible conveyor trains to transport the salt for processing.  *Id*.  At that time, Compass forecasted that the project would cost $70-$80 million and, after it was fully implemented, would reduce the unit cost of salt mined at Goderich by over 23%—saving the Company approximately $30 million annually, beginning in 2018.[3]  ¶¶4, 31.  Defendant Malecha disclosed this forecast to investors during an April 2015 earnings call.  ¶33.  Significantly, Compass' cost-savings projection was premised on Goderich producing 7.5 million tons of salt per year using CMCH.  ¶32.  Because the unit cost of salt decreases as production volume increases, production volume was a key variable in Compass' ability to reduce its unit cost and attain the expected cost-savings.  *Id*.

Throughout 2016 and 2017, however, various issues—including challenges with the implementation of the new CMCH machines—caused the CMCH project to fall far short of the assumptions on which the Company's cost-savings model was based.  ¶¶5-6, 34-40.  Exacerbating those problems, in 2016, Compass encountered increased levels of rock and other impurities in Goderich's salt deposit, which slowed mining operations and contributed to the underperformance of

---

[3]    "Unit cost" is the total expenditure incurred by a company to produce, store, and sell one unit of a particular product.  *See* https://www.investopedia.com/terms/u/unitcost.asp.

the CMCH system. ¶34. During 2016, the CMCH equipment that Compass had installed produced only about 1.4 million tons of salt—which was significantly below Company expectations, and a fraction of the 7.5 million tons required to achieve the $30 million in cost-savings. ¶¶5, 34.

The difficulties implementing CMCH as planned, combined with other operational challenges at the Goderich mine, caused Compass to incur significant unplanned expenses. ¶¶5, 35. For example, in late 2016 and early 2017, to make up for the shortfalls at Goderich, Compass purchased approximately 250,000 tons of salt from third parties at significant premiums in order to meet its contractual commitments to customers. *Id*. Compass also had to pay shipping and logistics expenses to transport salt from its mine in Cote Blanche, Louisiana to the northern markets typically served by Goderich. *Id*.

The production shortfalls at Goderich resulted in significant increases in unit cost. ¶36. While Compass had projected that unit costs at Goderich would remain stable through mid-2016, and then begin to decline by the end of 1Q17, they instead *increased by more than 42%* during that period—primarily because of the difficulties implementing CMCH. ¶¶5, 36.

During the first three operating months of 2017, as Goderich was transitioning to exclusively using CMCH, the CMCH system was producing less than 260,000 tons of salt per month. ¶¶6, 38. That amount was substantially below internal expectations and put the mine on pace to produce *less than half* of the 7.5 million tons of salt needed to generate $30 million in annual savings. *Id*. Moreover, the installation of an additional CMCH machine that Compass was relying on to increase production was about nine months behind schedule, and was not expected to be completed until November 2017. ¶¶6, 39. The CMCH equipment that had already been installed was also taking significantly longer to ramp up than Compass had initially assumed. ¶¶6, 40. In the interim, Goderich's production shortfalls were continuing to result in significant unplanned expenses, and in turn, substantial increases to unit cost—a trend that Compass' experience showed would persist until

- 4 -

the ramp-up was complete.  ¶40.

In April 2017, Defendant Malecha received an internal presentation explaining that "the move to [CMCH] has not met expectations and forecasts," and that Goderich "has not been able to maintain consistent production."  ¶41.  Two days later, Malecha informed the Company's Board that "*[w]e have not made the progress required on . . . continuous mining*[] and production reliability." *Id*.  That month, Compass reevaluated its $30 million cost-savings projection, and determined that many of the assumptions used in its original calculations had proven faulty.  ¶¶7, 42.  For example, Compass, working with a third-party consultant, had underestimated the amount of electricity needed to run the CMCH systems, as well as the maintenance and repair expenses for the systems, which were breaking down more often than expected.  ¶43.  Compass' new projections showed that *even if* CMCH could produce 7.5 million tons of salt annually, the direct annual savings from CMCH would only be approximately *$18 million*.  ¶¶7, 44.

Instead of accurately updating the cost-savings projection issued to investors, Compass executives reverse-engineered a new model to support the existing $30 million forecast.  ¶45.  The revised model included other Goderich mine cost-reduction initiatives that were *not* directly related to CMCH, as well as future initiatives the Company had *not yet identified*.  *Id*.  For example, it included expected savings from separate "continuous improvement projects" at Goderich—such as a project predating CMCH to reduce the number of conveyor belt stops—as well as an amount for yet-to-be-identified "operational excellence" projects.  *Id*.  Compass employees and executives— including Defendant Malecha—*reviewed the new forecast* and determined that the Company would nonetheless *continue to tell investors* that it expected CMCH to generate $30 million in annual cost-savings.  ¶¶7, 46.

Thereafter, Defendants reiterated the $30 million cost-savings forecast on numerous occasions—despite knowing that CMCH would only directly save, at most, $18 million per year—

and even as they received periodic internal reports showing that Goderich was continuing to fall short of the production levels underlying the cost-savings model. ¶¶7, 47-51. *See, e.g.*, ¶48 (Standen on 5/4/17: "we're sticking to the $30 million coming out in 2018"); ¶50 (Malecha on 5/4/17: "looking at our costs this year to next year . . . that $30 million . . . should be real cost reduction"); ¶51 (Malecha on 5/17/17: "continuous mining . . . [at] Goderich . . . is expected to result in about $30 million in annualized savings in '18").

By August 2017, internal estimates of the expected cost-savings directly from the CMCH upgrade had declined even further—to just *$13 million per year*. ¶52. From August through October 2017, Compass executives provided reports to Defendants Malecha and Standen, and the Board, showing that Goderich was continuing to fall far short of the production expectations underlying the CMCH cost-savings model. ¶53.

From April to October 2017, Goderich's CMCH system produced an average of 310,000 tons of salt per month—still putting the mine on pace to produce *less than half* of the 7.5 million tons underlying the cost-savings model. ¶54. Compass executives also provided reports to management showing that unit costs continued to be significantly higher than expected. *Id*. Nevertheless, following each of the reports in August, September, and October 2017, Defendants continued to tell investors that CMCH would save the Company approximately $30 million annually, beginning in 2018—without adequately disclosing that this forecast required a level of salt production that Goderich was far from achieving, or that ongoing production shortfalls would continue to result in unit costs increasing, rather than decreasing. ¶55.[4] Many of these statements were scripted and

---

[4]  *See also* ¶56 (Malecha on 8/8/17: highlighting "the $30 million in cost reductions we expect to achieve when continuous mining is fully implemented in 2018"); ¶57 (Malecha on 8/8/17: "we're expecting that [production] rates will continue to improve on those [CMCH] miners as we go through this year and, ultimately, we get to 100% by the end of the year"); ¶57 (Standen on 8/8/17: "the $30 million will start coming out Jan 1, [2018] on an annualized basis"); ¶58 (Malecha on 9/29/17: highlighting the "$30 million in annual savings that will come from our Goderich investments"); ¶59 (Sepich on 9/29/17: "[O]nce fully implemented, [CMCH] will result in

vetted by multiple executives before they were made.  ¶63.

On February 14, 2018, Defendants told investors that, as a result of "delays" in ramping up CMCH at Goderich, the $30 million annual cost-savings would not be attained until 2019, rather than in 2018—but still reaffirmed that CMCH would ultimately save Compass $30 million per year. ¶¶8, 103.  At the same time, Defendants falsely attributed the delayed savings to a ceiling fall incident at Goderich in September 2017, as well as salt "quality issues" that they blamed on the mine's geology, but which were actually due in part to the CMCH equipment producing salt that was finer than the salt previously produced by drill-and-blast mining.  ¶¶8, 105, 107, 109.

Defendants also falsely stated that Compass had "already achieved about $5 million of savings in 2017" from CMCH (¶¶9, 64, 111; *see also* ¶112), although internal documents showed that CMCH had enabled the Company to reduce costs by just *$1.1 million* in 2017—by eliminating the need to purchase explosives for drill-and-blast mining.  ¶¶9, 65, 113.  The remaining $3.9 million in savings came from other Goderich projects that were not directly related to CMCH.  *Id*.  And even those savings were more-than offset by higher expenses at Goderich during 2017 related to CMCH. *Id*.  First, Compass had to pay over $4 million in maintenance and repair expenses.  ¶67.  Second, it incurred $600,000 in penalties to customers related to salt quality, because the CMCH equipment produced salt that was finer than some customers' contractual specifications.  ¶68.  Third, Compass paid approximately $5 million in price premiums for salt that it purchased from third parties to cover the Goderich production shortfalls.  ¶69.  Finally, the Company began work on a $9 million filtering

---

significant cost savings.  We've noted a $30 million savings as our target . . . ."); ¶60 (Standen on 9/29/17: "With our Goderich mine investments [in] [CMCH] winding down, we remain on track to achieve our $30 million cost reduction in 2018."); ¶61 (Standen on 9/29/17: "Most critically, we remain on track to achieving our $30 million in annualized savings at Goderich, which will be a step change in how efficiently we produce salt."); ¶¶62, 98 (Malecha on 10/31/17: stating that "[i]nstallation of continuous mining and haul[age] systems at the Goderich mine is also on track," and highlighting "the $30 million in cost reductions we expect to achieve in 2018 from our investment in continuous mining at Goderich").

system to address salt quality issues caused in part by the CMCH equipment, which Compass determined would reduce Goderich's annual output by about 400,000 tons—increasing unit costs going forward.  ¶70.

