## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

IBT EMPLOYER GROUP WELFARE
FUND, and RETAIL WHOLESALE
DEPARTMENT STORE UNION LOCAL
338 RETIREMENT FUND,

          *Plaintiffs*,

vs.

          Case No. 2:22-cv-02432-EFM-ADM

COMPASS MINERALS
INTERNATIONAL, INC., FRANCIS J.
MALECHA, JAMES D. STANDEN, and
ANTHONY J. SEPICH,

          *Defendants*.

## MEMORANDUM AND ORDER

This is a case brought under the Private Securities Litigation Reform Act of 1995[1] ("PSLRA"). Before this Court are three motions by Defendants: their combined Motion to Strike and Motion to Dismiss Plaintiffs' Amended Complaint (Doc. 26) and their Unopposed Motion for Hearing (Doc. 39). The parties are Plaintiffs IBT Employer Group Welfare Fund and Retail Wholesale Department Store Union Local 338 Retirement Fund and Defendants Compass Minerals International, Inc., Francis J. Malecha, Anthony J. Sepich, and James D. Standen.

---

[1] 15 U.S.C. § 78u-5(c).

Plaintiffs claim that Defendants violated Sections 10(b)[2] and 20(a) of the Securities Exchange Act ("SEA"), as well as the Securities Exchange Commission's ("SEC") Administrative Rule 10b-5.[3]

Before the Court is Defendants' Motion to Strike and Motion to Dismiss Plaintiffs' Amended Complaint (Doc. 26).  In their Motions, Defendants Compass Minerals International, Inc., Francis J. Malecha, Anthony J. Sepich, and James D. Standen seek dismissal of Plaintiffs IBT Employer Group Welfare Fund's and Retail Wholesale Department Store Union Local 338 Retirement Fund's claims for violations of Sections 10(b)[4] and 20(a)[5] of the Securities Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

## I.       Factual and Procedural Background[6]

This is a federal securities action regarding alleged misstatements made by Defendants Compass Minerals International, Inc. ("Compass") Francis J. Malecha, James D. Standen, and Anthony J. Sepich.  During the relevant period, Malecha was Compass's CEO, President, and a director, Standen served as Compass's CFO, and Sepich was Senior Vice President of Compass's salt segment.  Lead Plaintiff Retail Wholesale Department Store Union Local 338 Retirement Fund and Plaintiff Local 295 IBT Employer Group Welfare Fund bring this action after purchasing Compass's stock sometime between October 31, 2017, and November 18, 2018 (the "Class Period").

---

[2]

[3] 17 C.F.R. § 240.10b-5.

[4] Codified as 15 U.S.C. § 78j(b).

[5] Codified as 15 U.S.C. § 78t(a).

[6] The facts are taken from Plaintiffs' Complaint and are considered true for the purposes of this Order.

A.     **Background**

Plaintiffs claim Defendants made multiple false statements regarding the success of a continuous mining and continuous hauling ("CMCH") system installed at Compass's Goderich mine. Many of Plaintiffs' allegations parrot facts contained within a consent order issued by the SEC on September 23, 2022 (the "SEC Order"). This order was the result of an SEC investigation into Compass's dealings after Compass publicly revealed on November 18, 2018, that the CMCH system had lost Compass millions of dollars earlier that year.

Plaintiffs' Complaint begins by stating that they

allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters based upon the investigation undertaken by their counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Compass Minerals International, Inc. ("Compass Minerals" or the "Company"), press releases, analyst and media reports, and other public reports and information about the Company, including the [SEC Order].

Sixty percent of Compass's revenue stems from mining and distributing salt for various purposes, including consumer and professional use. Within Compass's "Salt Segment," the Goderich mine remains its "crown jewel." Goderich is the largest salt mine in the world and alone accounted for roughly one-third of Compass's entire earnings during the Class Period.

In 2014, Compass made the decision to upgrade the equipment at Goderich to a continuous mining and continuous haulage ("CHCM") system. Compass forecasted the project would cost between $70 and $80 million and, after it was fully implemented, would reduce the unit cost at Goderich by over 23%. This reduction in unit costs was estimated to save the Company approximately $30 million annually, beginning in 2018. Those savings, however relied upon Goderich mine producing at least 7.5 million tons of salt annually.

In 2016 and 2017, however, not only was the CMCH equipment malfunctioning more often and requiring more electricity than predicted but geological issues at the mine increased production costs. For example, in 2016, the CMCH equipment produced merely 1.4 million tons of salt. And during the first quarter of 2017, unit costs increased at Goderich by 42% when the CMCH system produced merely 260,000 tons of salt per month.

In April 2017, Malecha received an internal presentation stating that "the move to [CMCH] has not met expectations and forecasts," and that Goderich "has not been able to maintain consistent production." Soon after, Malecha addressed Compass's Board stating, "We have not made the progress required on . . . continuous mining[] and production reliability."

Compass's executives then reevaluated the potential savings from the CMCH system and concluded that the maximum direct annual savings would be $18 million—not $30 million as previously supposed. Instead of informing investors of this development, Compass brainstormed a new financial model to achieve $30 million in annual savings. This model included savings from unidentified projects. Malecha and the other Compass executives reviewed these forecasts and decided to tell investors that CMCH would still generate $30 million in annual savings.

In August 2017, however, Compass's internal estimate of the maximum amount of annual savings from the CMCH system declined to $13 million. And reports provided to Malecha, Standen, and the other Board members from August through October of 2017 revealed that Compass failed to meet the production requirement to reach even that number.

**B.    Alleged misstatements during the Class Period**

According to Plaintiffs, the Class Period began on October 31, 2017, and ran until November 18, 2018. Each allegedly false statement during this period is discussed below along with the underlying facts at the time.

1.      *Malecha's statement to investors on October 31, 2017*

On October 31, 2017, Malecha addressed investors during Compass's earnings call for the third quarter of 2017.  In a prepared statement, he said:

> Installation of continuous mining and haul[age] systems at the Goderich mine is also on track, even with the partial roof collapse we experienced in September. We are currently commissioning the final continuous mining system and expect to complete this in 2017 in fourth quarter . . . . Our cost-savings plan initiated in July . . . is on track. . . . These savings are in addition to the $30 million in cost reductions we expect to achieve in 2018 from our investment in continuous mining at Goderich.

That same day, Compass filed its quarterly report for the third quarter of 2017 on Form 10-Q.  Standen signed the report.  The report, according to Plaintiffs, failed to disclose that: (1) the Goderich mine was failing to produce the quantity of salt that Compass Minerals' business model required; (2) these production shortfalls were primarily due to the CMCH system underperforming Compass Minerals' expectations; and (3) these production shortfalls were resulting in higher unit costs that materially reduced the Company's earnings.

2.      *Standen's statements on February 14, 2018*

On February 14, 2018, Defendants held an earnings call with investors regarding the fourth quarter of 2017.   During the call, both Malecha and Standen stated that they expected to achieve $30 million in annualized savings by the beginning of 2019—not 2018 as previously promised. When asked about the reason for the delay in cost savings, Malecha and Standen blamed a ceiling fall that occurred in September 2017 for "most of this cost" instead of the CMCH system or difficulties associated with it.  In reality, the ceiling fall had caused just 20% of the 2017 production shortfall.  Eighty percent stemmed from the underperformance of the CMCH system.

During the call, Standen also emphasized that the CMCH system had "already achieved about $5 million of savings in 2017 when we finished installing the fourth [CMCH] mining system

and completely stopped drilling and blasting in the fourth quarter."  Slide 4, shown during the presentation, repeated this statement.  Malecha affirmed Standen's statements by adding, "[W]e have already achieved some 2017 cost savings from the continuous miners."

The CMCH system, however, had directly reduced costs by just $1.1 million—and that was accomplished only by eliminating the purchasing costs of explosives.  The remaining $3.9 million in savings came from projects unrelated to CMCH.  Furthermore, Plaintiffs allege that Defendants' purported $5 million in savings wholly failed to consider: (1) the extra $4 million in maintenance and repair costs the CMCH system necessitated; (2) $600,000 in penalties to customers because of the lower salt quality the CMCH system was producing; (3) $5 million for purchasing salt from third party vendors to meet Compass's contractual obligations after the Goderich mine's production shortfalls; and (4) $9 million in 2019 to purchase and install additional filtering systems to address salt quality issues caused by the CMCH equipment.  In total, the CMCH system resulted caused a $8.5 million net loss to Compass during 2017.

3. *Compass's Form 10-K on February 27, 2018*

On February 27, 2018, Compass filed its 2017 Form 10-K, signed by Malecha and Standen. This form represented that the Goderich mine's annual production capacity was 8 million tons of salt a year.  It defined "annual production capacity" as "our estimate of the tons that can be produced assuming a normal amount of scheduled down time and operation of our facilities under normal working conditions, including staffing levels, based on actual historical production rates." Compass further promised that "[a]s we introduce new production methods, such as continuous mining at our Goderich salt mine, we will update our estimates if necessary as new production data become available."

4.      *Standen's and Malecha's statements in May and June 2018*

On May 1, 2018, Compass issued a press release signed by Standen.  It stated:

> Salt segment operating earnings totaled $34.1 million, compared to $45.4 million in the first quarter of 2017.  Earnings for this segment were pressured by increased logistics costs as well as higher-cost carryover inventory produced last year and sold in the first quarter of 2018.  Approximately $20 million in increased logistic and production costs primarily resulted from the ceiling fall incident at the Goderich mine last year, which led the company to use rock salt from its Louisiana mine to serve customers in the Great Lakes region in the first quarter.