In response to the news that the expected $30 million in annual cost-savings from CMCH would not be realized until 2019—as opposed to 2018, as Defendants had repeatedly told investors beginning in 2015—the price of Compass stock fell more than 9% over two trading days, from $69.25 per share on February 13, 2018, to $63.00 per share on February 15, 2018.  ¶114.  However, Defendants' misleading assurances about CMCH—including that it had already delivered $5 million in cost-savings, and would still ultimately deliver the promised $30 million in annualized cost-savings—prevented a more substantial decline in Compass' share price.  *Id*.

On February 27, 2018, Compass filed its 2017 annual report on Form 10-K, which misrepresented that Goderich's "[a]nnual production capacity" was eight million tons of salt—at a time when the CMCH system was not capable of mining close to that amount.  ¶¶9, 71-75, 115-116.  Indeed, during 2017, Goderich had produced less than 5.2 million tons of salt—1.5 million tons less than planned.  ¶¶73, 116.

On May 1-2, 2018, Defendants continued to blame the ceiling fall for disappointing Salt segment results—claiming that it had reduced Compass' earnings for 1Q18 by $20 million.  ¶¶10, 75, 120, 124-125.  By doing so, Defendants conveyed that costs had increased as a result of a one-off natural event, rather than because the CMCH upgrade was not performing as expected.  ¶¶76, 122, 126.  In fact, the direct costs from the ceiling fall had reduced Compass' earnings by just *$3 million* in 1Q18.  ¶¶10, 76, 122, 126.  The other $17 million was due to continuing operational issues at Goderich—only a small portion of which stemmed from the ceiling fall.  *Id*.

On August 6-7, 2018, Defendants disclosed "production constraints" at Goderich, but again falsely blamed a one-time event—this time, a recently-resolved 12-week labor strike at the mine.

¶¶11, 77, 141. In truth, the primary cause of the production constraints was the underperformance of the CMCH system. ¶77. While the strike caused a production shortfall of approximately 750,000 tons—31% of the 2018 production shortfall—*the other 69%* of the shortfall was due to the CMCH system. ¶¶77, 142, 145. Defendants also once again blamed increased costs in the Salt segment on the September 2017 ceiling fall, which they told investors had resulted in costs for shipping salt from the Cote Blanche mine to customers in northern markets. ¶¶78, 148. But Compass was actually incurring these shipping costs mainly because of the CMCH system's shortcomings. ¶¶78, 149. In total, only *20%* of the 2017 production shortfall at Goderich was due to the ceiling fall, and only *31%* of the 2018 production shortfall was due to the strike—while the rest of the shortfalls in both 2017 and 2018 were due to the deficient performance of the CMCH system. ¶¶11, 73, 77, 85-86.

Following the news that Compass would be unable to meet increased salt demand due to production constraints at Goderich, the Company's share price tumbled 4.3%. ¶152. By disproportionately blaming the strike, and continuing to conceal that the primary cause of the production constraints was the CMCH system, Defendants prevented a more substantial decline in the Company's share price. *Id*.

On September 12, 2018, Defendants falsely represented that Goderich was "about 75% of the way to" its targeted production rate of 600,000 tons per month—indicating that the mine was currently producing around 450,000 tons of salt per month. ¶¶12, 79-80, 155-158. However, internal production reports showed that Goderich was producing far less than that. ¶¶12, 81, 159. During the period from April through July 2018, the mine produced an average of 314,000 tons of salt per month; in August 2018, it produced 332,000 tons of salt; and as of September 12, 2018, it was on pace to produce less than 225,000 tons of salt in September 2018. ¶¶82, 159.

Indeed, before and during the Class Period, Goderich was failing to produce the quantity of salt that Compass' business required by increasingly large amounts, resulting in higher unit costs that

- 9 -

materially reduced Compass' earnings and income from continuing operations. ¶83.  During 2016, Goderich produced *800,000 fewer* tons of salt than planned—leading to increased unit costs that reduced Compass' income from continuing operations by *approximately 8%*.  ¶84.  In 2017, the shortfall was *1.5 million* tons.  ¶85.  While the September 2017 ceiling fall caused approximately 300,000 tons—or 20%—of the shortfall, *the remaining 80%* was due to the underperformance of the CMCH system.  *Id*.  That year, increased unit costs at Goderich reduced Compass' income from continuing operations by *approximately 15%*.  *Id*.  During 2018, the shortfall grew to *more than 2.4 million* tons.  ¶86.  Although the strike caused approximately 750,000 tons—or 31%—of the shortfall, *the remaining 69%* was due to the underperformance of CMCH system.  *Id*.  That year, increased unit costs at Goderich reduced Compass' income from continuing operations by *approximately 41%*.  *Id*.  Defendants, however, failed to disclose this material information in Compass' SEC filings during the Class Period.  ¶¶88-96, 102, 119, 123, 143.  Ultimately, the Goderich mine produced *less than four million tons* of salt in 2018, at a unit cost that was *more than double* what unit costs had been at the mine before Compass began the CMCH project four years earlier.  ¶¶16, 87.

From May through September 2018, Defendants also repeatedly claimed that Compass had achieved approximately $15 million in annualized cost-savings in the Salt segment, without disclosing that these savings were more-than offset by higher expenses at Goderich related to CMCH.  ¶¶13, 133-134, 137, 139, 153-154.

On October 23, 2018, investors discovered that CMCH was not, in fact, generating *any* cost-savings for Compass.  ¶¶14, 162-163.  That day, the Company preannounced disappointing financial results for 3Q18, and lowered its full year 2018 earnings guidance.  ¶162.  Defendants blamed lower-than-expected production rates at Goderich, which had resulted in an estimated "negative impact of $15 million to third-quarter 2018 Salt segment earnings"—wiping out the $15 million in

annualized savings that Compass had purportedly attained in the Salt segment to-date.  ¶¶14, 162-163.  And, Defendants finally admitted that the production constraints were due to difficulties "ramp[ing] up production" of the "continuous mining systems[.]"  ¶162.  In response to this news, the price of Compass stock fell more than 30% over two trading days, from $67.89 per share on October 22, 2018, to $47.24 per share on October 24, 2018.  ¶¶14, 164.  Analysts and investors expressed frustration with Defendants' failure to timely disclose production issues, or to deliver the expected benefits of CMCH at Goderich.  ¶165.  For example, a large bondholder commented that investors' "reliance on the Goderich mine and steady production levels seemed assured by management up until yesterday[.]"  ¶166.  After Compass announced the abrupt termination of Defendant Malecha on November 19, 2018—which analysts attributed "to the severity of the issues at Goderich"—its share price tumbled nearly 8% over three trading days.  ¶¶15, 167-168.

On November 6, 2019, Compass revealed that the SEC was "investigating the Company's disclosures concerning the operation of the Goderich mine."  ¶¶17, 169.  Following a multi-year investigation, on September 23, 2022, the SEC announced settled charges against Compass for, *inter alia*, misleading investors about its operations at Goderich.  ¶¶17, 170-173.  The Company agreed to pay $12 million to settle the charges, and "to cease and desist from further violations" of the federal securities laws.  ¶¶17, 171.  The same day, the SEC Order was published, which contained detailed factual findings by the SEC, and apprised investors for the first time of Defendants' knowing or reckless misrepresentations and omissions during the Class Period.  ¶¶17, 171, 174.

## III.    ARGUMENT

On a Federal Rule of Civil Procedure ("Rule") 12(b)(6) motion, the question is whether a claim is plausible and, therefore, "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Notwithstanding th[e] heightened pleading standard[s]" imposed on securities fraud claims by Rule

9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a court must "'accept the well-pleaded [factual] allegations of the complaint [as true] and construe them in the light most favorable to the plaintiff.'" *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1247-48 (10th Cir. 2022). Factual "disputes are ill-suited for" resolution at "the pleadings stage[.]" *UMB Bank, N.A. v. Monson*, 2022 WL 3910467, at *5 (D. Kan. Aug. 31, 2022) (Melgren, J.).[5]

### A.    The AC Properly Relies on the SEC Order

Recognizing that the SEC Order is fatal to its motion to dismiss, Defendants argue that the Court must strike all of Plaintiffs' allegations based on the SEC Order pursuant to Rule 12(f). MTD at 10-12.[6] But the weight of authority holds that a plaintiff may rely on facts and investigatory findings recounted in complaints filed by other private litigants,[7] as well as complaints and orders from governmental entities.[8] Indeed, numerous cases have held that a plaintiff may rely on facts

---

[5]    To state a §10(b) claim, a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Here, Defendants challenge the elements of falsity and scienter.

[6]    "Courts generally disfavor the 'drastic remedy' of striking" material from a pleading, and should do so "only when the material may be prejudicial to a party and lacks any 'possible relation to the controversy.'" *Sawo v. Drury Hotels Co., LLC*, 2011 WL 3611400 at *2 (D. Kan. Aug. 15, 2011). "Any doubt as to the utility of the material to be stricken should be resolved against the motion to strike." *Rubio ex rel. Z.R. v. Turner Unified Sch. Dist. No. 202*, 475 F. Supp. 2d 1092, 1101 (D. Kan. 2007).

[7]    *See, e.g., City of N. Mia. Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *5-*6 (S.D.N.Y. Jan. 21, 2021) ("'the weight of authority holds that plaintiffs may base factual allegations on complaints from other proceedings'") (collecting cases), *aff'd sub nom. Town of Davie Police Officers Ret. Sys. v. City of N. Mia. Beach Police Officers' & Firefighters' Ret. Plan*, 2021 WL 5142702 (2d Cir. Nov. 5, 2021); *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214 (S.D.N.Y. 2019) (same); *Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC*, 2013 WL 1342529, at *5 n.8 (S.D.N.Y. Mar. 29, 2013) ("There is no . . . absolute rule . . . . that Plaintiffs may not rely on factual allegations from other complaints in support of their claims."); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012) (rejecting argument that "sections of the [complaint] that rely on allegations put forth in other litigants' complaints should be disregarded or stricken").