The next day, Compass filed a Form 10-Q for the first quarter of 2018, also signed by Standen.  It similarly stated:

> Salt operating earnings decreased 25%, or $11.3 million, due to higher per-unit product and logistics costs as well as higher-cost inventory produced in 2017 and sold in the first quarter of 2018.  The higher per-unit product and logistics costs resulted from lower production at our Goderich mine due to a ceiling fall that occurred last year, leading to deliveries of salt from our Cote Blanche, Louisiana mine to our Northern markets.

Likewise, on May 2, Defendants held an earnings call in which Standen directly blamed the $20 million in increased costs on the ceiling incident.  Slide 8 of the presentation stated largely the same.  In fact, only $3 million in direct costs stemmed from the ceiling fall.  The remaining $17 million arose from the continued shortcomings of Goderich's CMCH system.

That same day, when directly asked if the CMCH equipment had caused any salt quality issues, Malecha responded "we've had quality issues at the mine, but not driven by—or caused by the continuous miners, but more the area of the mine that we're mining in, and the geology that we're incurring."

At that time, the CMCH equipment was producing salt finer than required by its customers' specifications, causing Compass to incur penalties.  Malecha also did not disclose that Compass had to spend $9 million in sorting and screening equipment to address the quality issues caused by

the CMCH system.  Furthermore, the use of that screening equipment reduced the output of the Goderich mine by 400,000 tons per year, increasing unit costs.

On May 16, 2018, Standen made a presentation to investors and once again blamed the ceiling collapse for Compass's reduced production.  He also stated, "We have had delays in our ramp-up, which were largely driven by salt quality issues that are being addressed through our new optical sorting."  He continued:

> With our cost savings and efficiency projects, we have identified approximately $40 million in annualized cost reductions within the salt segment.  These savings are expected to come from technology enhancements at our Goderich mine with the introduction of continuous mining and haulage, as well as various other efficiency programs at this mine and throughout the other salt operations.
>
> We have realized about $15 million in annualized savings for this business through the first quarter of 2018. This includes broad-based streamlining in addition to some of the initial savings from the transition to continuous mining and haulage. We expect that the remainder of these savings will be achieved mainly at Goderich.

A slide shown during Standen's presentation stated that Compass had "[a]chieved ~$13 million in annualized salt business savings as of end of 2017 [sic]."  Standen repeated these statements nearly verbatim on June 12, 2018.

At that time, the CMCH system had not realized any savings for Compass in either 2017 or 2018.  Rather, any potential savings were more than offset by the system incurring millions in additional costs.

### 5.    *Standen and Malecha's statements in August 2018*

On August 6, 2018, Compass issued a press release regarding its financial results for the second quarter of 2018.  In the press release signed by Standen, Compass stated:

> While market-wide average bid volumes have increased this season compared to the 2017–2018 season, the company currently does not expect to increase salt sales volume expectations for 2018 due to production constraints.  These constraints are due to the impact of the ongoing ramping up of production following the [12]-week

strike at the Goderich mine, which included an unexpected 7-day full work stoppage near the end of the strike.

On August 7, Standen further discussed the strike's impact on production at the Goderich mine. In short, he attributed Goderich's "reduced production levels," and the expected "cost impacts" to the strike. Standen also blamed a $3 million additional expense due to a production shortfall at the Goderich mine on the ceiling fall. However, the CMCH system was primarily responsible for the production shortfall. In total, the strike had caused a production shortfall of 750,000 tons of salt—or 31%—for 2018. The CMCH system, in contrast, caused the remaining 69% of 2018's production shortfall, i.e., roughly 1.65 million tons of salt.

Regarding the mine's salt quality, Standen further stated, "[W]e commissioned and began full utilizing our new optical sorting and screening equipment during the strike. Ultimately, we believe these efforts will improve our operations as we've largely addressed the quality issues in our salt production." Standen did not reveal, however, that using the optical sorting equipment would reduce output at the Goderich mine by 400,000 tons annually.

That same day, Malecha stated:

The second important takeaway is that we believe we have all the pieces in place to drive more efficiency through our salt operations, and particularly, at our Goderich mine. Our continuous mining and continuous haulage systems at the mine are ramping up and served [us] well during the work stoppage. As we have previously reported, we estimate that this investment has already delivered approximately $5 million in ongoing annualized cost savings.

As stated above, the CMCH had yet to produce any savings for Compass at all. Instead, it had been consistently increasing Compass's costs and had failed to achieve the production requirements necessary to obtain millions of dollars in promised annualized savings.

6.      *Standen's and Sepich's statements on September 12, 2018*

On September 12, 2018, Standen and Sepich addressed investors at a conference.  Standen went first, stating that the CMCH system had already achieved $15 million in ongoing annualized savings as of the end of the second quarter of 2018.  Sepich followed, showing a slide which compared Goderich's current production rate to the announced target rate of 600,000 tons per month.



While displaying this slide, Sepich stated, "Getting to our targeted monthly production rates will determine when we start achieving the full savings we expect from these investments. As you can see on this chart, we're about 75% of the way to our targeted rates."  Afterward, Standen repeated that Compass was at "75% production at Goderich" with the goal of moving up to 100%.  Addressing the "depressed production levels," Standen blamed them completely on the ceiling fall and the strike, assuring investors that "those items would generally non-repeat."

At the time of the conference, the CMCH system had yet to produce any savings. Furthermore, although the Goderich mine had produced 438,000 tons in January 2018, it had produced an average of 314,000 tons per month from April to July of 2018.  In August 2018, it had produced 332,000 tons of salt.  At the time Sepich spoke, it was on track to produce 225,000 tons in September, although that number ultimately increased to 346,000 tons of salt that month.

Furthermore, the ceiling fall had occurred in September 2017 and had no effect on the production shortfall in 2018.  Likewise, the strike—undisputedly a one-off event—caused merely 31% of the production shortfall in 2018.   The rest was caused, once again, by the CMCH system's underwhelming performance.

## C.  Revelations and fallout.

In a press release issued October 23, 2018, Malecha finally revealed—at least in part—that the CMCH system was not generating any savings for Compass.  He stated:

> We are disappointed with our salt segment earnings, which were pressured this quarter by lower-than-expected production at our Goderich mine.  Our employees are making improvements each month to ramp up production with our new continuous mining systems; however, the pace of improvement continues to be slower than expected since the end of the strike.  Our new guidance reflects this slower ramp-up for the remainder of the year.

In total, Compass's "lower-than-expected" production rates for the third quarter of 2018" resulted in an estimated "negative impact of $15 million to third-quarter 2018 Salt segment earnings."

Immediately, Compass stock shares fell from a closing price of $67.89 per share on October 22, 2018, to close at $54.70 per share on October 23, 2018, with more than seven times the previous day's trading volume.  The next day, Compass's shares dropped again. This time, to $47.24 per share—more than a 30% total decline.  Several investors voiced irritation, accusing Compass executives of engaging in deception regarding the CMCH system and Goderich's production. On November 19, 2018, Compass terminated Malecha, prompting further stock price drops.

On November 6, 2019, Compass revealed that the SEC was "investigating the Company's disclosures concerning the operation of the Goderich mine."   On August 5, 2021, Compass announced that it had discovered a material weakness in its internal control over financial

reporting.  Before this date, Compass had valued its salt inventory using a forecasted cost per ton rather than the actual cost per ton.  This valuation method violated the U.S. Generally Accepted Accounting Principles ("GAAP").  After making the announcement, Compass released updated salt segment results for the first quarter of 2019 through the first quarter of 2021.

After a multi-year investigation, the SEC issued the SEC Order on September 23, 2022. By its terms, the SEC Order was a consent judgment, issued after negotiation between Compass and the SEC.  At the same time, the SEC issued a press release entitled "SEC Charges Compass Minerals for Misleading Investors about Its Operations at World's Largest Underground Salt Mine."  Both the SEC Order and the press release stated that Compass would pay $12 million in civil penalties.  The SEC Order, however, declined to find that Malecha, Standen, Sepich, or any other Compass executives acted with scienter.

**D.      Procedural history**

Plaintiff IBT Employer Group Welfare Fund filed the present action on October 21, 2022, seeking to bring a class action on behalf of itself and other similarly situated investors.  Plaintiff Retail Wholesale Department Store Union Local 338 Retirement Fund joined as a named plaintiff on January 11, 2023.  Defendants submitted the present Motion to Strike and Motion to Dismiss on May 12, 2023.  Defendants also filed a Motion for Hearing on August 24, 2023.

## II.      Legal Standard

Under Rule 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[7]  Upon such motion, the court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible

---

[7] Fed. R. Civ. P. 12(b)(6).

on its face.'"[8]  A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct.[9]  The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature of claims as well the grounds on which each claim rests.[10]  Under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint, but need not afford such a presumption to legal conclusions.[11]  Viewing the complaint in this manner, the court must decide whether the plaintiff's allegations give rise to more than speculative possibilities.[12]  If the allegations in the complaint are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"[13]

## III.    Analysis

### A.    Defendants' Motion to Strike

Defendants begin by asking the Court to strike all of Plaintiffs' allegations because many rely almost verbatim on the SEC Order.[14]  Defendants assert two reasons why allegations based on the SEC Order are unavailable to Plaintiffs.  First, Defendants claim that any allegations relying on unproven allegations in a separate case are immaterial as a matter of law, and thus subject to

---

[8] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[9] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[10] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

[11] *Iqbal*, 556 U.S. at 678–79.