[8]    *See, e.g., In re Teva Secs. Litig.*, 2023 WL 3186407, at *26 (D. Conn. May 1, 2023) (holding

- 12 -

derived from SEC complaints and consent orders to plead a §10(b) claim.[9]

The cases cited by Defendants rely on *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893-94 (2d Cir. 1976), in which the Second Circuit determined that a plaintiff's complaint could not reference a complaint that resulted in a consent decree, since the consent decree was inadmissible under Federal Rule of Evidence 410, which governs *nolo contendere pleas*.[10] But as other courts have observed, "those decisions emanate from a misconstruction of [*Lipsky*]." *Mylan*, 379 F. Supp.

securities fraud plaintiffs could rely on "State Attorneys General's allegations"); *Major Energy Elec. Servs., LLC v. Horowitz*, 2020 WL 4432121, at *6-*7 (S.D.N.Y. July 31, 2020) (same as to Illinois AG's complaint); *Mylan*, 379 F. Supp. 3d at 215 (same as to NYAG complaint); *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 419 n.7 (E.D. Penn. 2019) (same as to "State AG complaint"); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 343 (S.D.N.Y. 2015) (same as to "NYAG's complaint"); *see also GSAA Home Equity Tr. 2006-2 ex rel. LL Funds LLC v. Wells Fargo Bank, N.A.*, 133 F. Supp. 3d 1203, 1209 (D.S.D. 2015) (same as to Federal Reserve consent order).

[9] *See, e.g.*, *Abadilla v. Percigen, Inc.*, 2022 WL 1750033, at *5 (N.D. Cal. May 31, 2022) (§10(b) plaintiff could rely on SEC order, which was "sufficient to establish falsity"); *In re Under Armour Sec. Litig.*, 540 F. Supp. 3d 513, 521-22 (D. Md. 2021) (plaintiff could rely on facts from SEC consent order to plead §10(b) claim); *Utesch*, 385 F. Supp. 3d at 419 n.7 (plaintiff can "'rely "on documentary evidence that qualifies as a reliable source for pleading purposes"'" which includes "SEC complaints"); *Hull v. Glob. Digit. Sols., Inc.*, 2017 WL 6493148, at *5 n.12 (D.N.J. Dec. 19, 2017) (allowing plaintiffs in securities class action to "derive[]" allegations from SEC complaint); *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 7117455, at *21-*22 (M.D. Pa. Dec. 7, 2016) (relying on SEC order's factual findings in assessing whether plaintiffs pled viable claims for securities fraud); *Vanleeuween v. Kenyuan Petrochemicals, Inc.*, 2014 WL 3891351, at *4 (S.D.N.Y. Aug. 8, 2014) ("Plaintiffs appropriately relied on the SEC complaint in pleading . . . a claim under Section 10(b)."); *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012) ("'[T]here is nothing improper about utilizing information contained in an SEC complaint as evidence to support private claims under the PSLRA.'") (quoting *SEC v. Lee*, 720 F. Supp. 2d 305, 340-41 (S.D.N.Y. 2010)), *aff'd*, 525 F. App'x 16 (2d Cir. 2013); *Haw. Ironworkers Annuity Tr. Fund v. Cole*, 2011 WL 1257756, at *11 (N.D. Ohio Mar. 31, 2011) (plaintiff could rely on SEC complaint in pleading scienter); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 395 (S.D.N.Y. 2005) (holding that an SEC complaint is an adequate source for a factual allegations in securities fraud action); *Dau v. Cephalon Inc.*, 2000 WL 1469308, at *1 (E.D. Pa. Sept. 25, 2000) (securities fraud action could base allegations on SEC complaint).

[10] *See* MTD at 10-11 (citing *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *16 n.5, *26 (S.D.N.Y. May 10, 2012); *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593 (S.D.N.Y. 2011); *Scognamillo v. Credit Suisse First Bos. LLC*, 2005 WL 8162733, at *6 (N.D. Cal. Feb. 1, 2005); *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003)). Since *Lipsky*, the Second Circuit has admitted that its reliance on Rule 410 was mistaken. *See United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981) (recognizing that civil consent decrees are "governed by" Federal Rule of Evidence 408).

3d at 215.  The majority of courts have found that "*Lipsky* does not . . . stand for the proposition that any factual allegation derived from a government investigation or pleading must be stricken from a private plaintiff's complaint."  *Fannie Mae*, 891 F. Supp. 2d at 471.[11]  Indeed, the *Lipsky* court itself "cautioned that its holding was limited to 'the facts of this case.'"  *Fannie Mae*, 891 F. Supp. 2d at 471 (quoting *Lipsky*, 551 F.2d at 893); *VNB Reality*, 2013 WL 5179197, at *4 (same).

According to Defendants and the line of cases on which they rely, the SEC Order is immaterial because it would not be admissible as evidence in this litigation, since it "'did not result in an adjudication on the merits[.]'"  MTD at 11.  However, "the law does not require that the allegations in a complaint be based on admissible evidence."  *Bonciminio v. N.Y. State Unified Ct. Sys.*, 2018 WL 2225004, at *10 (S.D.N.Y. May 15, 2018).  And the SEC's factual findings *are* admissible in this action because they fall squarely into the hearsay exception of Federal Rule of Evidence 803(8)(A)(iii) (for "factual findings from a legally authorized investigation"), and are not excluded by Federal Rule of Evidence 408 (which applies only to settlement-related conduct and communications, not investigatory findings of fact).[12]

The reasoning behind the majority position is both clear and persuasive: "'It makes little sense to say that information . . . which [the complaint] could unquestionably rely on if it were mentioned in a news clipping . . . is immaterial simply because it is conveyed in an unadjudicated complaint.'"  *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 414 (S.D.N.Y. 2020) (quoting *Bear Stearns*, 851 F. Supp. 2d at 768 n.24).  Indeed, not only is

---

[11]  *See also VNB Reality, Inc. v. Bank of Am. Corp.*, 2013 WL 5179197, at *3 (S.D.N.Y. Sept. 16, 2013) (*Lipsky* "does not mandate the elimination of material from a complaint simply because the material is copied from another complaint."); *Bear Stearns*, 851 F. Supp. 2d at 768 n.24 ("[S]ome courts . . . have stretched the holding in *Lipsky* to mean that any portion of a pleading that relies on unadjudicated allegations in another complaint is immaterial under Rule 12(f)," but "[n]either . . . precedent nor logic supports such an absolute rule.").

[12]  *Lipsky* was also mistaken for failing to discuss Federal Rule of Evidence 803(8), which had become effective just the year before.  *See* Pub. L. No. 93-595, 88 Stat. 1926 (Jan. 2, 1975).

- 14 -

there "nothing improper about utilizing information from the SEC as evidence to support private claims . . . 'it would have been irresponsible for [Plaintiffs] to have ignored the SEC's highly relevant allegations and findings'" in pleading their claims. *de la Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003).

Plaintiffs have also satisfied their obligations under Rule 11(b), which requires that counsel certify that: "to the best of the person's knowledge, information, and belief, formed after an inquiry *reasonable under the circumstances* . . . the factual contentions have evidentiary support or, if specifically so identified, *will likely have evidentiary support after a reasonable opportunity for further investigation or discovery*." Fed. R. Civ. P. 11(b)(3).

The AC satisfies these requirements, *first*, by stating that its factual allegations are "based upon the investigation undertaken by . . . counsel, which included . . . a review of" Compass' SEC filings, "press releases, analyst and media reports, and other public reports and information about the Company, including the [SEC Order]." AC at 1 (introductory paragraph); *see Teva*, 2023 WL 3186407, at *26 (averment that "counsel's investigation included a review of" the complaints on which they relied satisfied Rule 11(b)).

And *second*, the SEC Order itself provides a sufficient basis for counsel's good-faith belief "that substantial additional evidentiary support will exist for the [AC's] allegations . . . after a reasonable opportunity for discovery." AC at 1 (introductory paragraph); *see Teva*, 2023 WL 3186407, at *26 (rejecting Rule 11 argument; finding that plaintiffs "were permitted to reallege allegations brought in prior complaints drafted by experienced counsel or governmental investigators and counsel," and that it was "reasonable to rely on a governmental investigation" because facts from such an investigation may have additional "'evidentiary support'").[13]

---

[13]   *See also Strougo*, 105 F. Supp. 3d at 343 (rejecting Rule 11 argument where allegations based on NYAG complaint were "derived from a credible complaint based on facts obtained after investigation"); *Lee*, 720 F. Supp. 2d at 340-41 (plaintiff's "reliance on" SEC complaint "does not

This is so because a "'presumption of regularity attaches to the actions of Government agencies'" (*DeMartino v. N.Y. State Dep't of Tax'n & Fin.*, 2023 WL 2563967, at \*2 (2d Cir. Mar. 20, 2023) (quoting *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001))), which supports the reliability of the SEC Order here.  *See Hanson v. Frazer, LLP*, 2015 WL 4561707, at \*3 (S.D.N.Y. July 17, 2015) ("allegations in an SEC complaint are the product of a government investigation and therefore arguably carry a presumption that they are the product of serious factual inquiry").