[12] *See id.* ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

[13] *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 570).

[14] Defendants attach an exhibit showing how 28 paragraphs from Plaintiffs' 219-paragraph Amended Compliant mirror language found in the SEC Order.  After reviewing the Complaint, it becomes apparent that number is much higher, albeit falling far short of the entirety of the Complaint like Defendants claim.

Fed. R. Civ. Proc. 12(f)'s prohibition.  Second, Defendants claim that Plaintiffs violated Rule 11(b) by failing to independently investigate the underlying facts contained in the SEC Order.

### 1.    Rule 12(f)

Rule 12(f) allows courts to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" either on motion by a party or sua sponte. Defendants cite several cases from the Southern District of New York to argue "that references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f)."[15]  They also argue that facts from the SEC Order are inadmissible because, as a consent order, no adjudication on the merits occurred.

First, Defendants' argument about the SEC Order being improper "evidence" is unripe at the motion to dismiss stage.  Second, Plaintiffs point to a more recent Southern District of New York case acknowledging that "the weight of authority holds that plaintiffs may base factual allegations on complaints from other proceedings because neither Circuit precedent nor logic supports an absolute rule against doing so."[16]   After all, "[i]t makes little sense to say that information which the complaint could unquestionably rely on if it were mentioned in a news clipping is immaterial simply because it is conveyed in an unadjudicated complaint."[17]

---

[15] *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593 (S.D.N.Y. 2011).

[16] *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337 (S.D.N.Y. 2021), *aff'd sub nom. Town of Davie Police Officers Ret. Sys. v. City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan*, 2021 WL 5142702 (2d Cir. 2021) (cleaned up) (further citations and quotations omitted).

[17] *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379 (S.D.N.Y. 2020) (quoting *In re Bear Stearns Mortgage Pass-Through Certificates Litig.*, 851 F.Supp.2d 746, 768 (S.D.N.Y. 2012)) (cleaned up).

Given that there is no binding Tenth Circuit or Supreme Court opinion on the issue, the Court is free to agree with Plaintiff's position as the more logical one.  At this stage of the case, Plaintiffs are not relying on the SEC Order as evidence.  Thus, Defendants' argument on that point is moot.[18]  Furthermore, Plaintiffs may allege facts contained with the SEC Order.  Mere inclusion of the facts underlying Plaintiffs' Complaint within the SEC Order is not a sufficient reason to strike those allegations. Thus, the Court denies Defendants' Motion on this ground.

### 2.    Rule 11(b)

Plaintiffs must still adhere to Rule 11(b)'s requirement that their counsel independently conduct a reasonable investigation to ensure the accuracy of their pleaded facts.  Specifically, Rule 11(b) cautions plaintiffs that by submitting a complaint, they certify that after an "inquiry reasonable under the circumstances[,] the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."

Defendants rely primarily on *Amorosa v. General Electric Co.*,[19] where an opted-out plaintiff "copied almost verbatim from the operative complaint in the Class Action" without conducting any independent investigation or alleging additional facts.[20]  There, the court acknowledged "there is no absolute rule barring a private plaintiff from relying on government pleadings and proceedings in order to meet" the requirements of Rule 9(b) of the Federal Rules of

---

[18] Plaintiffs correctly note that *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976)—the Seminole case in a line of cases upon which Defendants rely—dealt with an evidentiary issue and limited its holding to the facts of that case.  Regardless, because *Lipsky* is not binding nor particularly persuasive to the Court, no further analysis is necessary.

[19] 2022 WL 3577838 (S.D.N.Y. 2022).

[20] *Id.* at *1, 3.

Civil Procedure and the PSLRA.[21]   However, the court recognized it should "be mindful of the limitations of such records."[22]   Because the plaintiff blindly copied all his allegations without performing any sort of investigation or alleging additional facts, the court granted General Electric's motion to dismiss.[23]

Similarly, in *In re Connetics Corp. Securities Litigation*,[24] the court struck allegations by the plaintiffs because they made "no effort to inform the Court what other sources of information besides the SEC complaint and press release they relied on in formulating their specific claims."[25] The court therefore concluded that "under Rule 11(b), plaintiffs did not personally investigate their claims against defendants."[26]

In contrast, Plaintiffs cite *In re Teva Securities Litigation*[27] where the plaintiffs recycled several allegations made in a state attorney general's complaint.[28]   The defendants argued that copying allegations violated both Rule 11(b) and Rule 12(f) and asked the court to strike those allegations.[29]   Ultimately, the court denied the defendants' motion.[30]   In reaching this conclusion, the court noted that "it is reasonable to rely on a governmental investigation because such information may have more 'evidentiary support.'"[31]   Furthermore, the plaintiffs' counsel *had*

---

[21] Id. at *3 (further citations and quotations omitted).

[22] *Id.* at *3 (further citations and quotations omitted).

[23] *Id.* at *5

[24] 542 F. Supp. 2d 996 (N.D. Cal. 2008)

[25] *Id.* at 1005.

[26] *Id.* at 1005–06.

[27] 2023 WL 3186407 (D. Conn. 2023).

[28] *Id.* at *24.

[29] *Id.*

[30] *Id.* at *27.

[31] *Id.* at *26 (quoting *de la Fuente v. DCI Telecommunications, Inc.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003)).

conducted their own investigation and added additional allegations to the complaint beyond those based on the state attorney general's complaint.[32]  Moreover, the plaintiffs had "identif[ied] the sources that counsel investigated, and attest[ed] in good faith that discovery [would] provide evidentiary support for allegations pled on information and belief."[33]  The court concluded that "Rule 11 requires nothing more."[34]

This is an issue of first impression before the Court.  As to pleading fraud generally, the Tenth Circuit has stated that "[a]llegations of fraud may be based on information and belief when the facts in question are peculiarly within the opposing party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief."[35]

Here, Plaintiffs' Amended Complaint borrows heavily from the SEC Order.  Indeed, each of the factual allegations upon which Plaintiffs rely to show Defendants' falsity and scienter either copy or paraphrase the SEC Order.  Nevertheless, the Complaint also includes numerous factual allegations external to the SEC Order, mostly relating to the particularity of Defendants' statements and the aftereffects of those statements on Compass's stock prices.

Plaintiffs' allege that all the facts asserted in their Complaint rest on "personal knowledge as to themselves and their own acts and upon information and belief as to all other matters based upon the investigation undertaken by their counsel."  This investigation included, among other

---

[32] *Id.*

[33] *Id.*

[34] *Id.*; *see also Homeward Residential, Inc. v. Sand Canyon Corp.*, 2014 WL 2510809, at *7 (S.D.N.Y. 2014) ("Rule 11 seems to allow incorporation of allegations from other complaints if they are combined with material the plaintiff has investigated personally that lends credence to the borrowed allegations.").

[35] *Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992); *see also AKH Co. v. Universal Underwriters Ins. Co.*, 2015 WL 4572778 (D. Kan. 2015) (quoting *Scheidt*).

things, a review of Compass's SEC filings, press releases, analyst and media reports, other public reports and information about the Company, and the SEC Order.

The Court considers this investigation to be a reasonable inquiry under the circumstances for the purposes of Rule 11(b). First, the facts upon which Plaintiffs rely to allege falsity and scienter all involve internal reports, communications, and presentations within Compass—not publicly available information. It seems unlikely that a private party—i.e., Plaintiffs—conducting a reasonable investigation would uncover those internal reports, and Defendants offers no argument to the contrary. Second, Plaintiffs base their allegations regarding Defendants' wrongdoing on "information and belief." This is appropriate when, like here, information relevant to falsity and scienter is peculiarly within Defendants' knowledge. Third, Plaintiffs' counsel investigated the facts surrounding the internal reports and Compass' operations as outlined in the SEC Order. This is evident from the additional allegations and elaborative quotes contained in Plaintiffs' Complaint compared to the SEC Order. Thus, Plaintiffs did not wholly shirk their duty to investigate under Rule 11 like the plaintiff did in *Amorosa*. Finally, having corroborated the events contained in the SEC Order, Plaintiffs justifiably believe that the specific facts stated in the SEC Order—issued after a lengthy governmental investigation—will likely have a basis in evidence after a reasonable opportunity for discovery. To quote the *In re Teva* court, "Rule 11 requires nothing more." Accordingly, the Court denies Defendants' Motion to Strike.

**B.      Defendants' Motion to Dismiss Plaintiffs' claim for violation of Section 10(b) and Rule 10b-5**

To state a claim for violating Section 10(b) and Rule 10b-5, a plaintiff must plead facts showing:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of

-18-

securities; (3) *the defendant acted with scienter, that is, with intent to defraud or recklessness*; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.[36]

"Though [courts] view the allegations favorably to the plaintiffs, federal law creates a heavy burden on claimants alleging securities fraud."[37]  This is because securities fraud claims are governed by the PSLRA, which imposes a heightened standard for pleading falsity and scienter.[38]  Under the PSLRA, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed."[39]

Defendants attack Plaintiffs' claims on several grounds: lack of falsity, lack of scienter, and failure to file in time.  The Court will address each in turn.