Accordingly, Plaintiffs are entitled to rely on the SEC Order's detailed factual findings at this juncture, and "Rule 11 requires nothing more." *Teva*, 2023 WL 3186407, at \*26.[14]

### B.      The AC Pleads Actionable Misrepresentations

#### 1.      The AC Alleges Falsity with the Requisite Particularity

The AC pleads Defendants' misstatements with the requisite particularity by: (i) identifying the statements, who made them, and when and where they were made; and (ii) explaining in detail why the statements were materially false or misleading when made.  *See* ¶¶98-161.  The AC also satisfies the PSLRA's requirement that, when making allegations based on information or belief, a plaintiff state with "'particularity'" the "'facts upon which that belief is formed.'" *Adams v. Kinder-*

---

demonstrate that it lacks evidentiary support, but rather provides it with the necessary evidentiary support"); *de la Fuente*, 259 F. Supp. 2d at 260 (same; and holding in Rule 11 context that §10(b) plaintiff did not need to independently verify SEC's factual findings because "[t]he PSLRA does not require that a plaintiff re-invent the wheel before filing a complaint"); *c.f. In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at \*8 n.3 (W.D. Pa. May 18, 2023) ("Counsel need not conduct a *separate* investigation" to "corroborate" information in article relied on in complaint) (emphasis in original).

[14]   Defendants' cited cases to the contrary are factually distinguishable.  MTD at 11-12 (citing *Ass'n of N.J. Chiropractors, Inc. v. Data iSight, Inc.*, 2022 WL 4483596, at \*2 (D.N.J. Sept. 27, 2022) (plaintiffs referenced "a complaint in an unrelated matter"); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 812 (N.D. Cal. 2019) ("[p]laintiffs claim[ed] that [d]efendants . . . admitted to some of the facts in the FTC Complaint" "but such admissions [were] not pled"); *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at \*20 (C.D. Cal. May 5, 2011) (plaintiffs sought to rely on private litigants' complaints, rather than an SEC order); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (plaintiff "rel[ied] *entirely* on another complaint as the *sole* basis for his or her allegations") (emphasis in original); *Geinko v. Padda*, 2002 WL 276236, at \*6 (N.D. Ill. Feb. 27, 2002) (plaintiffs "d[id] not make clear what [p]laintiffs directly allege[d] as fact, and what [p]laintiffs merely [were] asserting that someone else ha[d] alleged")).

*Morgan, Inc.*, 340 F.3d 1083, 1098 (10th Cir. 2003) (quoting 15 U.S.C. §78u-4(b)(1)).

According to Defendants' repeated refrain, Plaintiffs were required, but failed, to specify the date, author, and recipients of the internal reports and documents that contain the facts demonstrating falsity. *See, e.g.*, MTD at 23, 25-31. In other words, Defendants do *not* argue that *the facts establishing the falsity* of their representations are not particularized—and as explained above, those facts are properly sourced from the SEC Order. Rather, Defendants contend that Plaintiffs failed to plead the *underlying documentary sources of those facts* with sufficient particularity. But the PSLRA "requires only that the pleader state with particularity all 'facts' upon which the belief is formed, and it [does] not require[] that the pleader always state the source of those facts." *See Adams*, 340 F.3d at 1101.

In *Adams*, the Tenth Circuit rejected such a demanding particularity requirement: "[W]e do not adopt the position that the particularity requirement . . . establishes a per se rule that a plaintiff's complaint must always identify the source, either personal or documentary, of the facts alleged." *Id*. The court reasoned that "requiring the allegation of the sources . . . of all facts alleged *is in our view too restrictive a response to the requirement of pleading facts with particularity*" and would improperly require plaintiffs to "plead . . . evidence in their complaint." *Id*. Since the PSLRA does not require a plaintiff to reveal the source of an allegation, it necessarily does not require a plaintiff to identify the date, author, or recipient of a document that is the source of an allegation. Instead, a plaintiff must simply allege facts that "are detailed enough to support a reasonable belief that the defendant's statements . . . were false or misleading." *Id*. at 1102; *see also Pluralsight*, 45 F.4th at 1248 (same).[15]

---

[15] Other circuits agree. *See, e.g.*, *Glazer Cap. Mgmt., L.P. v. Forescout Techs. Inc.*, 63 F.4th 747, 769 (9th Cir. 2023) (rejecting particularity argument that "ask[ed] the court to impose an impossibly high burden on securities action plaintiffs"); *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 150 (2d Cir. 2021) (courts "'must be careful not to mistake heightened pleading standards for impossible ones'"). Defendants' cited cases do not support their manufactured pleading

Here, the AC identifies each instance when Defendants received internal reports that contradicted their later statements, and provides detail regarding those reports' contents and recipients. *See, e.g.*, ¶¶41, 46, 53-54. The AC also alleges the precise dollar values of Goderich's actual cost-savings and its actual production volumes (¶¶7, 52, 54, 72-74, 76-77, 81-82, 85-87), demonstrating that Defendants' public statements claiming different figures were false and misleading. *See, e.g.*, ¶¶99, 104, 113, 116, 126, 134, 145, 159. Nothing more is required.

### 2. Defendants' Remaining Arguments Regarding Each Category of Misstatements Are Meritless

#### a. Defendants' Statements Concerning Expected Cost-Savings Are Actionable

The AC explains in detail why Defendant Malecha's statement on October 31, 2017 highlighting "the $30 million in cost reductions we expect to achieve in 2018 from our investment in continuous mining at Goderich" was knowingly false when made. ¶¶62, 98. Defendants had reexamined the projection six months earlier, in April 2017, and determined that it was based on faulty assumptions—making it unattainable even under a best-case scenario of the CMCH system producing 7.5 million tons of salt per year. ¶¶42-44, 99. As of August 2017, Defendants' estimate of the direct annual savings from CMCH was just $13 million. ¶¶52, 99. Malecha himself had reviewed the revised forecast, and knew that it included other Goderich cost-reduction initiatives that were not directly related to CMCH, as well as future initiatives that Compass had not even identified. ¶¶45-46, 99. Further undermining the $30 million cost-savings projection, internal reports showed that during the six-month period from April to October 2017, Goderich was on track to produce approximately 3.7 million tons of salt in 2017—*less than half* of the 7.5 million tons needed to achieve the projection, and unit costs at Goderich continued to be significantly higher than

---

requirement. They principally rely on *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103 (10th Cir. 2015), in which the Tenth Circuit merely recounted the standard for particularity and did not reach the issue of whether the plaintiffs had satisfied that standard. *Id.* at 1112.

expected.  ¶¶54-55, 99.  Defendants' statements: (i) in February 2018, deferring the $30 million annual cost-savings to 2019, but still reaffirming that CMCH would save Compass $30 million per year (¶¶103, 117); and (ii) in May and June 2018, highlighting $40 million in cost-savings in the Salt segment, which included the $30 million from CMCH (¶¶133, 137), were false for the same reasons. ¶¶104, 118, 134, 138.

Defendants' laundry list of purported defenses to the falsity of these statements is meritless. *First*, the cost-savings projections are not protected by the PSLRA's "safe harbor" provision because—as the facts above demonstrate—Plaintiffs have adequately alleged that the statements were made with "actual knowledge" that they were false and misleading.  15 U.S.C. §78u-5(c); *see also Simmons Invs., Inc. v. Conversational Computing Corp.*, 2011 WL 673759, at *5 (D. Kan. Feb. 17, 2011) (holding the safe harbor did not apply because plaintiff alleged that defendants' statements were knowingly false when made).[16]

Moreover, cautionary language must "warn investors of exactly the risk that Plaintiffs claim was not disclosed." *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1231 (N.D. Okla. 2003).  The generic cautionary language Defendants rely on, including that "'cost overruns, delays and performance uncertainties'" could occur, and that cost-savings "'may not be realized in accordance with our projections'" (MTD at 6-8, 25) was wholly insufficient to warn investors about the actual risk at issue—Defendants had *already determined* that, even under the best circumstances, the $30 million in expected cost-savings from CMCH *could not* be realized because the assumptions underlying that projection were faulty.  In short, "neither" the safe-harbor nor the related "'bespeaks caution doctrine'" "protects fraud[.]" *In re NPS Pharms., Inc. Sec. Litig*, 2007 WL 1976589, at *4

---

[16]  The "safe harbor" provides that a forward-looking statement is not actionable if: (i) the statement is identified as forward looking and is accompanied by meaningful cautionary language; or (ii) plaintiff has failed to plead or prove that the statement was made with "actual knowledge" that it was false and misleading.  *See* 15 U.S.C. §78u-5(c).

(D. Utah July 3, 2007).

*Second*, Defendants attempt to separate their assurances that Compass had "made progress with [the] capital projects at the Goderich mine"; the mine was "running in line with [the] current production plans"; and "[i]nstallation of" the CMCH system was "on track" (¶98) from the $30 million projection itself, in order to argue that these portions of their statements are "puffery"—that is, immaterial as a matter of law.  MTD at 23.  But statements must be "viewed in their entirety and in context" to determine whether they are puffery.  *Better v. YRC Worldwide Inc.*, 2012 WL 4433500, at *6 (D. Kan. Sept. 25, 2012); *see also In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1341 (10th Cir. 2012).  In the context of Defendants' knowingly false projection, lagging production, and rising unit costs, and other problems including the installation of a CMCH machine that was nine months behind schedule, the statements are not immaterial puffery.  ¶¶99-101.[17]

Likewise, "Defendants' attempt to recharacterize" their cost-savings projections "as opinions . . . is unavailing."  *Correa v. Liberty Oilfield Servs., Inc.*, 548 F. Supp. 3d 1069, 1083 (D. Colo. 2021); *see* MTD at 25-26.  These statements were not even framed as opinions, but regardless, Defendants recognize that opinion statements are actionable if (as relevant here): (1) "the speaker did not hold the belief she professed"; *or* (2) the opinion "contain[s] embedded statements of fact" that are false.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86 (2015).  Here, Defendants did not believe their cost-savings estimates because they knew, at best, CMCH would only directly save $13 million per year.  ¶52.  The cost-savings forecast also contained a false statement of embedded fact—that it reflected Defendants' estimate of savings *directly* from CMCH, and not unrelated or unidentified cost-savings projects.  ¶45.