### 1.    *Falsity*

For each of the alleged misrepresentations, Defendants claim that Plaintiffs fail to plead falsity with sufficient particularity to state a claim under the PSLRA.  "A statement may be deemed false, for the purpose of an allegation surviving a motion to dismiss, if a reasonable person would understand that a statement is inconsistent with the facts on the ground."[40]  "In reviewing the sufficiency of a plaintiff's pleadings, [courts] evaluate the facts alleged in a complaint to determine

---

[36] *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1200 (10th Cir. 2015) (*quoting In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012)) (emphasis in original).

[37] *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.,* 79 F.4th 1209, 1216 (10th Cir. 2023)

[38] *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1298 (10th Cir. 2018) (citing 15 U.S.C. § 78u-4(b)(1)–(2)).

[39] 15 U.S.C. § 78u-4(b)(1).

[40] *Anderson v. Spirit AeroSystems Holdings, Inc.*, 105 F. Supp. 3d 1246 (D. Kan. 2015), *aff'd*, 827 F.3d 1229 (10th Cir. 2016), as amended (July 6, 2016).

whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading."[41]   To evaluate a complaint's sufficiency, courts examine six factors:

> (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.[42]

When alleging falsity, the Tenth Circuit does not require plaintiffs to cite the sources from which they learned about each pleaded fact.[43]   Rather, those facts may be pleaded "based on information and belief."[44] Providing those sources within the complaint, however, may support a conclusion that a reasonable person would have found those statements misleading.[45]   This is especially true when the alleged facts "may be sufficiently ambiguous or indistinct so that disclosure of source information is required before they lend measurable support to a reasonable belief in the misleading nature of a defendant's statements"—for example, allegations of a secret meeting between defendants.[46]   However, allegations that are "objectively verifiable by defendant" do not require the plaintiff to plead the information's source in order to support a reasonable belief that the defendant made misleading statements.[47]

---

[41] *Hampton,* 897 F.3d at 1298 (cleaned up) (further citation omitted).

[42] *Adams,* 340 F.3d at 1099.

[43] *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1102 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003)

[44] *Id.* at 1105.

[45] *See id.* at 1102–03.

[46] *Id.* at 1102.

[47] *Id.*; *see also In re Level 3*, 667 F.3d at 1340 (discussing the phrase "objectively verifiable" within context of materiality analysis); *Hampton*, 897 F.3d at 1299 ("The PSLRA did heighten the standard of pleading securities fraud, however, and where a plaintiff does not identify the sources of the facts stated in the complaint, the facts alleged

Still, not every false statement is material such that it is actionable under the PSLRA. Rather, statements or omissions are material only "if a reasonable investor would consider it important in determining whether to buy or sell stock."[48]  Examples of immaterial statements include "puffery" and "rosy affirmations."[49]

Straddling the fine line between material and immaterial are statements of opinion, statements of corporate optimism, and forward-looking statements.  These statements are generally protected under the PSLRA's safe harbor provisions or the common law bespeaks-caution doctrine[50].  Normally, statements within these categories will not rise to the level of materiality required to state a claim under the PSLRA.[51]  But there are exceptions.

First, statements of corporate optimism—i.e., puffery—"are generalized statements of optimism that are not capable of objective verification."[52]  Such "[v]ague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions."[53]  Examples include statements such as "[we] will make meaningful progress" and "[integration] is progressing well."  Nevertheless, some statements may "cross the line from corporate optimism and puffery to objectively verifiable matters of fact."[54]  For example, the Tenth Circuit has considered statements that a corporation is "ahead of plan," "under budget," "generally

---

will usually have to be particularly detailed, numerous, plausible, or objectively verifiable by the defendant before they will support a reasonable belief that the defendant's statements were false or misleading.") (cleaned up).

[48] *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir.1997).

[49] *In re Level 3*, 667 F.3d at 1340.

[50] *See SEC v. GenAudio Inc.*, 32 F.4th 902, 927–29 (10th Cir. 2022); *Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 870 (D. Kan. 2019) (citing 15 U.S.C. § 78u-5(c)).

[51] *See GenAudio Inc.*, 32 F.4th at 927–29.

[52] *Id.* at 927 (further citation and quotations omitted).

[53] *Id.* (further citation and quotations omitted).

[54] *In re Level 3*, 667 F.3d at 1340.

done, substantially done, by that I mean 85%, 90% done," or that "[m]ost of the physical integration of [the new system] is now complete" to be objectively verifiable such that they are not corporate optimism but actionable statements under the PSLRA.[55]

Similarly, statements of an individual's opinion are usually immaterial.[56]  But an opinion can cross the line into materiality "if the speaker omits material facts that make the statements misleading to would-be reasonable investors."[57]   Furthermore, those statements "may be actionable if the opinion is known by the speaker at the time it is expressed to be untrue or to have no reasonable basis in fact."[58]

Another exception to liability is the "bespeaks caution" doctrine.[59]  This doctrine applies to otherwise misleading forward-looking statements "when the defendant has provided sufficiently specific risk disclosures or other cautionary statements to nullify any potentially misleading effect."[60]  To apply this doctrine, courts "look for evidence of general, forward looking projections dealing with subjects that *were dealt with in much greater detail in the cautionary sections* of the registration statement and amendments thereto."[61]   That is, "the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which the

---

[55] *Id.*

[56] *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184 (2015).

[57] *See GenAudio*, 32 F.4th at 925; *see also Omnicare*, 575 U.S. at 188 ("[A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view.  And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience.").

[58] *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 n.6 (10th Cir. 1997) (citing *Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1093–94 (1991)).

[59] *See id.*, 120 F.3d at 1122 (applying the bespeaks cautions doctrine to securities fraud claims).

[60] *See GenAudio Inc.*, 32 F.4th at 928 (cleaned up) (citation omitted).

[61] *Id.* (cleaned up) (citation omitted) (emphasis in original).

plaintiffs challenge."[62]   Of course, "cautionary language does not protect material misrepresentations or omissions when defendants knew they were false when made."[63]

Finally, the safe harbor provision of the PSLRA, 15 U.S.C. § 78u-5(c), essentially adopts the "bespeaks-caution" doctrine.  That is, it excludes from actionable statements any forward-looking statements that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."[64]  Oral forward-looking statements are treated similarly and are exempt under the PLRSA:

> (A) if the oral forward-looking statement is accompanied by a cautionary statement--
>
>> (i) that the particular oral statement is a forward-looking statement; and
>>
>> (ii) that the actual results might differ materially from those projected in the forward-looking statement; and
>
> (B) if--
>
>> (i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;
>>
>> (ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and
>>
>> (iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).[65]

---

[62] *Id.* at 929 (citation omitted).

[63] *Id.* (citation omitted).

[64] 15 U.S.C. § 78u-5(c)(1)(A)(i); *see also Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864 (D. Kan. 2019) (addressing § 78u-5(c)'s safe harbor provision and "bespeaks caution" doctrine together).

[65] *Id.* § 78u-5(c)(2).

Like the bespeaks caution doctrine, the PSLRA's safe harbor provision will not apply to statements "made with actual knowledge by that person that the statement was false or misleading."[66]

Taken together, Plaintiffs' pleaded facts showing falsity are detailed, numerous, coherent, and plausible.  Nevertheless, Defendants assert four reasons why the alleged misleading statements are unactionable: (1) the statements were not materially misleading in the context of accompanying warnings because of the PSLRA's safe harbor and the bespeaks caution doctrine; (2) the allegedly false statements are puffery; (3) the statements were all unactionable forward-looking statements and statements of opinion; (4) Plaintiffs fail to allege the misrepresentations with the requisite particularity.

Defendants also divide the statements made after October 31, 2017, into six categories: (1) expected cost-savings from the CMCH system; (2) realized cost savings from the CMCH system; (3) Goderich's annual production capacity; (4) the reasons for increased costs and production constraints; (5) "current salt production levels" at Goderich; and (6) omissions regarding production trends at Goderich.  The Court will address each in turn.

### a. Expected cost-savings

Defendants first attack Plaintiffs' allegations relating to the expected cost-savings at Goderich, consistently advertised by Defendants as $30 million in annual savings.

On October 31, 2017, Malecha stated, "Our cost-savings plan initiated in July . . . is on track. . . .  These savings are in addition to the $30 million in cost reductions we expect to achieve in 2018 from our investment in continuous mining at Goderich."

---

[66] *Id.* § 78u-5(c)(1)(B)(i); *see also Simmons Invs., Inc. v. Conversational Computing Corp.*, 2011 WL 673759, at *5 (D. Kan. 2011) (holding PSLRA safe harbor provision did not apply when plaintiff pleaded facts showing that defendants had knew the statement was false, even though it was accompanied by cautionary statements).

On February 14, 2018, when addressing delays in ramping up the CMCH system at Goderich, Malecha stated that Compass was "to achieve the $30 million run rate of savings by the end of 2018.  This means that we expect the full $30 million of savings to come through in 2019." At the same time, Standen stated, "By the end of 2018, we expect to reach our $30 million savings run rate with 2019 being the first full year of savings."

On February 27, 2018, Compass filed the 2017 Form 10-K which stated, "[W]e expect [CMCH] to generate annual cost savings of approximately $15 million in 2018 and $30 million in 2019 if all efficiencies are realized."