---

[17]    Even if it were appropriate to consider these phrases in isolation, statements that may otherwise constitute puffery may be actionable "if the speaker knew at the time the statements were made that they were untrue or had no reasonable basis in fact."  *Anderson v. Spirit AeroSystems Holdings, Inc.*, 105 F. Supp. 3d 1246, 1255 (D. Kan. 2015), *aff'd*, 827 F.3d 1229 (10th Cir. 2016).  That is precisely what Plaintiffs have alleged here.

Finally, Defendants argue that Standen's statements in May and June 2018, projecting $40 million in annual cost-savings in the Salt segment (¶¶133, 137), were not false because the $40 million figure "explicitly encompassed other projects[.]" MTD at 26. This argument misses the point. Standen explained in the very same statement that the $40 million figure included "technology enhancements at [the] Goderich mine with the introduction of [CMCH]" (¶¶133, 137)— *i.e.*, the $30 million in expected cost-savings from CMCH at Goderich that Defendants "clung" to until October 23, 2018. ¶165. Plaintiffs have plausibly alleged that the $30 million CMCH cost-savings estimate was false for all of the reasons above.

> **b.      Defendants' Statements Concerning Realized Cost-Savings Are Actionable**

The AC also sufficiently alleges that Defendants vastly overstated Compass' actual cost-savings from CMCH. ¶¶111-113, 133-139, 153-154. Defendants contend that Plaintiffs did not plead the falsity of Defendants' February 2018 statements that the CMCH system had already achieved $5 million in savings in 2017 with sufficient particularity. *See* MTD at 27. As Defendants concede, however, the AC describes the amount of actual savings from CMCH—*i.e.*, $1.1 million in 2017, compared to the claimed $5 million—and explains that the difference was attributable to non-CMCH projects. ¶¶113, 136. These allegations are sufficient at the pleading stage.

Defendants' argument that Plaintiffs failed to plead facts establishing contemporaneous falsity also fails. *See* MTD at 27. The amount that CMCH saved *in 2017* was a fact in existence when Defendants spoke *in February 2018*. As such, Defendants' statements were false when made, regardless of the date of the internal documents the AC cites to demonstrate falsity.

Defendants contend that their statements that Compass achieved "15 million in annualized savings" through 2Q18 and "$13 million in annualized salt business savings as of the end of 2017," are not false because those statements included non-CMCH initiatives. *Id*. at 27-28. These arguments raise inappropriate factual disputes and are also incorrect. Defendants made clear that the

alleged $15 million in cost-savings was the result of "moving the entire production of the [Goderich] mine to a continuous mining and continuous hauling operation."  ¶¶153-154.  Because Plaintiffs' interpretation is plausible, the Court must credit it at this stage of the litigation over Defendants' competing narrative.[18]

Even if Defendants' interpretation was correct, the AC explains that these statements are misleading because they created the false impression that the cost-savings were largely attributable to CMCH when the savings from that upgrade were entirely offset by increased costs due to CMCH. ¶¶134, 136, 154.

Moreover, Defendants do not dispute that Compass' realized cost-savings figure *included* the $5 million in savings for 2017 that they falsely attributed to CMCH.  *See* MTD at 27.  In truth, CMCH had only saved approximately $1.1 million in 2017.  ¶¶65, 136.  Thus, Defendants' statement also created the false impression that CMCH was responsible for a greater percentage of the Company's 2017 cost-savings than it actually was.

> **c.    Defendants' Statements Concerning Production Capacity Are Actionable**

The AC explains that the statement in Compass' February 27, 2018 Form 10-K that Goderich's "[a]nnual production capacity" was eight million tons of salt per year was false because Compass had discontinued drill-and-blast mining at Goderich during 4Q17, and the CMCH system was not capable of mining close to eight million tons of salt annually during the transition period.

---

[18]    *See, e.g.*, *Pluralsight*, 45 F.4th at 1250-51 ("We need not evaluate Defendants' hypotheticals" because on a motion to dismiss Plaintiffs need not "negate every alternative explanation to adequately plead falsity."); *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 146 (2d Cir. 2021) (court was "required to credit the plaintiffs' plausible theory" and "defendants' contrary and competing 'explanation' for [officer's] statements, although not unreasonable, '[was] entitled to little weight at this stage of the litigation'"); *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *17 (S.D.N.Y. Sept. 30, 2021) ("At the motion to dismiss stage of a securities fraud action, 'the court reads ambiguities' in challenged statements 'in [the plaintiff's] favor.'"); *In re Myriad Genetics, Inc.*, 2021 WL 977770, at *9 (D. Utah Mar. 16, 2021) ("the court will not apply [defendant's] interpretation of the statements to grant a motion to dismiss").

¶¶115-116. Indeed, during 2017, Goderich had produced less than 5.2 million tons of salt, which was 1.5 million tons less than Compass had planned to produce. ¶116. And 80% of that shortfall was due to the CMCH system's underperformance. *Id*.

According to Defendants, this statement was not false because Goderich's reported production capacity was based on data from Goderich's prior "drill-and-blast" method of salt mining, and therefore a "reasonable investor" would not have interpreted Defendants' statements to mean that Goderich would continue to produce that amount using CMCH. MTD at 28. But the reported production capacity was an "estimate of the tons salt that *can be produced.*" ¶115. An investor could reasonably understand Defendants' statement to refer to Goderich's current and future production capacity. Because Plaintiffs' interpretation is plausible, the Court is required to credit it over Defendants' competing explanation at this juncture. *See Pluralsight*, 45 F.4th at 1250-51.

Defendants' argument also fails because a reasonable investor would understand Goderich's reported production capacity as reflecting the salt production method that was currently in use at the mine—*i.e.*, CMCH. In fact, Compass falsely represented in the very same statement that: "As we introduce new production methods, such as [CMCH] at our Goderich salt mine, we *will update* our estimates if necessary *as new production data become available.*" ¶115. Yet, Compass had failed to do just that, although available production data showed that Goderich had only produced 5.2 million tons of salt in 2017—1.5 million tons less than planned. ¶116.[19]

### d.    Defendants' Statements Concerning the Reasons for Increased Costs and Production Constraints Are Actionable

The AC sufficiently pleads that Defendants' statements concerning the reasons for the increased costs and production constraints at Goderich were false and misleading because they only

---

[19]  Defendants misstate *Omnicare*'s holding in arguing that because they divulged the purported basis for their estimate, they are immune from liability. *See* MTD at 29. *Omnicare* does not shield opinions or estimates, where, as here, the speaker knows are not supported by the grounds upon which the opinion is purportedly based. *See Omnicare*, 575 U.S. at 190-95.

identified non-CMCH factors—while concealing that those problems were mostly attributable to the CMCH upgrade. *See, e.g.*, ¶¶120-122, 124-126 (claiming that the ceiling collapse had reduced earnings by $20 million, when the true amount was $3 million); ¶¶127-128 (attributing salt quality issues to the mine's geology, when those issues were partly caused by the CMCH equipment); ¶¶105-110 (blaming the ceiling collapse for increased costs and delayed savings, although it was responsible for 20% (300,000 tons) of the 2017 production shortfall, and the rest was due to the CMCH system's underperformance); ¶¶141-142 (blaming the labor strike for production constraints, although it was responsible for 31% (750,000 tons) of the 2018 production shortfall, and the rest was due to the CMCH system's underperformance).

Defendants repeat their refrain that Plaintiffs failed to plead falsity with sufficient particularity (MTD at 29-30), but that argument fails for the reasons stated above. Defendants' argument that their statements were not misleading because they did "not purport to identify every reason for the increased costs and production constraints" (*id*. at 30), misses the point because the underperformance of the CMCH system was the *primary driver* of those issues. ¶¶70, 75-78, 83-86. "The existence of multiple explanations" for Compass' increased costs, delayed savings, and production constraints—including the undisclosed explanation that the CMCH system was underperforming—"is what made [Defendants'] statement[s] misleading." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1149 (10th Cir. 2015). By only identifying other, less significant reasons, while failing to mention CMCH, Defendants created the false impression that the problems at Goderich were due to one-off events, rather than the underperformance a flagship initiative.

### e. Defendants' Statements Concerning Current Salt Production Levels Are Actionable

The AC adequately alleges the falsity of Defendants' statements on September 12, 2018 that the Goderich mine was currently producing approximately 450,000 tons of salt per month, when internal production reports as of September 12, 2018 showed that Goderich was currently producing

far less than that amount. ¶¶79-82, 155-159. Defendants' particularity argument on this issue fails because, as noted above, even though a plaintiff is not required to identify *the sources* of the information demonstrating falsity, the AC cites monthly production reports that contradicted Defendants' public statements. ¶¶81-82.

Defendants' argument that this statement was not misleading because it purportedly concerned the status of CMCH implementation, rather than Goderich's production rate, is irreconcilable with the presentation slide—which is titled "Goderich Mine Production Plan," identifies Goderich's monthly "[c]urrent production rate" and targeted production rate, and makes no mention of CMCH. ¶¶79, 155.[20] But even if Defendants had articulated a plausible competing interpretation—which they have not—Plaintiffs are not required to "negate every alternative explanation to adequately plead falsity." *Pluralsight*, 45 F.4th at 1251.

### 3.    Plaintiffs Have Pled Actionable Omissions Under Item 303

Item 303 of Regulation S-K requires that a company's SEC filings "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(2)(ii). Disclosure is required ""'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'"" *Pluralsight*, 45 F.4th at 1269.[21]

---

[20]   Defendants' reliance on a representation weeks earlier that Compass purportedly does not disclose production levels (MTD at 31) is misplaced because that is exactly what Defendants did during the September 2018 conference.