Finally, on May 16, 2018, Standen stated:

> With our cost savings and efficiency projects, we have identified approximately $40 million in annualized cost reductions within the salt segment. These savings are expected to come from technology enhancements at our Goderich mine with the introduction of continuous mining and haulage, as well as various other efficiency programs at this mine and throughout the other salt operations.

Plaintiffs argue that each of these statements are false because as early as April 2017, Defendants had reviewed internal reports and costs estimates showing that Compass would achieve merely $18 million in direct annual savings based on the CMCH system.  Defendants further reduced that projected figure to $13 million by August 2017.  Thus, even under a best-case-scenario of the Goderich mine producing 7.5 million tons per year, the CMCH system would never generate the previously expected $30 million in savings.

The Court finds that the misstatements are pleaded with sufficient particularity.  Plaintiffs have identified the time, place, speaker, and content of each misrepresentation.  Likewise, the facts showing falsity—that the annual cost savings from the CMCH system would only ever amount to $13 million—are specific and objectively verifiable such that naming the source of these facts is unnecessary.  And the Court concludes that that a reasonable investor would consider statements

stating that Compass expected $30 million in cost savings—a figure which translates directly to profits—important in determining whether to buy or sell Compass's stock.   Thus, the above statements are material for the purposes of Section 10(b) and Rule 10b-5.

Defendants protest on several grounds.   First, they argue that "on track" and other similar statements are too vague to be more than mere corporate puffery.   But this ignores the very specific statements that Malecha and Standen made stating that they expected $30 million in savings from the CMCH system.   The "on track" and other arguable puffery statements served only to strengthen this conclusion without dissolving the actionable basis for Plaintiffs' claims.

Second, Defendants argue that the PSLRA's safe harbor provision applies because the statements were forward-looking and accompanied by cautionary statements.   However, Plaintiffs allege facts plausibly showing that Defendants knew as of August 2017 that the CMCH system was never going to result in $30 million in direct savings.   Thus, the PSLRA's safe harbor does not apply.

Third, Defendants contend that these statements are mere statements of opinion, placing on Plaintiff an even higher pleading standard.   Even assuming arguendo that Defendants' statements were statements of opinion, Plaintiffs plead that the purported $30 million in savings from the CMCH system had no basis in fact.   Neither achieving the maximum output at Goderich nor increasing realized efficiencies would result in more than $13 million in annual savings.   With no reasonable basis in fact, Defendants' statements are actionable under the PSLRA even if they were statements of opinion.

Finally, Defendants address Standen's statement on May 16, 2018, that Compass would realize "approximately $40 million in annualized cost reductions within the salt segment." Defendants contend that this statement refers to the CMCH system without relying on it

exclusively.  And Plaintiffs offer no particular facts showing that the $40 million figure in overall savings is false.  Therefore, the Court finds that Plaintiffs do not plead with particularity facts showing that the May 16 statement is actionable.

> b.   Realized cost savings

Next, Defendants challenge statements made regarding Compass's realized cost savings. On February 14, 2018, Standen stated, "We already achieved about $5 million of savings in 2017 when we finished installing the fourth [CMCH] mining system and completely stopped drilling and blasting in the fourth quarter."  The same day, Malecha stated "[W]e have already achieved some 2017 cost savings from the continuous miners."

On May 16, 2018, Standen said that Compass had already achieved $15 million in annualized savings through the first quarter of 2018.  However, he accredited the savings to "broad-based streamlining in addition to some of the initial savings from the transition to continuous mining and haulage."  That same day, one of Standen's presentation slides stated that Compass had "[a]chieved ~$13 million in annualized salt business savings as of end of 2017[.]" Standen echoed the substance of those statements on June 12, 2018.

On September 12, 2018, Sepich stated:

Specifically, at Goderich, I'm referring to moving the entire production of the mine to a continuous mining and continuous haulage operation. We, in fact, ended all drilling and blasting at that mine in November of 2017 and are now ramping up at our targeted operating rates. As of the end of the second quarter of 2018, we've achieved a run rate of $15 million in ongoing annualized savings from these efforts.

Plaintiffs allege that each of these statements are false because they fail to account for the increased operational costs at the Goderich mine and improperly attributed the "realized savings" to the CMCH system.  For example, Plaintiffs allege that internal documents show that in 2017 Compass had only achieved $1.1 million in savings from using the CMCH system, and that

occurred only because Compass stopped purchasing explosives.  The remaining $3.9 million came from cost-cutting elsewhere.  Furthermore, Plaintiffs allege that this figure wholly failed to consider the extra $4 million in maintenance and repair costs to the CMCH system, $600,000 in penalties to customers because of lower salt quality resulting from the CMCH system, and $5 million in purchasing salt from third party vendors to meet its contractual obligations after the Goderich mine's production shortfalls.  These figures demonstrate that, during 2017, Compass suffered a direct loss of $8.5 million due to the CMCH system and an overall loss of $4.6 million considering Compass's other savings.  And this is without considering the additional $9 million filtering system Compass purchased to address salt quality issues caused by the CMCH equipment.  As pleaded, Plaintiffs' fact plausibly show that Defendants' statement that the CMCH system resulted in $5 million in savings for 2017 is false.

Regarding the $15 million in cost savings from 2018, Plaintiffs allege that the CMCH system was overall increasing costs at the Goderich mine, thus offsetting any purported savings.  However, Plaintiffs do not allege any factual details to support this statement—for example, from where those savings came, the amount in increased costs from the CMCH system, etc.  Therefore, the Court concludes that Plaintiffs have failed to allege falsity as to these statements with the requisite particularity required under the PSLRA.

As to Malecha's statement regarding the $5 million in realized cost savings for 2017, Defendants only challenge is that Plaintiffs fail to plead sufficient factual detail about the internal documents containing the information on which Plaintiffs rely to show falsity.  However, this is not required under Tenth Circuit law.  Furthermore, Plaintiffs plead several objectively verifiable facts which detail Compass's extra expenses resulting from the CMCH system.  All told, those expenses dramatically offset and overcome any "savings" CMCH may have realized from ceasing

to purchase explosives. The losses also outweigh the remaining $3.9 million in savings from other sources by $4.6 million. Doubtless, a reasonable investor would consider the impact of the CMCH system on Compass's profitability in deciding whether to invest. Thus, Plaintiffs have adequately pled that Malecha's statement regarding Compass's $5 million in savings was false.

        c.     Annual production capacity

In this category, Plaintiffs allege only one statement. On February 27, 2018, Defendants filed their Form 10-K for the 2017 fiscal year. Within the Form, Defendants estimated that the Goderich mine had the "annual production capacity" to produce eight million tons of salt. Defendants defined annual production capacity as "our estimate of the tons that can be produced assuming a normal amount of scheduled down time and operation of our facilities under normal working conditions, including staffing levels, based on actual historical production rates." Furthermore, Defendants stated "[a]s we introduce new production methods, such as continuous mining at our Goderich salt mine, we will update our estimates if necessary as new production data become available."

Plaintiffs argue that a reasonable investor would have understood "annual production capacity" to refer to the current amount of salt being produced at the Goderich mine with the CMCH system. During 2017, Goderich produced on 5.2 million tons of salt, a far cry from the advertised eight million. Thus, omitting the actual number of tons produced and instead substituting "historical production rates" was materially misleading.

The Court agrees with Plaintiffs. By listing the Goderich mine's capacity as eight million tons annually, Defendants sent a clear message to investors that the Goderich mine could produce eight million tons in 2017 as well. Simply put, this was not the case. Accordingly, the statement was misleading. Had Compass qualified its reliance on "historical production rates" by disclosing

that the Goderich mine was not presently capable of producing eight million tons, it would be a different story.  As it stands, failing to disclose Goderich's true production capacity during 2017 was a material omission.  Accordingly, Plaintiffs have adequately pled falsity regarding Defendants' Form 10-K statement about the Goderich mine's annual production capacity.

     d.  Reasons for increased costs and production constraints

   This group of alleged misstatements focuses on the reasons Defendants gave to investors as to why the Goderich mine experienced increased costs and lowered production from February to September of 2018—namely, a ceiling fall in September 2017, a labor strike in 2018, and the mine's geology.  At various times, Defendants claimed that these occurrences prevented Compass from reaching its forecasted $30 million in savings from the CMCH system in 2018, reducing earnings by $20 million for the first quarter of 2018, and creating a production shortfall at Goderich.

   To show these representations are false, Plaintiffs allege that the ceiling fall only impacted Compass's earnings in the amount of $3 million.  The remaining $17 million in reduced earnings stemmed directly from the CMCH systema and operational issues at Goderich.  Furthermore, the labor strike accounted from only 20% of the production shortfall in 2017 and 31% of the production shortfall in 2018.  The remainder came from the CMCH system and its inefficiencies. Finally, Plaintiffs allege that the salt quality issues had nothing to do with the mine's geology but rather resulted from the CMCH system producing finer salt than required by Compass's contracts.

   As always, Defendants begin by attacking the particularity of these pleaded facts.  But even though Plaintiffs do not reveal the sources of these facts, they are all objectively verifiable, detailed allegations giving rise to the plausible conclusion that Defendants' statements were misleading. Thus, Defendants' argument fails on this ground.