[21]   The Court should disregard Defendants' argument that the Third and Ninth Circuits have held that Item 303 cannot provide a basis for liability under §10(b) (MTD at 32) because the Tenth Circuit recently declined to make such a finding in *Pluralsight*, 45 F.4th at 1270. *Compare In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014), *and Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000) (an Item 303 violation does not *automatically* give rise to a §10(b) violation),

The AC alleges that during 2016 through 2018—for *three consecutive years* before and during the Class Period—Goderich failed to produce sufficient quantities of salt by increasingly large amounts because of the underperforming CMCH system. ¶83. Those shortfalls led to higher unit costs, which materially reduced Compass' income from continuing operations. *Id*. Yet, Defendants failed to disclose this material information in Compass' quarterly and annual SEC filings during the Class Period, in violation of Item 303. ¶¶88-96, 102, 119, 123, 143. The AC specifically pleads the amounts of the shortfalls: (i) 800,000 tons during 2016; (ii) 1.5 million tons during 2017 (roughly 80% of which was caused by the CMCH system); and (iii) 2.4 million tons during 2018 (roughly 69% of which was caused by the CMCH system). ¶¶84-86. It further alleges that the reduction in Compass' income from continuing operations due to higher unit costs grew from 8% in 2016, to 15% in 2017, to 41% in 2018. *Id*.

Defendants argue that these numbers do not constitute a "trend" because Compass eventually managed to increase salt production at Goderich beginning in 2019. MTD at 32-33. But this hindsight argument ignores both the plain meaning of the word "trend," which does not need to be permanent, and the language of Item 303, which includes *uncertainties*.[22]

The AC also adequately alleges that this trend was known to management, including by citing monthly production reports. *See, e.g.*, ¶¶53-55, 81-82. Defendants' worn-out argument that Plaintiffs failed to provide certain details about those reports (MTD at 33) appeals to a pleading

---

*with Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 107 (2d Cir. 2015) ("a failure to make a required disclosure under Item 303 . . . is an omission that can serve as the basis for a Section 10(b) securities fraud claim").

[22] Moreover, "'whether a pattern or occurrence is sufficiently lengthy to constitute a trend is a question that should not be resolved at the motion to dismiss stage.'" *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019). And courts have found "trends" over much shorter time periods for purposes of Item 303. *See, e.g.*, *Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 872 (D. Kan. 2019) (rejecting argument "that negative performance during *part of [a] quarter* [could not] constitute a 'trend'" under Item 303).

burden that does not exist.  *See Franchi v. SmileDirectClub, Inc.*, 2022 WL 4594575, at *9 (M.D. Tenn. Sept. 30, 2022) (Item 303 does not impose "'a heightened pleading standard'" for knowledge, which may be "'"'alleged generally"'"" under Rule 9(b)).

Once a trend or uncertainty is known, management "must evaluate *objectively* the consequences of the known trend . . . or uncertainty, on the assumption that it will come to fruition," and "[d]isclosure is [] required *unless* management determines that a material effect on the [company's] financial condition or results of operations *is <u>not</u> reasonably likely to occur*."  ¶94 (quoting 1989 SEC Interpretive Release); *see also Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, 2022 WL 17815767, at *4 (2d Cir. Dec. 20, 2022) (same).[23]  Here, that analysis is simple because Goderich's salt production shortfalls and the resulting unit cost increases had *already* "come to fruition" and materially impacted Compass' "financial condition [and] results of operations" by the start of the Class Period—reducing income from continuing operations by 8% in 2016.  ¶¶84, 94.

## C.    The AC Pleads a Strong Inference of Scienter

"'Scienter is "a mental state embracing [1] intent to deceive, manipulate, or defraud," or [2] recklessness.'"  *Pluralsight*, 45 F.4th at 1258-59.  "Recklessness is 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it'"; and "'is akin to conscious disregard.'"  *Id*. at 1259.  A plaintiff can raise a strong inference of scienter "even without a motive."  *Nakkhumpun*, 782 F.3d at 1152.

A court must assess whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

[23]    The test therefore is not a "'more-likely-than-not standard'" as Defendants suggest.  MTD at 33. Nor do Plaintiffs need to allege "particularized factual allegations about management's view on the potential scope and duration of any impact from these issues" under Defendants' made-up standard. *Id*. at 33-34.

standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original). The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences'"; it need only be strong and "at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324. "In other words, a tie goes to the plaintiff." *Anderson*, 105 F. Supp. 3d at 1262.

### 1.    The Facts Alleged from the SEC Order Give Rise to a Strong Inference of Intent to Defraud or Recklessness

The AC alleges that Defendants were privy to internal reports which stated that the CMCH initiative was grossly underperforming expectations. Defendants' public statements regarding the cost-savings from CMCH and Goderich's salt production conflicted with these internal reports, which supports an inference of scienter. *See Level 3*, 667 F.3d at 1345 ("'[D]ivergence between internal reports and external statements on the same subject' and 'disregard of the most current factual information before making statements' can be factors supporting scienter."). For example:

- In April 2017, Defendants revised their internal CMCH's cost-savings estimates, (¶¶41-46), but continued to publicly reaffirm their original estimates that they then viewed internally as unobtainable (¶¶47-51);

- Internal reports provided to Compass' executives and Board from August through October 2017 showed that Goderich's salt production was far below the levels needed to support their public savings estimates (¶53), yet Defendants continued to publicly affirm that CMCH would save Compass $30 million in 2018 (¶55);

- A 2017 internal report showed that CMCH saved Compass only $1.1 million in 2017, but Standen told investors that Compass had achieved $5 million in 2017 savings (¶¶64-66); and

- In 2018, Sepich and Standen claimed that CMCH was producing 450,000 tons per month when internal reports showed that Goderich had never reached that rate under CMCH and that it had not come close in the past eight months (¶¶80-82).

Compounding their fraud, Defendants: (i) knowingly attributed savings to CMCH that were from unrelated projects at Goderich (¶65); and (ii) falsely attributed setbacks with CMCH and its savings targets to one-off, unforeseen events—a ceiling collapse, a labor strike, and the mine's

geology—rather than the CMCH system's underperformance. ¶¶75-78, 127-128. The fact that Defendants maintained that CMCH was a success despite contrary facts supports the inference that they acted with scienter.

These allegations, which are drawn from the SEC Order, demonstrate Defendants' actual knowledge (or at the very least, reckless disregard) that their public statements were false or misleading—notwithstanding the SEC's strategic decision not to charge Compass with scienter-based violations, which could have been made for any number of reasons. *See, e.g.*, *York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 468 (9th Cir. 2023) ("[T]he SEC's decision not to charge a defendant with fraud does not 'hurt[]' a plaintiff's 'ability to plead a strong inference of scienter.'").[24]

Defendants' reliance on *Smallen v. W. Union Co.*, 950 F.3d 1297 (10th Cir. 2020), to argue that Plaintiffs cannot rely on the SEC Order's factual findings to plead scienter, is misplaced. MTD at 14. In *Smallen*, unlike here, the plaintiffs argued that the mere fact of government investigations into the company was evidence of scienter, because it alerted defendants to the alleged misconduct. *See* 950 F.3d at 1306. Although the court stated that "the *existence* of government investigations [into the company] . . . *standing alone*," was insufficient to plead scienter, the court recognized that that "governmental investigations into a company *can* contribute to an inference of scienter"—and "consider[ed] it as one piece of the puzzle in [its] holistic analysis of [p]laintiff's allegations." *Id.* at 1308. Moreover, the relevant government order in *Smallen* did not mention the individual defendants or allege any facts showing their knowledge of a fraud. *Compare id.* at 1310 n.8, *with*

---

[24]   *See also In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 707 n.5 (9th Cir. 2012) ("We draw no inference from the SEC's decision not to plead scienter or charge defendants with fraud."); *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *14 n.6 (N.D. Cal. Mar. 31, 2023) (plaintiffs could rely on SEC order to plead scienter even though "the SEC did not assert a scienter-based fraud"); *Under Armour*, 540 F. Supp. 3d at 521-22 ("Despite containing no finding on the issue of scienter, the SEC's Order include[d] specific allegations that the company and its top officials . . . were aware of the potential misleading nature of [their] . . . practices.").

SEC Order (MTD Exhibit C), ¶¶16, 18, 23-24.  Defendants' citations to two other out-of-circuit and inapt cases are likewise unpersuasive.[25]

As the Ninth Circuit recently explained, any purportedly exculpatory language in an SEC order is "irrelevant at [the pleading] stage, where [the court] must accept [Plaintiffs'] allegations as true."  *York*, 65 F.4th at 468.  And none of the purportedly exculpatory language in the SEC Order outweighs the inference of scienter here.  *See* MTD at 15, 20.

*First*, the statement in Paragraph 22 of the SEC Order that Malecha and Standen "focus[ed] on saying what they believed was justified and supported by their subordinates" is not a factual finding, but is simply a non-binding opinion about Defendants' subjective state of mind.  Tellingly, Defendants do not cite the next sentence in Paragraph 22 because it supports an inference of scienter: "The issues at Goderich *were well-understood* by Compass'[] most senior management [*i.e.*, Malecha and Standen], business unit leaders [*i.e.*, Sepich], and . . . Board of Directors"—of which Malecha was a member. And the fact that Paragraph 22 appears under the heading "Compass'[] Misleading Statements About Goderich in May 2017" makes clear that the SEC's opinion relates *only* to the May 2017 misstatements, and not later misrepresentations made during the Class Period.