Next, Defendants claim that the statements were non-exhaustive lists, vague, and unintended to specify every reason for the increased costs or production constraints. But the statements on which Plaintiffs rely are more specific than Defendants imply. For example, Standen's statement on May 2, 2018, directly attributed $20 million in additional costs to the ceiling fall without attributing any costs to the CMCH system. That same day, Malecha explicitly denied that any quality issues with the sale produced resulted from the CMCH equipment. Instead, Malecha blamed the geology of the mine, thus omitting the fact that CMCH system was making the salt too fine to meet contractual specifications.

Likewise, Defendants' statements on August 7, 2018, referenced the labor strike as the reason behind production shortage and failed to include the CMCH system as a contributing factor. Given that the labor strike caused less than a third of the shortfall in both 2017 and 2018 compared with CMCH's failures resulting in more than two-thirds of the shortfall, wholly blaming the labor strike was a materially misleading.

Finally, Standen addressed the "depressed production levels" at the Goderich mine on August 13, 2018. At that time, Standen blamed these levels completely on the ceiling fall and the strike, assuring investors that "those items would generally non-repeat."

Taken together, these statements paint an inaccurate picture of the CMCH system as a cost-savings, production-enhancing asset while ignoring the difficulties it caused Compass at the time. A reasonable investor might plausibly rely on this mischaracterization of the CMCH system's success in deciding whether to buy or sell Compass's stock. Thus, the Court finds that Plaintiffs plausibly plead falsity as to these statements.

e.    Current salt production levels

The only statement regarding salt production levels comes from Sepich's comment on September 12, 2018.  He stated that Compass was "about 75% of the way to our target rates" at the Goderich mine and Compass's efforts to "move from 75% production at Goderich up to that 100%."  When he said that, Sepich was displaying to investors a graph showing a target production rate of 600,000 tons of salt per month, with an arrow pointing to "Current production rate."  Afterward, Standen repeated that Compass was at "75% production at Goderich" with the goal of moving up to 100%.



Plaintiffs allege that at the time Sepich and Standen made these statements, the Goderich mine had been producing an average of 314,000 tons per month from April 2018 to August 2018. Specifically, in August, the mine had only produced 332,000 tons.  Furthermore, it was on track to produce less than 225,000 tons in September, although it ended up producing 346,000 tons.

Defendants argue that the "broader context of the statement" shows that "75% of the way to our target rates" reflects "that the Company was 75% of the way towards completing CMCH implementation, not that it had reached 75% of the disclosed production target at the mine."  This argument is borderline frivolous.

The clearly marked Y-axis of the graph says "Tons Produced," not "CMCH Implementation." Also, Sepich's referral to "target rates" matches "Target 600k tons/month" on the graph such that a reasonable investor could only infer that Sepich was referring to the number of tons being produced at Goderich. Thus, the most logical conclusion is that Sepich represented that the Goderich mine was producing 450,000 tons in September 2018. The same reasoning applies to Standen's statement that Compass had achieved 75% production at Goderich. Under the facts pleaded by Plaintiffs, this was not the case. Therefore, Plaintiffs have plausibly alleged falsity as to these statements.

       f.      Trends relating to salt production

Lastly, Plaintiffs allege that Defendants failed to disclose material trends about salt production in violation of Item 303 of Regulation S-K ("SK-303").[67] "Item 303 of Regulation S–K requires disclosure in offering documents of, among other things . . . any 'known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.'"[68]

Citing a Ninth Circuit case,[69] Defendants contend that "Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5"[70] and cannot create a basis for liability for a private action. The Ninth Circuit, however, based its ruling on the Third Circuit's decision in *Oran v. Stafford*.[71] There, the Third Circuit—in an opinion written by then-Judge Alito—

---

[67] 17 C.F.R. § 229.303(b)(2)(ii).

[68] 719 F.3d 1190, 1197 (10th Cir. 2013) (quoting 17 C.F.R. § 229.303(b)(2)(iii)).

[69] *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014).

[70] *Id.* at 1056.

[71] 226 F.3d 275 (3d Cir. 2000).

discussed whether a violation of SK-303 automatically resulted in liability under Section 10-b.[72] Ultimately, it concluded that "the materiality standards for Rule 10b–5 and SK–303 differ significantly."[73]   Under SK-303, management must disclose every "known trend, demand, commitment, event or uncertainty" that is "reasonably likely to occur."[74]   In contrast, disclosure under Section 10-b requires "a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity."[75]  Given the broader language contained in SK-303, "SK–303's disclosure obligations extend considerably beyond those required by Rule 10b–5."[76]   Accordingly, the Third Circuit determined that "a violation of SK-303's reporting requirements does not *automatically* give rise to a material omission under Rule 10b-5."[77]

Since *Oran*, only the Ninth Circuit has held that a violation of SK-303 can *never* form the basis for liability under Section 10-b.[78]   In contrast, the Second and Eleventh Circuits have both held that violations of SK-303 may lead to liability under Section 10-b "so long as the omission is material under [Section 10-b's test], and the other elements of Rule 10b-5 have been established."[79]

---

[72] *Id.* at 287–89

[73] *Id.* at 288.

[74]  *Id.* at 287 (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, Exchange Act Release No. 34-26831, 54 Fed. Reg. 22427, 22430 (May 24, 1989)).

[75] *Id.* at 288 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 237 (1988)) (further citation omitted).

[76] *Id.*

[77] *Id.* (emphasis added).

[78] *See In re NVIDIA*, 768 F.3d at 1056.

[79] *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 103–04 (2d Cir. 2015); *accord Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1331 (11th Cir. 2019); *see also In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *17–18 (S.D. Ohio 2023) (summarizing current state of law on this issue).

The Tenth Circuit has not weighed in on this issue.  The closest it came was in *Indiana Public Retirement System v. Pluralsight, Inc.*,[80] where the Tenth Circuit remanded the case to the district court to address whether SK-303 violations "can give rise to Rule 10b-5 liability."[81]  The district court has not yet issued any further rulings in that case.

Here, the Court is persuaded by the Second and Eleventh Circuits' reasoning.  The circuit courts to have addressed this issue recognize "that a duty to disclose under Section 10(b) can derive from statutes or regulations that obligate a party to speak."[82]  Although the disclosure duties under Section 10-b and SK-303 are not identical, they are compatible.  Accordingly, violations of SK-303 *may* form the basis for a liability under Section 10-b, but the appropriate standard for such claims derives from Section 10-b.  Thus, the parties' citations and arguments under SK-303's standards are inapposite to this case.

To establish Section 10-b liability for omissions, "the plaintiff must show that the defendant had a duty to disclose the omitted information."[83]  Rule 10b-5 requires disclosure of "material fact[s] necessary in order to make the statements made . . . not misleading."[84]  Thus, corporations have a duty to disclose if "the omitted fact is material to the statement in that it alters the meaning of the statement."[85]  An omission is material "when there is a substantial likelihood

---

[80] 45 F.4th 1236 (10th Cir. 2022).

[81] *Id.* at 1270.

[82] *Stratte-McClure*, 776 F.3d 94, 102 (2d Cir. 2015) (citing *Glazer v. Formica Corp.*, 964 F.2d 149 (2d Cir. 1992); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990); *Oran*, 226 F.3d at 285–86; *Gallagher v. Abbott Lab'ys*, 269 F.3d 806 (7th Cir. 2001)).

[83] *Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1162 (10th Cir. 2018).

[84] *Id.* (quoting 17 C.F.R. § 240.10b-5).

[85] *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (internal quotation marks omitted).

that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."[86]

Here, Plaintiffs allege that Compass failed to report that (1) the Goderich mine was failing to produce the quantity of salt that Compass Minerals' business required by increasingly large amounts; (2) these production shortfalls were primarily due to the CMCH system underperforming Compass Minerals' expectations; and (3) these production shortfalls were resulting in higher unit costs that materially reduced the Company's earnings and income from continuing operations.  In support of these sweeping statements, Plaintiffs allege that Goderich produced 800,000 fewer tons of salt than projected in 2016, followed by 1.5 million fewer tons in 2017, and a shortfall of 2.4 million tons in 2018.  That last number paints only part of the picture because Compass reduced its expectations each successive year.  In total, the Goderich mine produced less than four million tons of salt in 2018, slightly more than half of what it was producing prior to the installation of the CMCH equipment.  While Defendants blamed the strike and the ceiling fall for the mine's shortcomings, the CMCH was mostly responsible.

Plaintiffs also allege that the increased unit costs due to these shortfalls reduced Compass's income by 8% in 2016, 15% in 2017, and 41% in 2018.  From these facts, Plaintiffs infer that the CMCH system had a material trend of reducing production rates and increasing costs for three consecutive years.

Defendants first argue that the consistent data collected over a three-year period does not constitute a "trend" but rather a temporary problem.  Defendants point to the fact that Compass apparently rectified the problem by purchasing larger CMCH machines in 2019. The Court is unconvinced.

---

[86] *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).

Three years is more than sufficient to constitute a trend within any reasonable understanding of the term.[87]  Furthermore, Defendants' own argument—that the "temporary" issue was solved when Compass purchased new equipment—supports the fact that the trend was likely to continue had Compass not purchased newer and larger equipment.  This purchase—combined with other factors discussed below in the scienter analysis—likewise supports the fact that Defendants knew about the trend.