Similarly, the fact that the SEC Order states that the Compass personnel who reviewed the misrepresentations were not "'sufficiently knowledgeable about . . . Compass'[] . . . *disclosure obligations*'" under the securities laws (MTD at 2, 15) is meaningless, because "[t]he state of mind required is the intent to defraud investors, *not knowledge of the securities laws*."  *See United States v. Stewart*, 2004 WL 113506, at *2 (S.D.N.Y. Jan. 26, 2004).  Rather, a defendant is reckless if the

---

[25]   Defendants' reliance on *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1263 (C.D. Cal. 2015), for the prospect that "[t]here is no authority suggesting that the allegations in an SEC order, which are unproved and contested, can properly be considered evidence of scienter" conflicts with later Ninth Circuit authority holding the opposite. *See York*, 65 F.4th at 468.  And in *In re Apollo Grp., Inc. Sec. Litig.*, 2011 WL 5101787, at *10 n.5 (D. Ariz. Oct. 27, 2011), the plaintiffs relied on allegations from other private plaintiffs, rather than an official SEC order issued after an investigation.

"'danger of misleading buyers or sellers'" was "'known to the defendant'" or "'so obvious that the actor must have been aware'" of the danger (*Pluralsight*, 45 F.4th at 1259), which is what the allegations establish here.

Likewise, the fact that many of Defendants' misstatements were scripted and vetted by multiple executives before they were made (¶¶63, 186) shows that the misstatements were premeditated—not that Defendants "did not have any intent to deceive investors." MTD at 20. At the very least, the fact that Compass executives turned a blind eye to inaccuracies in the Company's prepared public statements—notwithstanding internal information that diverged from those statements—indicates "'conscious disregard'" for the truth, which "'is akin to'" recklessness. *Pluralsight*, 45 F.4th at 1259.

The factual findings set forth in the rest of the SEC Order make clear that Defendants received internal reports contradicting their public statements, which supports a strong inference of scienter. *See, e.g.*, SEC Order (MTD Exhibit C), ¶23 (stating that Malecha and Standen were provided with reports in August, September, and October 2017 reflecting that "expected savings directly from CMCH . . . had declined to $13 million"); *id.*, ¶24 (detailing additional reports provided to Malecha and Standen "showing Goderich continuing to fall far short of the production expectations underlying these cost savings models"); *id.*, ¶¶34-35 (contrasting Sepich's public statement that "'we're about 75% of the way to our target rates'" with internal monthly Goderich production reports demonstrating significantly lower production).

Plaintiffs' scienter allegations that predate the Class Period also support an inference of scienter. *See* MTD at 17. "Information from before the class period is relevant because it can 'confirm what a defendant should have known during the class period.'" *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 n.1 (9th Cir. 2018).[26] Such information is particularly relevant here because the

---

[26] *See also Owens v. Jastrow,* 789 F.3d 529, 542 n.12 (5th Cir. 2015) ("knowledge gained before

Class Period begins in October 2017—although the fraud began in April 2017—due to the five-year repose period for §10(b) claims (28 U.S.C. §1658(b)(2)), since this action was filed on October 21, 2022. *See* ECF 1. The AC describes internal reports from before, *and throughout*, the Class Period that contradicted Defendants' public statements about the progress of the CMCH upgrade and the attendant cost-savings. *See, e.g.*, ¶¶41-46, 53-55, 81-82, 180-183.[27]

Plaintiffs' allegations regarding the internal reports cited in the SEC Order are also sufficiently precise. *See* MTD at 17. For example, the AC directly quotes an April 2017 internal presentation, which stated that "the move to [CMCH] has not met expectations and forecasts," and Goderich "has not been able to maintain consistent production," and alleges that Malecha received the presentation. ¶41. The AC further alleges that from August through October 2017, Malecha and Standen received reports showing that the CMCH system at Goderich was producing an average of 310,000 tons of salt per month—falling short of production expectations by more than half. ¶¶53-54. That is more than sufficient at the pleading stage, when "reports need to be connected to Defendants only in a 'persuasive' way." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 216 n.18 (5th Cir. 2023).[28] Insofar as the precise sources of reports are not alleged, it is a reasonable inference that they originated from within Compass' Salt segment.

Finally, Defendants argue that the internal reports did not contradict their public statements, because the reports did not foreclose the possibility that CMCH might eventually live up to

---

the Class Period may be retained months later"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1222 (S.D. Cal. 2010) ("Statements made *before* the class period can be relevant evidence on this issue of *scienter* . . . .") (emphasis in original).

[27] Defendants' reliance on *Anderson v. Spirit AeroSystems Holdings, Inc.*, 827 F.3d 1229, 1240 (10th Cir. 2016), is misplaced because in that case, unlike here, there was no indication that conditions that existed prior to the class period continued into the class period. *See* MTD at 17.

[28] *See also Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 301 (S.D.N.Y. 2018) (report "'would have gone to any executive in charge of the [company] branches,' which presumably would have included the Individual Defendants").

Compass' forecasts. *See* MTD at 17-18. But this effort to invoke a fraud-by-hindsight defense does not withstand scrutiny. Defendants' statements were false and misleading because the assumptions underlying their targets were shown to have been faulty as of April 2017. ¶43. Defendants, to maintain the façade of CMCH's progress, then: (i) attributed savings to CMCH that were actually from unrelated projects (¶45 (conveyor belt improvements and other "operational excellence" projects)); (ii) blamed non-CMCH factors for increased costs and slower production (¶¶73, 75, 77-78, 127 (blaming ceiling collapse and labor strike)); and (iii) overstated CMCH's production capacity. ¶¶81-82. These misrepresentations were knowingly false at the time Defendants made them, regardless of whether Defendants believed CMCH might eventually live up to the hype.

### 2.    Additional Factors Further Support Scienter

While the facts alleged from the SEC Order, on their own, give rise to a strong inference of scienter that is far more compelling than any innocent inference that can be drawn from those facts, additional factors further strengthen the inference of scienter.

*The CMCH Upgrade Was a Core Operation.* In the Tenth Circuit, "the importance of [a company's] business is relevant and may be considered for purposes of [the] scienter inquiry." *Yellowdog Partners*, 426 F. Supp. 3d at 875; *see also Pluralsight*, 45 F.4th at 1264 (individual defendant's statements to investors that "the size of the sales force was at the core of [the company's] business model" supported an inference of scienter).[29] Here, salt production at Goderich was a core business of Compass, accounting for nearly one third of corporate earnings. ¶2. And the CMCH upgrade at Goderich was: (i) Compass' most important corporate initiative (¶¶184-185); (ii) discussed by Defendants during each Class Period earnings call and investor conference (*id.*); and

---

[29]    *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1010 (D. Colo. 2016) ("'Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis.'"); *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1127-28 (D. Colo. 2017) (allegation that a product was a company's "most important product," which held executives' attention, supported an inference of scienter).

(iii) the focus of numerous investors' and analysts' inquiries. ¶¶ 47-50, 56-57, 107, 127. Defendants therefore would have closely monitored the status of the CMCH project during the Class Period.[30]

*The Individual Defendants' Executive Positions*.   While an "executive's position, standing alone [cannot] give rise to the necessary inference of scienter," the "position [is] nonetheless a fact relevant to the court's weighing of the totality of the allegations." *Yellowdog Partners*, 426 F. Supp. 3d at 874-75.   Such allegations are stronger when accompanied by "additional particularized facts" supporting "an inference of scienter" (*Anderson*, 827 F.3d at 1245)—as they are here.   *See, e.g.*, ¶¶41, 180 (in April 2017, Malecha received an internal report explaining that Goderich "has not been able to maintain consistent production," which he relayed to the Board); ¶¶45-46, 181 (when Compass learned that CMCH would not meet expected cost-savings, Malecha approved a new forecast that included non-CMCH related projects, and even some yet-to-be identified projects, to misleadingly support the initial $30 million forecast); ¶¶53, 182 (from August through October 2017, Compass executives provided reports to Malecha and Standen showing Goderich was continuing to fall far short of production expectations).

*The Frequency of Defendants' Public Misrepresentations*.   The fact that the Individual Defendants publicly and repeatedly discussed CMCH during the Class Period supports an inference that they educated themselves on that subject, and were therefore aware—or recklessly disregarded––that their statements were false and misleading.   *See Pluralsight*, 45 F.4th at 1268 (individual defendant's "frequent[] field[ing] [of] questions from investors and analysts" regarding the same topics that were the subject of the fraud supported an inference of scienter).[31]   While Defendants

---

[30]   Defendants' authorities to the contrary stand only for the proposition that the core operations theory *by itself* is insufficient to plead scienter.   MTD at 19.

[31]   *See also Theodore v. Purecycle Techs., Inc.*, 2023 WL 4035880, at *6 (M.D. Fla. June 15, 2023) (making "statements repeatedly . . . can more strongly evince an inference that the defendant spoke with scienter."); *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303, at *4 (S.D.N.Y. June 2, 2022) (corporate officers presumed knowledgeable about subjects on which they choose to speak).

argue that the frequency of their comments, *standing alone*, does not support a strong inference of scienter (MTD at 20), this ignores that Malecha, Standen, and Sepich also received contemporaneous internal reports contradicting their public statements.[32]

*Other Improprieties*.  Finally, Compass' GAAP violations and subsequent restatement, and admitted internal control weaknesses (¶¶187-189), even if not independently sufficient to establish scienter (*see* MTD at 20-21), "lend further support" to the already-strong "inference of scienter in this case."  *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007).