Furthermore, there is no doubt that this omission was material.  Had the Goderich mine's trend toward diminished salt production and lower profitability been disclosed, that information would have significantly impacted investors' perception.  As evidenced by the extreme drop in Compass's stock shares when Malecha partially revealed the true state of the CMCH system on October 23, 2018, a reasonable investor would consider this information relevant in determining whether to buy Compass's stock.  Thus, disclosure of this trend was necessary to make other statements in Compass's filings, such as statements about Goderich's annual production capacity, not materially misleading.  Accordingly, the Court finds that Plaintiffs sufficiently plead falsity because Defendants omitted material trends, violating their duty to disclose under SK-303.

### 2.  Scienter

To establish the third element under the PSLRA, plaintiffs must "state with particularity facts giving rise to a *strong* inference that the defendants acted with scienter."[88]  In the corporate context, "[t]he scienter of the senior controlling officers of a corporation may be attributed to the

---

[87] *See, e.g.*, *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019) (holding nine months sufficient to establish trend and distinguishing cases where two or five months was insufficient) (further citations omitted).

[88] *Meitav Dash*, 79 F.4th at 1216 (cleaned up) (emphasis in original) (quoting 15 U.S.C. § 78u–4(b)(2)(A)).

corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority."[89]

While fraudulent intent is self-explanatory, the Tenth Circuit defines recklessness as "(1) act[ing] in 'an extreme departure from the standards of ordinary care' and (2) present[ing] a danger of misleading buyers or sellers that was [ ] known to the defendants or [ ] so obvious that the defendants must have been aware of the danger."[90]   Thus, "[i]n the securities-fraud context, recklessness is akin to conscious disregard—allegations of negligence or even gross negligence fall below the high threshold for liability under Section 10(b) of the Exchange Act."[91]

"An inference of scienter need not be irrefutable, i.e., of the 'smoking-gun' genre."[92] Rather, courts "will draw a 'strong inference' of recklessness only if, based on plaintiff's allegations, 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"[93]   Accordingly, courts must consider "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff" when determining whether a plaintiff has adequately pleaded scienter.[94]   Furthermore, courts must analyze "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."[95]

---

[89] *Adams*, 340 F.3d at 1106 (citation omitted).

[90] *Anderson*, 827 F.3d at 1237 (quoting *In re Level 3*, 667 F.3d at 1343 n.12).

[91] *Smallen v. W. Union Co.*, 950 F.3d 1297, 1305 (10th Cir. 2020) (further citation and quotations omitted).

[92] *Id.* at 1305 (further citation and quotations omitted).

[93] *In re Level 3*, 667 F.3d 1331, 1343 (10th Cir. 2012) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).

[94] *Smallen*, 950 F.3d at 1305 (quoting *Tellabs*, 551 U.S. at 323–24).

[95] *Id.*

Defendants argue that each individual fact Plaintiffs plead alone are insufficient to establish scienter. Although this argument is facially correct, it misses the mark. Rather, when taking all of Plaintiffs' allegations together, the Court finds that they establish a cogent inference of scienter that is at least as compelling as any alternative inferences.

### a.    Malecha's statements before and after the Class Period

Plaintiffs first point to Compass's April 2017 presentation to executives which stated that "the move to [CMCH] has not met expectations and forecasts," and Goderich "has not been able to maintain consistent production." At that time, Malecha informed the rest of the Compass Minerals' Board that "[w]e have not made the progress required on safety, continuous mining, and production reliability." This statement directly shows that at least in April 2017, Malecha knew the CMCH system was not performing in line with broadcasted expectations.

Similarly, Malecha's statement on October 23, 2018, that "the pace of improvement continues to be slower than expected since the end of the strike"—resulting in a $15 million loss for the third quarter of 2018—shows his knowledge of the sad state of the CMCH system at that time. It also heavily implies that Malecha knew about the *continuous* slower than expected improvements to the system during the Class Period, despite never revealing that fact to shareholders. Thus, both before and after the Class Period, Plaintiffs allege facts showing Malecha's knowledge of the failure of the CMCH system to generate the anticipated savings. Malecha's statements, while alone insufficient, favor finding that he acted with scienter during the Class Period.

### b.    Internal reports

Next, Plaintiffs point to Defendants' positions within Compass and access to internal reports to show scienter. The Tenth Circuit has held that "divergence between internal reports and

external statements on the same subject and disregard of the most current factual information before making statements can be factors supporting scienter."[96]

For example, in *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*,[97] the plaintiffs contended that the individual defendants—high level executives at Spirit AeroSystems Holdings, Inc.—had the requisite scienter by virtue of access to internal reports.[98]   The Tenth Circuit acknowledged "[f]or the sake of argument . . . that access to contradictory information can sometimes contribute to a strong inference of scienter."[99]   Even so, it noted that "it's not enough for the plaintiffs to allege briefings to a speaker on the underlying data or the speaker's access to internal reports."[100]   Simply put, "an executive's position in the company doesn't show knowledge of specific facts."[101]   If access to internal reports is the sole basis for scienter, "[a] plaintiff must thus allege facts with particularity showing not only the executive's access to contradictory information but also the executive's fraudulent intent or reckless disregard of accessible information."[102]

During the Class Period itself, Plaintiffs do not allege any statements by any of the individual Defendants revealing direct knowledge.   Rather, they infer Defendants' scienter from the unnamed internal reports provided to Malecha and Standen.   Without any additional

---

[96] *In re Level 3*, 667 F.3d at 1345 (further citation and quotations omitted).

[97] 79 F.4th 1209 (10th Cir. 2023)

[98] *See id.* at 1216–17.

[99] *Id.* at 1216.

[100] *Id.*

[101] *Id.* at 1217.

[102] *Id.*; *accord In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1245 (10th Cir. 2012) ("In short, the fact that a close reading of some of defendants' progress estimates suggests that they may have been inconsistent with a few internal reports does not lead us to a strong inference that defendants' statements were intentionally fraudulent or extremely reckless.").

allegations, Defendants' access to internal reports is alone insufficient to establish a strong inference of scienter.

Nevertheless, the internal reports consistently contained facts contrary to representations Defendants made for well over a year. Likewise, Defendants' repeated disregard of the most current factual information before making their misrepresentations favors finding scienter. Finally, the Court considers these internal reports alongside Malecha's statements to the Board, which showed he knew that the CMCH system was a financial failure at least before and after the Class Period. As alleged, the facts show that was also true during the class period. Thus, taking all of the facts together, Defendants' access to internal reports supports the inference that they acted with scienter during the Class Period.

### c. Defendants' executive positions

The Tenth Circuit has held that the fact that a defendant "was the most senior executive of the Company is a fact relevant in our weighing of the totality of the allegations."[103] Elsewhere, the Tenth Circuit has stated, "[t]he executives' positions . . . would help establish whether they should have known that particular cost projections were unrealistic."[104] However, "additional particularized facts are necessary for an inference of scienter."[105]

Here, Plaintiffs allege that during the Class Period, Malecha served as Compass's CEO, President, and Director, Standen was Compass's CFO, and Sepich was the Senior Vice President of Compass's salt segment. These are all top-level executive positions which alone cannot show that the Individual Defendants had the requisite scienter. Nevertheless, their executive positions

---

[103] *Adams*, 340 F.3d at 1106 (citation omitted) (discussing Meitav).

[104] *Anderson*, 827 F.3d at 1245.

[105] *Id.*

support the inference that they would have known about the contents of the internal reports and the status of the CMCH system.  This is a particularly strong inference regarding Sepich because he was the chief executive of Compass's salt segment and thus more closely involved with the Goderich mine.  Furthermore, Plaintiffs allege that most of Defendants' misrepresentations were scripted speeches reviewed and approved by Compass's executives.  As executives speaking on Compass's behalf, it is reasonable to infer that Defendants would have made themselves aware of the underlying facts.  Thus, while insufficient to establish scienter alone, Defendants' executive positions support the inference of scienter.

### d. Importance of CMCH upgrade to Compass's business

Like every other factor discussed, the Tenth Circuit has held that business operations are relevant but insufficient standing alone to raise an inference of scienter.[106]  Here, Plaintiffs allege that the Goderich mine accounted for one-third of Compass's earnings during the Class Period.  It was also the largest single contributor to Compass's financials.  Plaintiffs further allege that "Defendants closely monitored all aspects of Goderich's operations, including the progress of the CMCH upgrade, realized and projected cost-savings from CMCH, salt production volume, and unit cost."  And the Defendants always emphasized the CMCH system and its projected savings in shareholders meetings and earning calls, often receiving questions from investors about the system.  The only reasonable conclusion is that Defendants were aware of the importance of the Goderich mine and the CMCH upgrade to Compass's overall value as a business.

Once again, the importance of the CMCH upgrade at the Goderich mine alone is insufficient to support a strong inference of scienter.  But the facts alleged show that it was very important both to Compass's business as a whole and thus to shareholders.  The individual

---

[106] *See Meitav*, 79 F.4th at 1222 (citing *Anderson*, 827 F.3d at 1245–46).

Defendants recognized this fact and regularly discussed it in earnings reports and shareholder meetings. And as determined above, many of the representations made about the CMCH system's success at those meetings were materially false. Thus, the CMCH system's importance to Compass and the individual Defendants increases the likelihood they stayed informed of developments at the Goderich mine.