### 3.   The Inference of Scienter Is More Compelling than Any Inference of Innocence

The preceding evidence, when viewed holistically as it must be on a motion to dismiss, raises an inference of scienter at least as cogent and compelling as any competing inference of innocence.  Defendants' arguments to the contrary are meritless.  *See* MTD at 21.  Simply put, no inference of innocence can outweigh the fact that Malecha: (i) was informed in April 2017 that "the move to [CMCH] ha[d] *not met* expectations and forecasts" (¶41); (ii) reviewed Compass' revised forecast, which showed that, at best, CMCH would only directly save about $18 million per year (¶¶42-46); (iii) decided that Compass would *continue to tell investors* that it expected CMCH to generate $30 million in annual cost-savings (¶46); and (iv) then stated during the Class Period that Compass "expect[ed] to achieve" "$30 million in cost reductions . . . from our investment in [CMCH] at Goderich."  ¶98.  Although some of these events occurred shortly before the start of the Class Period, they are nonetheless powerful evidence of Defendants' intent to mislead investors during the Class Period because Defendants' public statements remained just as sanguine, despite it becoming even more evident that CMCH was underperforming.  Defendants' bid to spin their misstatements as

---

[32]   Defendants' cited cases do not support a different result here.  *See Nakkhumpun*, 782 F.3d at 1157-61 (allegations only concerned one earnings call); *Gold*, 776 F.3d at 1117 (the court did not discuss the frequency of defendants' statements to the public).

an innocent inability to "foresee [CMCH's] future performance" (MTD at 21), fails to make contact with Plaintiffs' chief allegation that Defendants were aware of contemporaneous information that contradicted their public statements. ¶¶64-70, 79-82. Finally, Defendants' argument that the SEC Order supports an inference of innocence fails for the reasons discussed above.

### D.    Plaintiffs Have Pled Cognizable Claims Against the Individual Defendants

As the scienter discussion above makes clear, Plaintiffs have adequately pled scienter as to each Individual Defendant—Malecha, Standen, and Sepich—without relying on the group pleading doctrine. *See* MTD at 34-35. Indeed, Defendants' citation to non-substantive paragraphs of the AC––while transparently ignoring all of the AC's substantive allegations—makes the frivolity of this argument clear. *See id.* (citing ¶29 (parties)); ¶178 (*additional* scienter allegations); ¶¶210-211 (§10(b) count)).

The AC's substantive allegations with respect to each Individual Defendant include that: (i) Malecha reviewed Compass' revised forecast showing that CMCH would not directly save $30 million per year (¶¶43-46, 98); (ii) Standen and Malecha received reports from August through October 2017, showing that Goderich was continuing to fall far short of the production expectations underlying the CMCH cost-savings model (¶53); and (iii) Sepich, as VP of the Salt segment, would have been one of the Compass "executives" who provided those reports to Standen and Malecha. *Id*. Yet each of the Individual Defendants made statements highlighting the expected $30 million in annual cost-savings from CMCH. *See, e.g.*, ¶¶58-61.[33]

### E.    Plaintiffs' Claims Are Timely

The statute of limitations is an affirmative defense for which Defendants bear the "burden to prove" that Plaintiffs' claims are untimely. *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v.*

---

[33] Defendants make the superfluous point that the Individual Defendants cannot be held liable for statements they did not make. MTD at 35 (citing *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011)). But Plaintiffs are not seeking that result.

*Nomura Holding Am., Inc.*, 873 F.3d 85, 122 (2d Cir. 2017).  Plaintiffs' claims are timely if they were brought within "'2 years after the discovery of the facts constituting the violation'" of §10(b). *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 638 (2010) (quoting 28 U.S.C. §1658(b)(1)).  The limitations period begins to run once the plaintiff "discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' *including scienter.*"  *Id*. at 653.  The plaintiff must have uncovered "enough information about [the defendants'] scienter to plead it with sufficient particularity to survive a motion to dismiss under the heightened pleading requirements for scienter under [the PSLRA]."  *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011).[34]

The AC alleges (*see* ¶¶17, 171, 174) that Plaintiffs' claims were "not 'discovered' until the issuance of the SEC Order" on September 23, 2022 "provided sufficient evidence of scienter."  *York*, 65 F.4th at 467.  That is because the "SEC Order put [Defendants'] prior statements in a new context, revealing that ostensibly innocuous statements were actually intentional misrepresentations."  *Id*.  Plaintiffs' claims were timely brought less than a month later, on October 21, 2022.  ECF 1.

As the Ninth Circuit recently explained in an analogous case, "[b]ecause [Plaintiffs have] pleaded facts that postdate the critical date"—here, October 21, 2020—Defendants have "two ways to show that" Plaintiffs' claims are time-barred.  *York*, 65 F.4th at 467.[35]  Defendants must "conclusively show" either: (i) that a reasonably diligent plaintiff "could have pleaded its claim based solely on things that it knew or should have known prior to the critical date"; or (ii) "that the SEC Order provided no information necessary to [Plaintiffs'] claim."  *Id*. at 466-67.  Defendants'

---

[34]   Such a fact-intensive inquiry is generally "inappropriate for resolution on a motion to dismiss." *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148, 1178 (D. Colo. 2012).

[35]   In *York*, the court discussed facts in terms of the "critical date"—*i.e.*, two years before the claim was brought.  *Id*. at 465-67 (citing *Merck*, 559 U.S. at 638).

arguments fall short on both counts.  *See* MTD at 35-39.

Defendants appear to attempt the first approach by arguing that various disclosures of disappointing news about the CMCH upgrade "trigger[ed]" a duty to investigate.  *Id.* at 36-37.  But they fail to explain how a reasonably diligent plaintiff investigating the claims would have discovered sufficient facts about scienter based solely on those disclosures—which "out of context . . . are innocuous."  *York*, 65 F.4th at 467.[36]

Defendants likewise fail to conclusively show how Plaintiffs could have adequately pled scienter based on either the threadbare announcement of an SEC investigation, or the publicly-available facts they point to such as Defendants' positions at the Company.  *See* MTD at 37.  Rather, it was the facts contained in "the SEC Order that revealed the extent" to which Defendants were aware of internal information that contradicted their public statements about the CMCH upgrade.  *York*, 65 F.4th at 467; *see also id*. at 468 (SEC order indicated company's statements "contradicted its own internal data"—which "creates a 'strong inference' that [it] 'knowingly misled' the public").

"For the same reasons," Defendants have failed "to show that the SEC Order did not provide information necessary for [Plaintiffs] to plead an adequate complaint."  *Id.* at 467.  As the defendants did in *York*, Defendants again lean on the fact that "the SEC Order did not contain any scienter-based claims" and included some potentially exculpatory language.  MTD at 38.  And just as the court did in *York*, this Court should reject those arguments: "[T]he SEC's decision not to charge a defendant with fraud does not 'hurt[]' a plaintiff's 'ability to plead a strong inference of scienter.'"  *York*, 65 F.4th at 468.  And the purported exculpatory language in the SEC Order is "irrelevant at this stage, where we must accept [Plaintiffs'] allegations as true."  *Id*.  "What matters is that

---

[36]  *See also Integrity Advance, LLC v. Consumer Fin. Prot. Bureau*, 48 F.4th 1161, 1173 (10th Cir. 2022) ("'[a]n incorrect prediction about a firm's future earnings, by itself, does not automatically tell us whether the speaker deliberately lied or just made an innocent . . . error'") (quoting *Merck*, 559 U.S. at 650), *cert. denied*, _ U.S. _, 2023 WL 3937614 (June 12, 2023).

[Plaintiffs have] plausibly alleged that the SEC Order provided facts and context without which [they] could not have otherwise pleaded scienter." *Id.*

Accordingly, Defendants have "failed to meet [their] burden to show that [Plaintiffs] discovered the facts constituting [their] claims more than two years prior to the filing of [the] complaint." *Id.*[37]

### F.    Plaintiffs Have Pled a Control-Person Claim Under §20(a)

Because Plaintiffs have adequately alleged a primary violation of §10(b), the Court should also sustain the §20(a) control person claim.  *See* MTD at 39.

## IV.    CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion in its entirety.[38]

DATED:  July 12, 2023

Respectfully submitted,

STUEVE SIEGEL HANSON LLP
NORMAN E. SIEGEL, KS #70354

*/s/ Norman E. Siegel*
NORMAN E. SIEGEL

460 Nichols Road, Suite 200
Kansas City, MO  64112
Telephone:  816/714-7100
816/714-7101 (fax)
siegel@stuevesiegel.com

*Local Counsel*

---

[37]  Defendants' cited cases, which either pre-date *Merck*'s repudiation of the inquiry notice standard, or are otherwise inapposite, do not aid in establishing their affirmative defense.

[38]  If the Court grants Defendants' motion in whole or in part, Plaintiffs respectfully request leave to amend, which is typically freely given. *See, e.g.*, *Teetz as Next Friend of Lofton v. Sedgwick Cnty., Kan.*, 2023 WL 3040460, at *5 (D. Kan. Apr. 21, 2023) ("Rule 15(a) anticipates the liberal amendment of pleadings.").

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARRYL J. ALVARADO
JOSEPH J. TULL
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
dalvarado@rgrdlaw.com
jtull@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
ERIN W. BOARDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
eboardman@rgrdlaw.com

KIRBY McINERNEY LLP
ANDREW M. McNEELA
IRA M. PRESS
DAVID A. BISHOP
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: 212/317-2300
212/751-2540 (fax)
amcneela@kmllp.com
ipress@kmllp.com
dbishop@kmllp.com

*Lead Counsel for Lead Plaintiff*

FRIEDMAN & ANSPACH
EUGENE FRIEDMAN (*pro hac vice to be filed*)
LEO GERTNER (*pro hac vice to be filed*)
1500 Broadway
New York, NY 10036
Telephone: 212/354-4500
efriedman@friedmananspach.com
lgertner@friedmananspach.com

*Additional Counsel*

- 40 -