### e.  Alternative means of reaching $30 million in cost savings

Another fact supporting the inference of scienter is that Defendants determined in April 2017 that they would need to implement additional as-of-then unidentified cost savings projects to reach $30 million in annualized savings. The only logical reason for doing this is that Defendants knew at that time that the CMCH system could not reach $30 million in savings by itself. And yet, Malecha and Standen continued to represent to shareholders that the CMCH system was on track to save $30 million annually. To be sure, Defendants reached this conclusion before the Class Period. It cannot by itself establish scienter. But the simple fact is that the CMCH system continuously trended towards losing more money for Compass until 2019 when Compass finally increased production by investing in larger machines. Thus, the natural inference is that Defendants knew the CMCH system was underperforming expectations throughout the Class Period. This is especially true because nothing occurred capable of changing their minds—rather, the CMCH continuously underperformed, increased costs, and failed to deliver savings for over a year and a half.

### f.  Competing inferences

Because Plaintiffs' claim arise under the PLSRA, the Court must consider not only Plaintiffs' inferences of scienter but also competing inferences of innocence. Defendants never submit a particular competing inference for this Court's consideration. Still, the obvious

competing inference would be Defendants' actual belief that the CMCH system was creating the savings they advertised—or at least gross negligence as to this fact.  A few factors support this inference.  First, Plaintiffs do not point to any financial incentive Defendants might have had in raising stock prices beyond normal incentives for executives in any business.  Although "scienter allegations may suffice even without a motive,"[107] "the absence of a motive allegation . . . is relevant" and may count against finding scienter.[108]  Second, Defendants cite the SEC Order in attempting to prove that they did not act with the requisite scienter.  But that legal conclusion contained within a consent order is irrelevant for the purposes of this Court's analysis.  Third, the consistency of the individual Defendants' statements might support an inference of their honestly, if negligently, held belief that their misstatements were true.  Finally, to the extent that it is relevant at all, the longstanding "internal weakness" in Compass's internal control over financial reporting supports the inference that Defendants may have been unaware of the actual financial state of the company.[109]

Defendants also highlight several warnings that accompanied the false statements as supporting the inference that Defendants lacked scienter.  But these warnings are largely generic and not specific to the CMCH system.  Rather, they are what any person would expect to find accompanying *any* statements from the executives of a mining corporation.  Thus, the Court does not consider them probative of innocence.

In sum, there is a reasonable competing inference of innocence or at least gross negligence.  However, the Court is not convinced that such inference is necessarily stronger than the cogent

---

[107] *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1152 (10th Cir. 2015)

[108] *In re Level 3*, 667 F.3d at 1347 (quoting *Tellabs*, 551 U.S. at 325) (quotations omitted).

[109] *See, e.g.*, *In re Molson Coors Beverage Co. Sec. Litig.*, 2020 WL 13499995, at *6 (D. Colo. 2020).

inference of scienter established by the particularized facts pleaded by Plaintiffs.  When viewed holistically, (1) the internal reports received by Defendants, (2) Defendants' executive positions, (3) the great importance of the CMCH upgrade and Goderich's production to Compass's business, (4) the lengthy period over which these misrepresentations took place, and (5) the undeterred trend of the CMCH system losing Compass money support a strong inference that Defendants either knew or should have known of the danger of misleading investors with their false statements.

Because Malecha and Standen were senior executives at Compass and acted within their official capacities when making their statements, the Court attributes their scienter to Compass itself.  Accordingly, the Court denies Defendants' Motion to Dismiss on this ground.

### 3.    Statute of limitations

Finally, Defendants argue that even if Plaintiffs sufficiently state a claim under the PSLRA, it is time barred by 28 U.S.C. § 1658(b)(1).  As stated above, the parties agree that § 1658(b)(2) blocks all claims occurring before October 21, 2017.  But § 1658(b)(1) also prevents plaintiffs from asserting claims more than "2 years after the discovery of the facts constituting the violation." From this language, Defendants argue that Plaintiffs should be time-barred from asserting their claims.  They assert that the reports of Compass's financial distress triggered a duty to investigate as of November 19, 2018, the date Compass terminated Malecha.  Plaintiffs' claims, filed on October 21, 2022, were accordingly out of time.

Statutes of limitations are affirmative defenses, which place the burden on the defendant.[110] "Typically, facts must be developed to support dismissing a case based on the statute of limitations."[111]  But if "the dates given in the complaint make clear that the right sued upon has

---

[110] See Herrera v. City of Espanola, 32 F.4th 980, 991 (10th Cir. 2022)

[111] Id.

been extinguished," then the statute of limitations becomes "a question of law suitable for resolution at the motion to dismiss stage."[112]

As interpreted by the Supreme Court, the limitation period under § 1658(b)(1) does not begin to run until the plaintiff discovers all the facts constituting the Section 10-b violation, including those facts showing falsity and scienter.[113]   However, the word "discovery" in § 1658(b)(1) refers not only to the formal legal process "but also those facts a reasonably diligent plaintiff would have known."[114]   Thus, the limitations period begins either when a plaintiff did discover all the requisite facts to state a claim or when a reasonable plaintiff would have done so.[115]

Therefore, in evaluating a statute of limitations challenge, courts must determine not only when the plaintiff discovered the underlying facts but also whether a reasonably diligent plaintiff would have discovered them sooner.[116]   Usually, a plaintiff's duty to investigate is triggered when the plaintiff is placed on "inquiry notice."[117]   "A plaintiff is on inquiry notice whenever circumstances exist that would lead a reasonable plaintiff of ordinary intelligence, through the exercise of reasonable due diligence, to discover his or her injury."[118]  But the date "inquiry notice" arises is separate from the date a reasonable plaintiff would discover the underlying facts.[119]  Thus,

---

[112] *Id.* (further citations and quotations omitted).

[113] *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010).

[114] *Id.*

[115] *See id.*

[116] *Id.* at 653; *see also Integrity Advance, LLC v. Consumer Fin. Prot. Bureau*, 48 F.4th 1161, 1172 (10th Cir. 2022), cert. denied, 143 S. Ct. 2610 (2023) (evaluating similar statute of limitations under Consumer Financial Protection Act of 2010).

[117] *See id.*

[118] *Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1280 (10th Cir. 2014) (further citation and brackets omitted).

[119] *Merck*, 559 U.S. at 653 ("We consequently find that the 'discovery' of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running of the limitations period.").

courts must conduct a fact-intensive inquiry to determine whether a reasonable plaintiff would have discovered the facts sooner than Plaintiffs did in this case.[120]

Here, Defendants' admissions in October 2018—and the accompanying decline in Compass's stock value—likely were sufficient to put Plaintiffs on inquiry notice as to Defendants' allegedly fraudulent conduct.  At that point, the clock started running for a reasonably diligent plaintiff to investigate Defendants' wrongdoing.  Furthermore, Plaintiffs "discovered" evidence regarding Defendants' falsity and scienter when the SEC issued its order on September 23, 2022, less than a month before filing this case.  Thus, the issue becomes whether a reasonable plaintiff would have discovered facts showing the falsity of Defendants' statements and accompanying scienter before September 23, 2022.

Defendants, however, fail to provide any analysis of when a "reasonable plaintiff" would have discovered the facts underlying each element of Plaintiffs' claims.  The Complaint is wholly unhelpful to Defendants' position, especially since Plaintiffs reference particularized facts contained internal documents, presentations, and communications to prove falsity.  These are not publicly available facts such that a reasonable investigator might discover them.[121]  Rather, it seems doubtful that a private party would obtain access to these internal documents absent the discovery process or governmental intervention.  And it seems just as unlikely that Plaintiffs would have been able to plead falsity with sufficient particularity without those facts.  Thus, the Court concludes, for the purposes of this Order, that Plaintiffs' claims became ripe on September 23, 2022, the date Plaintiffs discovered all the facts necessary to state their claims.  By filing their

---

[120] *See id.* at 652 (citing *Sterlin v. Biomune Systems*, 154 F.3d 1191, 1201 (10th Cir. 1998) as an example of a court determining when a reasonable plaintiff would have discovered the underlying facts).

[121] *See, e.g.*, *Integrity Advance*, 48 F.4th at 1174 ("Carnes hasn't identified what public information would have established his knowledge of Integrity's illegal conduct before then.").

Complaint mere weeks later, Plaintiffs brought their claims within the appropriate limitations period.  Thus, the Court denies Defendants' Motion on this ground.

## C.        Defendants' Motion to Dismiss Plaintiffs' claim for violation of Section 20(a)

Defendants also move to dismiss Plaintiffs' claim for violation of Section 20(a), which creates liability for controlling persons who violate other provisions of the Securities Exchange Act.[122]  Stating a claim for violation of Section 20(a) requires "(1) a primary violation of the securities laws and (2) control over the primary violator by the alleged controlling person."[123]

Defendants' entire argument for dismissal is that Plaintiffs' fail to plead an underlying violation of Section 10b-5 and Rule 10b-5.  As evident above, the Court disagreed with that conclusion.  Thus, the Court denies Defendants' Motion.

## D.        Defendants' Motion for Hearing

Given that the Court resolves all pending motions in this Order, a hearing is unnecessary. The Court therefore denies Defendants' Motion for Hearing as moot.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Strike (Doc. 26) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss (Doc. 26) is **GRANTED in part** and **DENIED in part**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Hearing (Doc. 39) is **DENIED** as moot.

---

[122] See 15 U.S.C.A. § 78t(a).

[123] *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1118 (10th Cir. 2015).

**IT IS SO ORDERED.**

Dated this 12th day of December, 2023.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE